## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELI LILLY AND COMPANY,
Lilly Corporate Center
Indianapolis, Indiana 46285,

and

LILLY USA, LLC,
Lilly Corporate Center
Indianapolis, Indiana 46285,

        *Plaintiffs*,

    v.

XAVIER BECERRA, in his official capacity
as Secretary of the U.S. Department of Health
and Human Services,
200 Independence Avenue SW
Washington, D.C. 20201,

The U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
200 Independence Avenue SW
Washington, D.C. 20201,

CAROLE JOHNSON, in her official capacity
as Administrator of the Health Resources and
Services Administration,
5600 Fishers Lane
Rockville, Maryland 20852,

and

The HEALTH RESOURCES AND
SERVICES ADMINISTRATION,
5600 Fishers Lane
Rockville, Maryland 20852,

        *Defendants*.

Case No.  1:24-cv-3220

## COMPLAINT

1.      This case involves the broken federal 340B program; Lilly's attempt to improve the program's integrity, consistent with the law; and the government's unlawful attempt to stop it.

2.      The 340B statute requires Lilly to sell its medicines at significantly reduced prices to specific categories of healthcare providers. At issue is *how* Lilly makes the 340B price available. The statute expressly provides for either up-front "discounts" *or* back-end "rebates." The government has never mandated either, and what's predominantly used today is a system of in-kind rebates. That system operates in the shadows, enables widespread abuse, and obstructs Lilly's ability to comply with federal law. To solve these problems, Lilly decided to offer the 340B price by paying cash instead. But the government unlawfully shut Lilly down before it could start—and without ever explaining why.

3.      Not all healthcare providers are eligible for 340B pricing. The 340B price is available only to a specific list of providers called "covered entities," which today includes about 60% of hospitals. These entities do not have to pass on the price reductions to their patients. That creates an arbitrage opportunity: covered entities can buy medicines at low prices (sometimes just pennies) and sell them for much more to patients and their insurers, including Medicare and Medicaid. Large hospitals and other covered entities pocket billions in profit from these transactions every year.

4.      Recognizing the potential for abuse, Congress imposed several conditions on the availability of 340B pricing. Among them is the duplicate-discount prohibition, which bars covered entities from requesting payment from a state Medicaid program for 340B-priced medicines. 42 U.S.C. § 256b(a)(5)(A)(i). Manufacturers pay state Medicaid programs rebates under a different federal program, so the duplicate-discount prohibition protects manufacturers from giving two significant mandatory price reductions for the same prescription—first by selling

reduced-price medicines to covered entities, and then again by paying a Medicaid rebate—and likely losing money on the sale. Another statutory guardrail prohibits a covered entity from dispensing 340B-priced drugs to individuals who are not their "patients." *Id.* § 256b(a)(5)(B).

5.     Early on, covered entities complied with these requirements by keeping their 340B inventory separate from their other inventory. By maintaining separate inventories, covered entities could verify in real time that 340B-priced medicine was *eligible* for dispensing—e.g., that the person receiving the prescription was not a Medicaid beneficiary and was a patient of the 340B provider. This assured manufacturers that dispensations of 340B medicines would comply with federal law.

6.     Over time, that assurance disappeared. Maintaining separate inventories was an administrative burden, so 340B providers sought alternatives. What emerged is a system of in-kind rebates called a "product replenishment model." It relies on an elaborate accounting fiction: (1) a package of medicine is purchased at market price; (2) that medicine is often dispensed in smaller quantities; (3) sometime later, covered entities or their vendors determine whether they believe prescriptions were 340B-eligible; (4) after filling enough prescriptions to equal a full package, a "replenishment" package is purchased at the 340B price; (5) the 340B-priced replenishment package is placed in general inventory; (6) that replenishment medicine is dispensed—regardless of whether the person filling the prescription is a patient of the 340B provider; and (7) the cycle begins anew.

7.     Only after this series of cumbersome steps and opaque transactions does 340B revenue trickle into the hands of covered entities—after for-profit third parties take their cut. The vast majority of these steps take place behind closed doors; the details of what purportedly triggered the 340B price, who is an eligible "patient," what happens to the "replenishment"

medicine, and who reaps the "spread" between the market price and the 340B price are all largely unknown.

8.    If that process sounds ripe for abuse, that's because it is. The Government Accountability Office has noted, for more than a decade, that the current system results in unchecked duplicate discounts. And it has noted that the government agency tasked with overseeing the 340B program, the Health Resources and Services Administration ("HRSA"), has no interest in detecting or stopping illegal duplicates. The agency has refused to issue guidance to covered entities on how to avoid duplicates in the largest part of Medicaid, and its audits of covered entities don't even look for them. Nevertheless, some estimate that illegal duplicates total more than *$2 billion* annually.

9.    And the problem is only going to get worse. The recently passed Inflation Reduction Act ("IRA") imposes a so-called Maximum Fair Price ("MFP") on medicines paid for by Medicare and obligates manufacturers to pay additional inflation rebates in Medicare Parts B and D. The new obligations overlap with 340B: manufacturers, by statute, must offer the lower of the MFP and 340B price, and pay inflation rebates only on non-340B-priced medicines. But the government has refused to take responsibility for de-duplicating claims and instead told manufacturers to develop their own de-duplication methods.

10.    Responding to that guidance, Lilly has been searching for a solution to these government-created compliance problems.

11.    When a prescription's eligibility for a lower price is known only after it is sold, the standard industry practice is to offer that lower price by providing a cash rebate. Indeed, HRSA has authorized the payment of cash rebates to commercial and government payers, including some 340B-covered entities known as AIDS Drug Assistance Programs ("ADAPs"). After careful

4

consideration and robust testing, Lilly decided to provide 340B pricing to all covered entities through cash payments—a "cash replenishment" model, to replace the unwieldy and opaque "product replenishment" model that prevails today.

12.    Lilly has contracted with Kalderos, a healthcare technology company, to implement a process that will efficiently deliver weekly cash replenishments directly to 340B providers. Providers will dispense the medicine and send readily available information to Kalderos; Lilly will put cash into their hands weekly (and without others' hands in the till). And Lilly's program will ensure that manufacturers are not forced to make duplicative price concessions across interlocking provisions of the 340B statute, the Medicaid statute, and the IRA. In this way, Lilly's approach would allow for more accurate—and more efficient—compliance with all statutory requirements. Lilly's *cash* replenishment approach thus represents a tremendous improvement over the *product* replenishment approach.

13.    Rather than embrace Lilly's new program, the HRSA has tried to stop it. Through a letter to Lilly on September 18, 2024 (the "September 18 Letter"), and letters to another manufacturer that sought to implement its own version of a rebate-based approach, HRSA has declared such approaches are unlawful and warned manufacturers that implementing cash replenishment approaches will subject them to civil monetary penalties ("CMPs") and removal from not just the 340B program but also Medicaid and Medicare Part B.

14.    HRSA's disapproval of Lilly's cash replenishment program contravenes the Administrative Procedure Act several times over.

15.    Most importantly, the agency's position conflicts with the 340B statute. The statute requires manufacturers to offer their medicines to covered entities at the reduced price, on commercially reasonable terms. And the statute expressly contemplates that 340B pricing may be

offered through either an up-front "discount" or an after-the-fact "rebate." *See, e.g.*, 42 U.S.C.
§ 256b(a)(1). Even if HRSA can *require* one or the other, the statute requires HRSA to do so
through the Pharmaceutical Pricing Agreement (PPA) manufacturers sign to participate in the
program. HRSA has not done so here.

16.     Nor has HRSA ever purported to bar cash replenishment (assuming it even could)
through notice-and-comment rulemaking. *See* 5 U.S.C. § 553. HRSA is not empowered to freely
invent new substantive obligations that bind manufacturers—over and above those that Congress
authorized—especially without going through the rulemaking process.

17.     The agency has also acted arbitrarily and capriciously in multiple ways. It has
arbitrarily permitted an in-kind *product* replenishment model while rejecting Lilly's materially
indistinguishable *cash* replenishment model. HRSA has not explained—and cannot—why it
allows the former while rejecting the latter.

18.     HRSA similarly countenances the cash replenishment approach for ADAP-covered
entities but refuses to do so for others. The agency again has not explained why only some covered
entities get the benefits of cash replenishment.

19.      And at every step, HRSA has offered no meaningful justification for its
disapproval. HRSA failed to acknowledge the many advantages that Lilly's cash replenishment
model offers—let alone address how those benefits could be outweighed by other unmentioned
considerations. Nor did HRSA engage with Lilly's argument that a cash replenishment model is
the *only* way to ensure compliance with the 340B statute and interlocking 340B-related provisions
of other federal statutes. And HRSA has not said what companies like Lilly should do to satisfy
the conflicting obligations that the Centers for Medicare and Medicaid Services ("CMS")—

another component of HRSA's parent agency, the Department of Health and Human Services ("HHS")—has put squarely on their shoulders.

20.     HRSA's rationale for prohibiting Lilly's cash replenishment model is flawed from top to bottom.

21.     HRSA's September 18, 2024 letter denies Lilly its statutory rights and places Lilly at certain risk of significant penalties for noncompliance if it proceeds to implement its cash replenishment model. That final agency action creates concrete and imminent harm for Lilly. This Court should set aside the letter and declare Lilly's cash replenishment program lawful.

## THE PARTIES

22.     Plaintiff Eli Lilly and Company is a publicly traded medicine company organized and existing under the laws of the State of Indiana and headquartered in Indianapolis, Indiana. Eli Lilly and Company participates in the 340B program.

23.     Plaintiff Lilly USA, LLC is a wholly owned subsidiary of Eli Lilly and Company existing under the laws of the State of Indiana and headquartered in Indianapolis, Indiana.

24.     Defendant HHS is an executive branch department in the United States government headquartered in the District of Columbia. HHS oversees the activities of HRSA.

25.     Defendant Xavier Becerra, sued in his official capacity only, is secretary of HHS (the "Secretary"). His official address is in the District of Columbia. Secretary Becerra has ultimate responsibility for oversight of the activities of HRSA, including the administration of the 340B program and the actions at issue in this Complaint.

26.     Defendant HRSA is an administrative agency within HHS and has been delegated authority for administering the 340B program. HRSA is headquartered in Rockville, Maryland.

27.     Defendant Carole Johnson, sued in her official capacity only, is administrator of HRSA. Her official address is in Rockville, Maryland. Administrator Johnson has ultimate responsibility for HRSA's Office of Pharmacy Affairs ("OPA"), which is involved directly in the administration of the 340B program and is directly responsible for the actions at issue in this Complaint.

**JURISDICATION AND VENUE**

28.     Lilly brings this action under the APA, 5 U.S.C. §§ 701–706.

29.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

30.     Venue is proper in this Court because, among other things, Defendants HHS and Becerra reside in this District. *See* 28 U.S.C. § 1391(e)(1).

31.     This Court may grant relief pursuant to 5 U.S.C. §§ 701–706.

32.     Lilly challenges "final agency action" within the meaning of 5 U.S.C. § 704.

33.     To constitute final agency action, a decision "must [1] mark the 'consummation' of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature" and "[2] be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). (internal citations omitted).

34.     HRSA's September 18 Letter reflects the consummation of the agency's decision-making. HRSA has prohibited Lilly from implementing its cash replenishment program, which HRSA claims violates the 340B statute. That creates real-world consequences for Lilly, which must either proceed to implement the model at significant risk to its reputation and ability to participate in Medicare and Medicaid or forgo its statutory rights, its access to the ADR process, and its ability to ensure compliance with the 340B program's statutory prerequisites.

## FACTUAL AND LEGAL ALLEGATIONS

### *The Federal 340B Program*

35.    Before 340B, manufacturers voluntarily sold reduced-price medicines to the Department of Veterans Affairs and certain other providers, like rural and community health centers. With the enactment of the federal Medicaid Drug Rebate Program of 1990, *see* H.R. Rep. No. 102-384, pt. 2, at 9–10 (1992), manufacturers were forced to offer Medicaid discounts that matched the lowest price they offered to other buyers. As a result, if a manufacturer continued to sell discounted medicines to these providers, it could drastically increase the rebates owed to Medicaid. That dynamic had the unintended consequence of disincentivizing manufacturers from continuing to sell reduced-price medicines to these providers.

36.    Congress sought to remedy that disincentive with the 340B program. Congress created the 340B program under the Veterans Health Care Act of 1992, codified as Section 340B of the Public Health Service Act. *See* 42 U.S.C. § 256b; *see also* Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

37.    The program works as follows: as a condition of reimbursing manufacturers under Medicaid and Medicare Part B, the HHS Secretary must "enter into an agreement with [the] manufacturer," 42 U.S.C. § 256b(a)(1), known as a PPA, that "incorporate[s] the statutory obligations and record[s] the manufacturers' agreement to abide by them." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 117–18 (2011).

38.    Each PPA provides that the manufacturer "shall offer" its medicines to each covered entity at or below the applicable "ceiling price." 42 U.S.C. § 256b(a)(1); PPA § II. The D.C. Circuit has interpreted this "shall offer" requirement to mean a "bona fide" offer to sell drugs at or below the statutory price. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024). The "ceiling price" is calculated using a statutorily prescribed formula that can require

manufacturers to sell their medicines for as little as a penny a unit. 85 Fed. Reg. 45,755 (July 24, 2020).

39.    The 340B statute expressly states that the 340B price may be made available to covered entities by either "rebate or discount." Specifically, the statute requires manufacturers to enter into an agreement under which "the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary), to the manufacturer for covered outpatient drugs . . . does not exceed" the ceiling price. 42 U.S.C. § 256b(a)(1).

40.    To the extent that the Secretary has discretion to *mandate* either a "discount" approach or a "rebate" approach, he must do so in the PPA. *See id.* The Secretary has not; the PPA is silent in this regard, stating only that the "[m]anufacturer shall offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price." PPA add. § 2.

41.    The Secretary has also not engaged in any other notice-and-comment proceeding to mandate how manufacturers must make the 340B price available. HRSA's creation of a new substantive requirement under the 340B statute, with a binding effect on manufacturers, constitutes an exercise of legislative authority. The agency cannot mandate use of the product replenishment model—assuming it even has the authority to do so—through positions staked out in letters sent to individual manufacturers. That is a violation of basic procedural requirements under the APA.

42.    The 340B statute includes several fundamental guardrails to protect manufacturers from program abuse. Under the duplicate-discount prohibition, a covered entity "shall not request payment" from a state Medicaid program for any "drug that is subject" to the 340B program "if the drug is subject to [a Medicaid rebate]." 42 U.S.C. § 256b(a)(5)(A)(i). This ensures that a manufacturer is not required to sell a medicine at the 340B price *and* issue a Medicaid rebate to the relevant state Medicaid program for the same medicine. The 340B statute also prohibits

"diversion"—that is, the transfer of a 340B-priced unit to a non-patient of the covered entity. *Id.* § 256b(a)(5)(B).

43.     If a covered entity violates the prohibition on duplication, the HHS Secretary may require the payment of CMPs. In "systematic and egregious" cases, the agency may "remov[e] the covered entity from the drug discount program" altogether. *Id.* § 256b(d)(2)(B)(v). The Secretary has also established an Administrative Dispute Resolution ("ADR") mechanism to address, in relevant part, claims by manufacturers that covered entities have violated the statutory prohibitions. *Id.* § 256b(d)(1)(B)(v), (d)(3); *see* 89 Fed. Reg. 28643 (Apr. 19, 2024); 42 C.F.R. § 10.21(a).

44.     The 340B statute includes procedures for policing unlawful duplication and diversion. Covered entities must, among other things, permit manufacturers to audit a covered entity's records that "directly pertain to the entity's compliance" with those two prohibitions. 42 U.S.C. § 256b(a)(5)(C). Such audits are a prerequisite for a manufacturer's filing of an ADR petition. 42 U.S.C. § 256b(d)(3)(A); *see also* 42 C.F.R. § 10.21(a)(2).

45.     To conduct an audit, however, manufacturers need to provide data to HRSA sufficient to establish "reasonable cause" for the audit—meaning evidence that a covered entity has caused the payment of duplicate rebates or diverted 340B medicines to non-patients. HRSA, *Manufacturer Audit Guidelines and Dispute Resolution Process*, 61 Fed. Reg. 65406, 65410 (Dec. 12, 1996).[1]

---

[1] Lilly reserves all rights on whether "reasonable cause" and other requirements contained in HRSA's Audit Guidelines are properly grounded in the 340B statute. Such issues are beyond the scope of this Complaint.

### The "Product Replenishment Model"

46.    Today, the dominant method for effectuating the 340B ceiling price is through the "product replenishment model."

47.    There are two variations on the model: one for medicines dispensed through contract pharmacies, and another for in-house dispensations at the covered entity. Both rely on up-front purchases of a medicine at the market price followed by a subsequent "replenishment" of that medicine at the 340B price. Ex. 1 (Pedley Decl.) ¶¶ 3, 5 (OPA director explaining that "the contract pharmacy's drug inventory is 'replenished' with a drug purchased directly by a covered entity at the 340B discount after a drug is dispensed").

48.    For-profit contract pharmacies deploy software that "compares the information about the dispense with eligibility criteria provided from the covered entity, in order to determine if the patient was eligible for 340B product." *Id.* ¶ 6. Then, the software "notifies the covered entity that it may place a replenishment order for the drug in question" using a covered entity's 340B purchasing account with the relevant wholesaler of the pharmaceutical manufacturer. *Id.* ¶ 7. Covered entities, for their part, conduct the same retrospective 340B eligibility determination for in-house dispensing using their own data.

49.    Covered entities use similar software for in-house dispensations. That software collects data about each covered-entity prescription filled from a so-called "neutral" inventory. It then "uses logic based on configurations, chosen by the entity, to separate 340B from non-340B transactions after they occur." Apexus, *340B Split-Billing Software Key Attributes (Jan. 2023)*. When the covered entity has filled enough prescriptions for patients the software deems to be 340B eligible, the software then helps covered entities place replenishment orders at the 340B price.

50.    Covered entities and contract pharmacies cannot place a replenishment order for each dispensation; they must wait until they have dispensed the equivalent of a full package of the

medicine. Ex. 1 ¶ 8. When it comes time to place the order, the covered entity, its contract pharmacy, or a third-party administrator places an order using the covered entity's 340B purchasing account. *Id.* ¶ 9. The manufacturer's wholesaler then delivers the 340B-priced medicine to the covered entity or the contract pharmacy, where it is placed on the shelf and becomes "neutral inventory" that "may be dispensed to any subsequent patient," irrespective of whether the recipient is a 340B-eligible patient. *Id.* ¶ 11.

51.     Practically speaking then, covered entities and their contract pharmacies often purchase covered outpatient drugs at market price, then replace that product with 340B-priced product on the back end. These back-end orders are referred to as product "replenishment orders." (Hence the name "product replenishment model".)

52.     The product replenishment model is a form of a rebate, in which manufacturers provide the 340B price to covered entities in arrears—*after* dispensing product to a customer. *See* Ex. 1 ¶ 3 (Pedley Dec.) (describing that "the contract pharmacy's drug inventory is 'replenished' with a drug purchased directly by a covered entity at the 340B discount after a drug is dispensed").

53.     The product replenishment model is not mentioned, much less mandated, in the PPA. Nor has it been subjected to notice-and-comment rulemaking.

54.     The HHS Office of the General Counsel has nevertheless acknowledged the prevalence of this arrangement, characterizing the model simply as "inventory-accounting." Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program 6 & n.6 (HHS, Off. of the Gen. Couns. Dec. 30, 2020). The agency has never objected to the product replenishment model.

55.     There are numerous drawbacks to the current replenishment model. For one, it is rife with abuse. In the contract pharmacy context, a for-profit contract pharmacy or a third-party

administrator determines, through a black-box algorithm, which dispensations may have been to 340B-eligible patients and therefore trigger a 340B-priced replenishment order. Covered entities and their contract pharmacies are often overinclusive in determining which dispensations should result in a 340B-priced product replenishment: the algorithms sweep in customers who are not in fact "patients" of the covered entity. *See, e.g.*, GAO, GAO-11-836, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 28 (Sept. 2011). And multiple covered entities and their contract pharmacies may claim the same patient as their own, which can result in duplicative 340B price concessions for the same prescription. *See, e.g.*, Adam J. Fein, *Exclusive: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market*, Drug Channels (July 11, 2023), https://www.drugchannels.net/2023/07/exclusive-for-2023-five-for-profit.html.

56.    Third-party administrators that service contract pharmacies market their IT abilities as identifying the maximum possible number of 340B-eligible units by reviewing dispensation data and "harvesting" 340B claims, often weeks or months after a prescription is filled. *See* Aaron Vandervelde et al., Berkely Rsch. Grp., *For-Profit Pharmacy Participation in the 340B Program* 5 (Oct. 2020), https://media.thinkbrg.com/wp-content/uploads/2020/10/06150726/BRG-ForProfitPharmacyParticipation340B_2020.pdf (describing that "large national and regional [pharmacy] chains turned to sophisticated software algorithms to identify 340B prescriptions and maximize the revenue generated from these discounted fills"). These proprietary algorithms run various profitability scenarios on data that have been harvested and identify 340B eligibility if that is the most financially beneficial outcome to the contract pharmacy or covered entity. *See id.* at 8 ("Contract pharmacy administrators develop and operate the software algorithms that determine 340B eligibility and enable for-profit pharmacies to influence which prescriptions are classified as

340B."); *see also* Neal Masia, Ph.D., All. for Integrity & Reform, *340B Drug Pricing Program: Analysis Reveals $40 Billion in Profits in 2019* 2, https://340breform.org/wp-content/uploads/2021/05/AIR340B-Neal-Masia-Report.pdf (last visited Oct. 12, 2024)

57.    The product replenishment model also severs the link the between the 340B-priced product and the covered entity prescription, rendering the entire transaction an unlawful diversion. The 340B-priced replenishment product is treated as if it were bought at the market price and available for dispensing, without regard to whether the person receiving the medicine is a patient of the 340B provider or otherwise eligible for the 340B price.

58.    Lastly, the product replenishment model makes it hard for manufacturers to identify and prevent unlawful Medicaid-340B duplicates. *See* 42 U.S.C. § 256b(a)(5)(A)(i). That is because the model makes it difficult to impossible for manufacturers to match a prescription for which a Medicaid agency has submitted a rebate claim with that prescription's 340B-priced replenishment counterpart, the latter of which is sold to the covered entity by a wholesaler in a different transaction, often months later.

59.    Manufacturers need timely information about 340B dispensations to prevent duplicate discounts. But under the product replenishment model, covered entities do not even internally identify 340B-eligible dispenses at the time a prescription is filled. Such identification occurs well afterwards—and even then, covered entities typically do not provide any information to manufacturers about the original sale that nominally triggered the discount. Thus, when a state Medicaid program requests a rebate from a manufacturer, it is difficult, if not impossible, for manufacturers to prevent paying a duplicate Medicaid rebate.

60.    In all, the product replenishment model method is slow, indirect, and opaque, and undermines the 340B statute's fundamental guardrails.

***The Product Replenishment Model Leads to Widespread Violations of 340B's Duplicate-Discount Prohibition.***

61.    As the product replenishment model has grown in popularity, abuses of the 340B program have skyrocketed. That growth is a direct byproduct of the incentives provided to covered entities and third-party participants to claim an ever-increasing volume of sales as 340B-eligible to expand their own profits.

62.    In 2010, the Affordable Care Act expanded the Medicaid Drug Rebate Program to include Medicaid managed care organizations. Since Medicaid managed care accounts for the vast majority of Medicaid utilization, that expansion substantially increased the potential for illegal Medicaid-340B duplicates. GAO, GAO-20-212, *Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* 1 (Jan. 2020) (the "2020 GAO Report").

63.    At the same time, covered entities' use of so-called contract pharmacies exploded. Using the product replenishment model, these for-profit contract pharmacies can buy and dispense 340B-priced medicines purportedly on behalf of covered entities. The Office of Inspector General has found that these relationships "create complications in preventing diversion . . . [and] duplicate discounts."  U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., No. OEI-05-13-00431, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program* 1, 2 (Feb. 2014), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf. Yet, between 2010 and 2019, the number of contract pharmacies increased from about 1,300 to about 23,000. 2020 GAO Report 2.

64.    With the Affordable Care Act's expansion of the Medicaid Drug Rebate Program and the increased use of contract pharmacies came increased risks that manufacturers would be subject to illegal Medicaid-340B duplicates. Between 2011 and 2018, total Medicaid rebates more than doubled, from about $15 billion to more than $36 billion. 2020 GAO Report 2. And in 2021 total Medicaid rebates increased to $42.5 billion. Medicaid and CHIP Payment and Access

Comm'n, *High-Cost Drugs and the Medicaid Program: MACPAC Evidence and Recommendations* (Feb. 2024), https://www.macpac.gov/wp-content/uploads/2024/02/Policy-in-Brief-High-Cost-Drugs-FINAL-2.pdf.

65.    Notwithstanding the explosive growth in the 340B and Medicaid rebate programs, HRSA has all but given up trying to enforce the duplicate-discount prohibition. "HRSA does not assess whether covered entities are actually following state policies and procedures regarding the use and identification of 340B drugs for Medicaid beneficiaries." 2020 GAO Report 2. And, although Medicaid managed care accounts for approximately 50% of Medicaid utilization, there is currently no system in place to prevent manufacturers from paying Medicaid managed care duplicates.

66.    The government's own watchdog, in fact, has concluded that "HHS does not have reasonable assurance that states and covered entities are complying with the prohibition on duplicate discounts," leaving "manufacturers at risk of providing duplicate discounts" and "compromis[ing] the integrity of the 340B Program." 2020 GAO Report 1; *see also* GAO, GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 35, 43 (June 2018) (finding "weaknesses in HRSA's audit process compromise its oversight of covered entities").

67.    It is now estimated that three to five percent of all Medicaid rebates duplicate 340B pricing, which in 2020 amounted to between *$1.3 billion* and *$2.1 billion* in illegal duplicates. Ashwin Mundra, *The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark,* Drug Channels (Mar. 18, 2022), https://www.drugchannels.net/2022/03/the-340b-noncompliance-data-gap-leaves.html. The amount of illegal duplicates is likely much higher today, since 340B purchases nearly doubled between 2020 and 2023 from *$38* to *$66 billion*. Adam J. Fein, *The*

*340B Program Reached $66 Billion in 2023—Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions*, Drug Channels (Oct. 22, 2024), https://www.drugchannels.net/2024/10/the-340b-program-reached-66-billion-in.html.

### *Without Action, the Inflation Reduction Act Will Dramatically Increase the Number of Unlawful Duplicates Paid by Manufacturers.*

68.     In August 2022, Congress passed, and the president signed, the Inflation Reduction Act. That law created two significant federal drug discount mechanisms that now intertwine with the 340B program. First, the IRA created the Drug Price Negotiation Program, which empowers HHS to fix the prices at which Medicare will purchase certain medicines. Second, the IRA created Medicare Part B and Part D inflation-rebate programs, under which manufacturers are required to pay Medicare rebates on medicines covered under Parts B and D if their prices rise faster than the rate of inflation. Both IRA programs impact manufacturers' 340B obligations.

69.     Under the Drug Price Negotiation Program, the HHS Secretary must "enter into agreements with manufacturers of selected [Medicare Part B and Part D] drugs," pursuant to which the Secretary and the manufacturer will negotiate a "maximum fair price" for the selected drug. 42 U.S.C. § 1320f-2(a). The manufacturer must then "provide access to such price" with respect to MFP-eligible individuals. *Id*. § 1320f-2(a)(1).

70.     Recognizing the overlap between discounting obligations under the Drug Price Negotiation Program and those under the 340B program, the IRA also provides that manufacturers must offer only the lower of the MFP or the 340B ceiling price—not both—if a prescription is subject to both reduced prices. 42 U.S.C. § 1320f-2(d).

71.     CMS, which administers the Drug Price Negotiation Program, reiterates this obligation in guidance, instructing that "manufacturers must ensure that the appropriate price concession is honored, consistent with their obligations under [the IRA], and inclusive of their

18

agreements under section 340B(a)(1)." CMS, *Medicare Drug Price Negotiation Program: Final Guidance* 230 (Oct. 2, 2024).

72.     That is no small task: if manufacturers choose to effectuate the MFP through a rebate model, CMS requires that rebates be issued 14 days after manufacturers receive verified claims data. *Id.* at 196.

73.     The Drug Price Negotiation Program, however, lacks mechanisms to avoid duplicate discounts. In CMS's Final Guidance, the agency disclaimed responsibility for "deduplicating discounts between the 340B ceiling price and [IRA price]," *id.* at 54, instead directing manufacturers to figure out a de-duplication mechanism on their own, *id.* at 56. Although the Final Guidance contemplates that a manufacturer might decline to pay an MFP rebate, *id.* at 230, there is no practical way for manufacturers to first identify potential duplicates and then "provide documentation demonstrating the claim was 340B-eligible," *id*.

74.     Worse still, neither the Drug Price Negotiation Program nor the 340B program provides manufacturers the right to audit covered entities to ensure they are not creating illegal duplicates under the IRA.

75.     Medicare Part B and Part D inflation rebates lack the same fundamental protections for manufacturers. Although manufacturers face civil monetary penalties if they fail to pay the appropriate inflation rebate, 42 U.S.C. § 1320f–6(c), CMS has no pathway for fulfilling its statutory obligation to exclude 340B units from its Part D inflation rebate claims, only a vague "plan to explore" a future solution at some point, *see* Medicare and Medicaid Programs, __ Fed. Reg. __, 1724 (anticipated Dec. 9, 2024) ("Inflation Rebate Final Rule"), https://public-inspection.federalregister.gov/2024-25382.pdf. And CMS has not provided for any type of dispute resolution process or other mechanisms to help ensure compliance with the duplicate-discount

obligations for either Part B or Part D drugs. Inflation Rebate Final Rule 1584, 1765. Yet such protections are critical. The government has said that it cannot bill inflation rebates to manufacturers for 340B-priced medicines. But the government will not have any way to identify those prescriptions—and neither will manufacturers.

76.    In short, the interplay of the IRA, Medicare Part B, and Part D inflation rebates increases manufacturers' need for timely information about how 340B drugs are distributed, dispensed, and billed—in some cases at the risk of substantial civil penalties.

***The Product Replenishment Model Prevents Manufacturers Like Lilly from Participating in 340B ADR Proceedings.***

77.    The opacity of the current product replenishment model also denies Lilly the information it needs to exercise its statutory audit rights, bring ADR claims against covered entities to recover for violations of the 340B statute, and comply with HRSA's recently revised ADR Rule.

78.    The 340B statute requires covered entities to submit to manufacturer audits to ensure covered entities are not causing the payment of duplicate Medicaid rebates or diverting 340B-priced medicines. 42 U.S.C. § 256b(a)(5)(C). Covered entity audits are a key part of maintaining the 340B program's integrity. They are also a prerequisite to filing an ADR claim against covered entities. *Id*. § 256(d)(3)(A).

79.    But to conduct an audit, manufacturers first need to provide evidence that a covered entity has caused the payment of duplicative Medicaid rebates or diverted 340B medicines to non-patients. HRSA, Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65406, 65410 (Dec. 12, 1996). Because the product replenishment model operates in the shadows, it is difficult for manufacturers to gather the information necessary to show reasonable cause unless covered entities are required to supply it. That lack of access to information makes it harder for Lilly to avail itself of audits and the ADR process.

80.     This lack of transparency also makes compliance with HRSA's recently revised ADR rule more difficult for manufacturers—regardless of who initiates the proceeding.

81.     HRSA's ADR rule is designed to channel disputes between manufacturers and covered entities regarding overcharges and duplicate discounts, among other issues, through an ADR process. *See* 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28634 (Apr. 19, 2024).

82.     Under that rule, covered entities may submit information or document requests to the ADR panel, which will then transmit them to the manufacturer. 42 C.F.R. § 10.22(a), (b).

83.     A manufacturer "must fully respond" to any such request. *Id.* § 10.22(c). Part of this full-response obligation includes a responsibility for manufacturers to "obtain[] relevant information or documents from any wholesaler or other third party that may facilitate the sale or distribution of its drugs to covered entities." *Id.* § 10.22(c)(1). In other words, HRSA's ADR rule requires manufacturers to produce information that it can only get from third parties that are not required (and may not be inclined) to voluntarily share it. Neither are such third parties under Lilly's control such that it could demand the information.

84.     Because the product replenishment model operates behind closed doors, Lilly does not have the information that it could be required to provide in an ADR proceeding and often cannot get such information.

### *Lilly Identifies a Cash Replenishment Model as a Solution to the Government-Created 340B Compliance Problem.*

85.     As these problems have worsened—particularly after HHS recently disclaimed any ability to solve them and put that onus on manufacturers—Lilly began searching for a solution. It landed on the cash replenishment model. A cash replenishment model eliminates unlawful duplicates and facilitates participation in the 340B ADR process. And a cash replenishment model

benefits covered entities by speeding up and streamlining effectuation of the 340B price, while preserving—or in many cases improving—their cash flow.

86.     Lilly intends to make the 340B price available to all covered entities, for all Lilly products, through a platform offered by Kalderos, a cutting-edge healthcare technology company. Kalderos's platform, Truzo, effectuates cash replenishments to covered entities that make 340B purchases. Covered entities will purchase Lilly products at the market prices and then submit a claim for a cash replenishment to ensure the covered entity pays no more than the 340B price. Lilly's use of the Truzo platform will be consistent with its own standard commercial practices, as well as the types of practices that HRSA has countenanced in the context of the ADAP replenishment model.

87.     To get a cash replenishment, covered entities will need to provide only readily available, nonproprietary claims data related to the dispensation and purchase of the eligible Lilly product. Lilly and Kalderos will then evaluate these claims data to either validate the claim and promptly issue a replenishment or flag the claim if it falls into one of the narrow circumstances that warrants denial or further action, such as when a covered entity is not registered as a 340B-covered entity on HRSA's website. Even when a submitted claim is flagged, covered entities will have clear visibility into the underlying reason. They will also be able to ask questions and raise concerns, and to resubmit the claim, if necessary, after corrections are made.

88.     This highly efficient, data-driven process is the only way that Lilly can identify and prevent duplication between *340B and Medicaid* before it happens. *See* 42 U.S.C. § 256b(a)(5)(A). The claims data that Lilly will collect under its program will enable it to match rebate claims requested by state Medicaid programs to replenishments paid under the 340B program. Lilly will *never* deny a cash replenishment claim from a covered entity because it is

duplicative of a requested Medicaid rebate; instead, Lilly will address any duplication with state Medicaid programs. And there will be no impact whatsoever on patients' access to their medications.

89.    The cash replenishment model is also the only way Lilly can ensure nonduplication between the ***340B price and MFP*** when a Lilly product inevitably becomes subject to the Drug Price Negotiation Program. Under the program, manufacturers must provide the lower of the MFP or the 340B ceiling price if a prescription is subject to both programs. 42 U.S.C. § 1320f-2(d). CMS has instructed manufacturers to take responsibility for policing nonduplication. *Medicare Drug Price Negotiation Program: Final Guidance* 231. The claims data that Lilly will collect under its cash replenishment program will enable it to identify claims subject to both an MFP and 340B pricing and adjust the price offered accordingly. Lilly will thus be in a position to prevent duplication, as instructed by CMS, and comply with requirements under both programs.

90.    Indeed, CMS's guidance concerning the MFP all but necessitates a 340B cash replenishment program. CMS requires that manufacturers effectuate the MFP within 14 days and "expects" that a manufacturer "will have documented evidence" that the "selected drug is 340B eligible" in order to invoke the nonduplication provision. *Id.* at 61. That instruction necessarily requires manufacturers to be able to accurately and timely identify 340B prescriptions.

91.    The cash replenishment model is also the only way Lilly can avoid ***340B-inflation rebate duplication*** and ensure that inflation rebates are correctly invoiced on certain Medicare Part B and Part D drugs. For Part D drugs, CMS initially proposed to loosely estimate, based on admittedly flawed data, the number of 340B units to back out of the inflation rebate calculation. 89 Fed. Reg. 61596, 61969–73 (July 31, 2024). Because that initial proposal was hopelessly flawed, CMS ultimately abandoned the estimation method but did not propose a replacement, only

stating that it would "explore avenues" to implement the statutory prohibition on duplicate discounts. Inflation Rebate Final Rule 1718. At the same time, CMS said it will not "provide claim-level data to manufacturers regarding the 340B Program or other statutory exclusions of units from rebate counts." *Id.* at 1583. And for Part B and Part D drugs, there is no audit or appeal process that would allow manufacturers to confirm that the inflation rebates are calculated correctly. Inflation Rebate Final Rule 1584–85, 1765; CMS, *Medicare Part B Drug Inflation Rebates Paid by Manufacturers: Revised Guidance* 19–20 (Dec. 14, 2023). Instead, CMS will allow a limited "Suggestion of Error process" that is "limited to mathematical steps involved in determining the rebate amount." 89 Fed. Reg. at 61956; *see also* Inflation Rebate Final Rule 1637–38.

92.     The claims data Lilly will collect through its cash replenishment program will enable it to determine exactly how many units of a Medicare Part B or Part D product were dispensed under the 340B program. That will ensure that the inflation rebates are accurately calculated for both Part B and Part D drugs and allow Lilly to protect itself from significant civil penalties for failing to do so.

93.     Requiring claims data as part of a cash replenishment model is also the only way that Lilly can fully and effectively utilize the ***340B ADR process***. Before a manufacturer may initiate an ADR proceeding, it must conduct an audit—and before it can do that, it must first make a sufficient "reasonable cause" showing. 61 Fed. Reg. 65406, 65409 (Dec. 12, 1996). Claims data enable manufacturers to do just that by helping manufacturers identify unlawful Medicaid-340B duplication.

### *Cash Replenishment Is an Integral Part of Many Federal Drug Programs, Including 340B.*

94.     Cash replenishment is not a new concept, even in the 340B program. Decades ago, manufacturers and ADAPs began entering into agreements that allowed manufacturers to offer the

340B price via cash replenishment. Neither manufacturers nor ADAPs sought HRSA's permission before executing these agreements. And HRSA never objected to these arrangements afterward.

95.    These voluntary rebate agreements became so pervasive, and presumably desirable, that in 1997 HRSA published a notice proposing to "recognize" a model. The notice provided for cash replenishments to ADAPs, so long as the replenishment amount equaled or exceeded the discount required by the 340B ceiling price. HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45823 (Aug. 29, 1997).

96.    The next year, HRSA published a final notice that "recognize[d] *rebates* obtained by the State ADAPs or their components that equal or exceed the 340B discount provided by the statutory ceiling price *as a method of participating in the 340B program.*" 63 Fed. Reg. at 35239 (emphasis added).

97.    The agency therefore expressly recognized—without pre-approval—a cash replenishment model implemented by manufacturers. HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35239, 35240 (June 29, 1998) (rebate agreements that predate Notice need not be renegotiated if provisions of Notice already met).

98.    In doing so, HRSA made several observations concerning cash replenishments. First, HRSA acknowledged that a cash replenishment is among the options available under the 340B statute for effectuating the 340B ceiling price: "Section 340B has no explicit language as to whether the required reduction in price should be obtained by an initial reduction in the purchase price (i.e., a discount mechanism) or received as a required reduction in cost rebated after purchase, dispensing, and payment are completed (i.e., a rebate option)." 62 Fed. Reg. at 45823.

99.     Second, HRSA concluded that a cash replenishment approach does not result in an impermissible overcharge to the covered entity merely based on timing—*i.e.*, by charging market rates before replenishments are applied—provided that manufacturers ultimately offer "at least the minimum statutory discount" and do not otherwise impose "requirements inconsistent with section 340B and published program guidelines." 63 Fed. Reg. at 35240.

100.     Third, HRSA acknowledged that requirements that are inherent in a replenishment model are not inconsistent with the 340B program. Covered entities can be "expected to submit claims-level data to a manufacturer in support of each qualified payment to receive a rebate from that manufacturer," which "may" include an "assurance that the claim is not for a drug subject to a Medicaid rebate." *340B Drug Pricing Program Omnibus Guidance*, 80 Fed. Reg. 52300, 52313 (Aug. 28, 2015).

101.     Fourth, HRSA justified the creation of the cash replenishment model based on the same dynamics that exist today throughout the 340B program. 62 Fed. Reg. at 45824. ADAPs, like nearly all covered entities today, use a pharmacy network that involves "formal agreements with a network of retail pharmacies," and these entities "submit claims to drug manufacturers for rebates on medications that were purchased through a retail pharmacy network at a price higher than the 340B price."  HIV/AIDS Bureau, *AIDS Drug Assistance Program (ADAP) Manual* 42 (June 2023). That "purchasing system" mimics the contract pharmacy and product replenishment models used by virtually every covered entity today.

102.     That is not all. The rebate model is an integral part of nearly every federal medicine discount program, including the Medicaid Drug Rebate Program, the Medicare Part D Coverage Gap Discount Program, the Drug Price Negotiation Program, the Medicare inflation rebate programs, and the Tricare Retail Pharmacy Program.

### *Lilly's Cash Replenishment Model Facilitates Both 340B Price Access and Statutory Compliance.*

103.    Lilly's cash replenishment model is more efficient, direct, and transparent than the current product replenishment model.

104.    Under the model, Lilly will offer cash replenishment for each prescription filled, meaning covered entities will no longer have to wait to accumulate package-level dispensations to receive replenishment product, as they must do under the current model.

105.    In addition, Lilly's cash replenishment model puts covered entities in control of their 340B revenue. Instead of waiting for third-party administrators and contract pharmacies to pay them, covered entities will receive direct deposits from Lilly first, which they can in turn distribute as appropriate.

106.    Further, Lilly will issue these cash replenishments on a weekly basis, improving covered entities' cash flow. In fact, many covered entities will receive their cash replenishment even before they pay the up-front cost of the medicine itself, depending on a covered entity's billing arrangements with wholesalers and how quickly a covered entity chooses to submit a cash replenishment claim.[2]

107.    On top of that, Lilly's new cash replenishment program will be entirely *free* for covered entities. Lilly is funding the implementation of Kalderos's Truzo platform for its entire portfolio of medicines. And Kalderos will provide intensive support to covered entities throughout onboarding and into regular platform use with a dedicated suite of resources.

---

[2]   The Truzo system will permit covered entities to continue to follow a schedule of batch submission of claims if that is their preference, but it will not limit them to such an approach unlike the current model.

108.    This highly efficient, data-driven process will give both parties visibility to the same data and prevent duplication, diversion, and other concerns before they happen. These features will in turn lead to fewer good-faith inquiries and disputes and ADR petitions, and reduce the burden on manufacturers, covered entities, and HRSA.

### *HRSA Purports to Reject Lilly's Cash Replenishment Model.*

109.    Lilly sought to educate HRSA on the benefits of its cash replenishment model for all program stakeholders. In August, Lilly's vendor, Kalderos, notified HRSA that it had contracted with a manufacturer to implement a cash replenishment model and provided the agency with information about its system.

110.    That same month, Lilly requested an in-person meeting with HRSA and previewed in its email the benefits of its cash replenishment model.  Ex. 2 (Aug. 30, 2024 Email to HRSA).

111.    On September 4, Lilly, Kalderos, and HRSA held a virtual meeting in which Lilly communicated its intent to adopt its cash replenishment model to HRSA. A few days later, Lilly sent HRSA a letter addressing HRSA's questions from the virtual meeting and outlining in further detail the benefits for all stakeholders of its cash replenishment program. Ex. 3 (Sept. 9, 2024 Letter to HRSA).

112.    On September 18, HRSA rejected Lilly's proposal. It offered no explanation and did not even acknowledge any aspect of Lilly's cash replenishment model, instead stating only that "implementing such proposal at this time would be inconsistent with the statutory requirements for the 340B Program, which require the approval" of HRSA.  Ex. 4 at 1 (Sept. 18, 2024 Letter to Lilly).

113.    Though HRSA decreed that Lilly could not lawfully implement its new cash replenishment model, it nevertheless included a list of twenty-three additional questions for Lilly. In the spirit of cooperation, Lilly provided written responses to those questions on September 23.

Ex. 5 (Sept. 23, 2024 Letter to HRSA).  It also asked for HRSA to tell Lilly by October 7 whether it had changed its position that Lilly's cash replenishment model was unlawful. HRSA never did so.

114.    Although HRSA failed to provide any explanation for its rejection of Lilly's cash replenishment model, some semblance of the agency's reasoning can be gleaned from its letters to another manufacturer. Just one day before rejecting Lilly's proposal, on September 17, HRSA issued a letter to Johnson & Johnson (the "J&J Letter") warning J&J to cease implementation of a similar cash replenishment program. HRSA publicly released that document—showing the agency's definitive views on the cash-replenishment approach. HRSA Letter to J&J (Sept. 17, 2024),        https://www.hrsa.gov/sites/default/files/hrsa/opa/sept-17-2024-hrsa-letter-johnson-johnson.pdf.  In the J&J Letter, HRSA posited three reasons for its disapproval. Each is legally deficient.

115.    First, the agency stated that the "Secretary has not 'provided'" that the proposed replenishment model would be appropriate. *Id.* In other words, HRSA purports to require Secretarial *pre-approval* of any cash replenishment model. But nothing in the 340B statute suggests that in-kind product replenishment is the statutory default or that cash replenishment is unlawful unless HRSA pre-approves it.

116.    Second, HRSA stated that charging covered entities the market price up front and then offering a cash replenishment violates the 340B statute's mandate that manufacturers not offer drugs that exceed "the maximum price[s] that covered entities may permissibly be required to pay." *Id.* (alteration in original). But again, nothing in the plain language of the statute—or in the PPA—supports this position. It is also contrary to HRSA's decades-old position, articulated

in its ADAP guidance, that initial purchases by covered entities at market prices do *not* result in an overcharge, so long as an appropriate replenishment is issued.

117.    Third, HRSA rejected the idea that the cash replenishment model is the same as the prevailing product replenishment model. In HRSA's view, "under a typical replenishment structure, a covered entity generally makes an initial purchase at a higher price, then subsequent, ongoing drug purchases are at the 340B price," while under the proposed cash replenishment model, "covered entities will be forced to pay a higher price point up front." *Id.* But there is no material difference between cash and product replenishment—they both effectuate the 340B price *after* a prescription has been filled. And both models rely on up-front purchases of medicines at list price, followed by a subsequent replenishment. The *only* difference is that, under Lilly's model, covered entities get cash instead of replacement product.

118.    HRSA also opined that the product replenishment model is somehow distinct from a cash replenishment model because "covered entities voluntarily choose to use replenishment processes," *id.*, suggesting that covered entities alone get to choose between their preferred replenishment models. The statute and the PPA provide for no such thing.

119.    On September 27, 2024, HRSA issued another letter to J&J reiterating that "any rebate mechanism" requires "Secretarial approval" and that, if J&J were to proceed with its cash replenishment model despite HRSA's rejection, it would violate 42 U.S.C. § 256b(a)(1). HRSA Letter to J&J (Sept. 27, 2024), https://www.hrsa.gov/sites/default/files/hrsa/opa/sept-27-24-hrsa-letter-johnson-johnson.pdf.

120.    Then came the kicker: HRSA stated that it would "begin the process outlined in J&J's Pharmaceutical Pricing Agreement related to terminating the agreement" and "initiate a

referral to the HHS Office of Inspector General" if J&J did not notify HRSA that it was ceasing implementation of its cash replenishment model by September 30, 2024. *Id.*

121.    HRSA has thus invoked the nuclear option of removal from not only the 340B program but also Medicaid and Medicare Part B if manufacturers implement a cash replenishment model. The agency, in other words, would risk depriving seniors and poor patients of life-saving medicines rather than countenance a cash replenishment model.

### HRSA's Decision to Ban Lilly's Cash Replenishment Model Is Unlawful.

122.    HRSA's rejection of Lilly's cash replenishment program is unlawful, contravenes the plain language of the 340B statute, and is arbitrary and capricious. Lilly's program is consistent with the 340B statute, Lilly's PPA, and other federal laws and regulations—and is not just eminently reasonable but an improvement on the current product replenishment model.

123.    To begin, the statute expressly contemplates cash replenishment. It requires manufacturers to agree that "the amount required to be paid (taking into account any *rebate* or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs" does not exceed the statutory ceiling price. 42 U.S.C. § 256b(a)(1) (emphasis added). The very next paragraph, which defines the ceiling price, refers to the price concession designed to achieve that price as the "rebate percentage." 42 U.S.C. § 256b(a)(2). And Lilly's PPA provides for dispute resolution mechanisms in case Lilly "believes that a covered entity has violated . . . the prohibition against duplicate discounts or *rebates*." PPA § IV(a) (emphasis added).

124.    Nothing in the 340B statute suggests that discounts are the statutory default or that cash replenishments are unlawful unless HRSA pre-approves them. Nor does the statute suggest that the *product* replenishment model is uniquely permissible, to the exclusion of *cash* replenishment. The 340B statute discusses "rebates" (i.e., replenishments) together with

"discounts," without indicating a preference for either or dictating a particular mode of replenishment. *See, e.g.*, 42 U.S.C. § 256b(a)(5), (d)(1)(B)(iv).

125.    The legislative history of the 340B statute removes any doubt about the permissibility of cash replenishment. Congress, in passing what would become 42 U.S.C. § 256b, noted that while the bill did not "specify" the "mechanism" by which "'covered entities' would receive these favorable prices," a "manufacturer rebate" was among the available options. H.R. Rep. No. 102-384(II), *16 (1992).

126.    To the extent that HRSA can insist on "pre-approval" of a cash replenishment program, it must do so by amending a manufacturer's PPA. *See* 42 U.S.C. § 256b(a)(1). HRSA has not amended Lilly's PPA to incorporate any such requirement.

127.    Nor has the agency purported to mandate the use of the product replenishment model through notice-and-comment rulemaking—assuming it can even do that.

128.    Given the plain-text support for Lilly's cash replenishment program, HRSA may not prohibit Lilly from implementing it. Nor may it subject Lilly's program to some sort of pre-approval policy, especially in the absence of a provision in the PPA specifying otherwise.

129.    HRSA's position also is arbitrary and capricious, for a host of reasons. First, the agency has acted arbitrarily by permitting an in-kind *product* replenishment model—which is materially indistinguishable from Lilly's *cash* replenishment model. The agency has not explained why it allows the former while rejecting the latter. Nor has the agency explained why "pre-approval" is required for a cash replenishment but not for a product replenishment.

130.    HRSA has also unlawfully failed to treat similarly situated entities the same: HRSA does not object to cash replenishments when requested by ADAPs, nor did it require pre-approval or suggest that those using that model before HRSA recognized it had been acting unlawfully,

much less threaten to terminate their PPAs. Yet HRSA refuses to allow cash replenishments for any other covered entities or when requested by a manufacturer. The agency has offered no reasoned explanation for such differential treatment.

131.    The agency never engaged with Lilly's several independent policy arguments in support of the cash replenishment model. It did not acknowledge the fact that Lilly's replenishment model would facilitate compliance with both the 340B duplicate-discount prohibition and the IRA; indeed, a cash replenishment model arguably is the *only* way to effectuate the requirements of the 340B statute and the interlocking provisions of other federal statutes that guarantee nonduplication of statutorily mandated price concessions.

132.    HRSA also failed to consider how the cash replenishment model will help Lilly more meaningfully participate in the ADR process. Claims data help manufacturers identify program abuse. If an audit proceeds to an ADR proceeding, manufacturers must "obtain[] relevant information or documents from any wholesaler or other third party that may facilitate the sale or distribution of its drugs to covered entities." 42 C.F.R. § 10.22(c)(1). Lilly's cash replenishment model enables it to ensure that it has the information it needs to comply with requests from covered entities and the ADR panel in an ADR proceeding.

133.    And HRSA failed to acknowledge the many practical programmatic enhancements that Lilly's cash replenishment model brings to the table—let alone address how those benefits could possibly be offset.

## CLAIMS FOR RELIEF
### COUNT I
### (Violation of the Administrative Procedure Act – Unlawful, Contrary to Statute, and in Excess of Statutory Authority)

134.    Lilly realleges and incorporates by reference the allegations in all preceding paragraphs of this Complaint.

135.    HRSA's position is unlawful, violates the plain language of the 340B statute, and exceeds the agency's statutory authority.

136.    The 340B statute requires only that participating manufacturers "shall . . . offer" the 340B price on a drug to qualifying purchasers if the drug "is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1).

137.    The 340B statute clearly contemplates that manufacturers may implement the ceiling price via cash replenishment. *See* 42 U.S.C. § 256b(a)(1), (a)(2), (d)(1)(B)(iv) (referencing "rebate").

138.    Even in a world where HRSA had authority to dictate whether manufacturers implement the ceiling price by way of cash replenishment or discount, that would have to be effectuated in the PPAs with manufacturers. *See* 42 U.S.C. § 256b(a)(1). Lilly's PPA does not contain a prohibition, explicit or implicit, on a cash replenishment model for effectuating the ceiling price.

139.    Nor did HRSA undertake notice-and-comment rulemaking to create what amounts to new substantive standards under 340B that are binding on manufacturers.

140.    Because there is no independent statutory basis apart from the PPA for HRSA to prohibit Lilly from adopting a cash replenishment model, and because Lilly's PPA is silent on whether it must implement the ceiling price via cash replenishment or discount, HRSA's

September 18 Letter is contrary to law and in excess of its statutory authority and must be set aside. 5 U.S.C. § 706(2)(A), (C).

## COUNT II
### (Violation of the Administrative Procedure Act – Arbitrary and Capricious)

141.    Lilly realleges and incorporate by reference the allegations in all preceding paragraphs of this Complaint.

142.    HRSA's position that Lilly may not implement a cash replenishment model is also arbitrary and capricious. Under the APA, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

143.    HRSA acted arbitrarily because it did not adequately explain why it can now condemn *one* replenishment model, when it has tacitly permitted another replenishment model—*product* replenishment—for years. A replenishment is a replenishment, whether in product or cash. It is arbitrary and capricious to treat the two differently, absent a compelling rationale. HRSA has provided no rationale; nor can it.

144.    HRSA also has acted arbitrarily by allowing the cash replenishment approach with respect to ADAPs, but refusing the same approach with respect to any other entity. The agency has offered no reasoned explanation for treating these entities differently.

145.    HRSA also failed to consider how the cash replenishment model will help police unlawful duplication and facilitate participation in ADRs. The claims data Lilly collects under its cash replenishment program will also allow it to match claims under Medicaid and the 340B program and, if necessary, address duplication with state Medicaid programs (while ensuring

covered entities receive timely 340B replenishments). HRSA's decision here did not even recognize that concern, much less address it.

146.    Similarly, the agency failed to consider how the claims data will enable Lilly to match claims and adjust pricing based on a comparison between the MFP and the 340B ceiling price, providing precisely the "documentation" CMS requires a manufacturer to maintain when invoking the nonduplication protection.

147.    Lastly, the agency failed to consider how the cash replenishment model will enable Lilly to participate in the ADR process by allowing manufacturers to "obtain[] relevant information or documents from any wholesaler or other third party that may facilitate the sale or distribution of its drugs to covered entities." 42 C.F.R. § 10.22(c)(1).

148.    In short, HRSA's position is arbitrary and capricious and should be set aside.

## PRAYER FOR RELIEF

149.    Lilly respectfully prays that this Court:

a.    Set aside HRSA's position on Lilly's cash replenishment model, including as expressed in the September 18 Letter, on the grounds that it is contrary to law, in excess of HRSA's statutory authority, and arbitrary and capricious under the Administrative Procedure Act;

b.    Preliminarily and permanently enjoin HRSA from taking any action to enforce its unlawful position on Lilly's cash replenishment model;

c.    Declare that Lilly's cash replenishment model is lawful and can be implemented;

d.    Award Plaintiffs costs and reasonable attorneys' fees, as appropriate; and

e.    Grant any other relief the Court deems just and appropriate.

Dated: November 14, 2024                    Respectfully submitted,

                                   By:   /s/ John C. O'Quinn
                                         John C. O'Quinn
                                         Matthew S. Owen
                                         Megan McGlynn
                                         KIRKLAND & ELLIS LLP
                                         1301 Pennsylvania Avenue N.W.
                                         Washington, D.C. 20004
                                         (202) 389-5000
                                         john.oquinn@kirkland.com
                                         matt.owen@kirkland.com
                                         megan.mcglynn@kirkland.com

                                         Catherine E. Stetson (D.C. Bar No. 453221)
                                         HOGAN LOVELLS US LLP
                                         555 Thirteenth Street N.W.
                                         Washington, D.C. 20004
                                         (202) 637-5600
                                         cate.stetson@hoganlovells.com

                                         *Attorneys for Plaintiffs*