# EXHIBIT 3

Lilly USA, LLC

Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1.317.276.2000
www.lilly.com

September 9, 2024

***BY ELECTONIC DELIVERY (CBritton@hrsa.gov)***

Ms. Chantelle V. Britton
Director, Office of Pharmacy Affairs
Health Resources and Services Administration (HRSA)
Office of Special Health Initiatives
5600 Fishers Lane
Rockville, MD 20857

**RE: Lilly 340B Cash Replenishment Program**

Dear Director Britton:

As a follow up to our September 4 meeting, I am writing to provide notice to HRSA of Lilly's intention to implement its obligation to offer the 340B ceiling price to covered entities through a rebate via a cash replenishment program, specifically using the Kalderos Truzo™ platform. We intend to make this change in our program effective November 1 with a public announcement on September 23 to allow adequate time for covered entity education and onboarding.[1] As discussed in our meeting last week, we welcome any questions or comments you may have as we proceed toward implementation.

We are optimistic that this approach will result in timelier effectuation of the ceiling price to covered entities and will address covered entity concerns with the current product replenishment rebate model (namely, that their vendors get the 340B value in the first instance and that the covered entities receive replacement product that they might never dispense, instead of a rebate in the form of cash). We also believe this approach is fully compliant with all laws, regulations, guidance, and the Pharmaceutical Pricing Agreement (PPA). Indeed, a cash replenishment model is likely compelled by recent changes made by the Inflation Reduction Act (IRA) and further necessitated by provisions in the final Administrative Dispute Resolution (ADR) rule, among other things.

We hope that HRSA will issue a statement endorsing Lilly's efforts to advance the cause of 340B—and broader government healthcare—program integrity, as new systems are needed to maintain the program's viability and to implement recent laws that prohibit certain duplicate discounts for which there are no established safeguards and for which manufacturers do not have audit rights or administrative remedies.

## I. Lilly's Cash Replenishment Program

Under the proposed change to our 340B program, Lilly would make the 340B price available to all eligible covered entities, for all Lilly products, through Kalderos's Truzo™ platform. Covered entities will purchase Lilly products at the usual market rate and then submit a claim for cash replenishment equal to the difference between the acquisition cost and the 340B ceiling price. Lilly will be offering cash replenishment on a unit basis (as opposed to forcing covered entities to accumulate to the package level as they must today) and will make payments on approved claims on a weekly basis. While covered entities are able to submit claims at any time, the Truzo™ system will also allow them to wait and make batch submissions of claims if that is the covered entity's preference. In order to

[1] In the event we encounter any unforeseen issues, this date may change.

receive a cash replenishment, covered entities will only need to provide basic, non-proprietary claims data related to the dispense and purchase of the eligible Lilly product, as laid out in the enclosed addendum from Kalderos. Covered entities are already keeping and providing this same data to their Third Party Administrators (TPAs) and other 340B vendors. Given our experience with existing claims data submission processes, we do not anticipate any issues with the Truzo™ platform's requirements, but as has always been our practice, to the extent any covered entities do encounter problems with the data submission process we would be more than willing to work with them on solutions on a case-by-case basis . Indeed, the D.C. Circuit recently concluded that such data requests are consistent with HRSA's past guidance, part of the "standard information" that manufacturers may ask of covered entities, and carry only a "minimal burden" to provide. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 463 (D.C. Cir. 2024).[2] And of course, covered entities will not be required to pay for the Truzo™ platform as Lilly is covering all costs.

As we explained in our meeting, Lilly will use this basic information to avoid paying duplicate and improper rebates to parties other than covered entities (such as CMS for duplicate Part B and Part D inflation rebates or maximum fair price drugs) that are not consistent with having sold the Lilly product at the 340B ceiling price. This prevention of duplicate discounts should have no bearing on the number of legally appropriate 340B claims made by covered entities. A table listing the five reasons that a claim would not automatically be validated, such as the covered entity is not listed in the HRSA OPAIS database, are included in the enclosed addendum from Kalderos.

This proposed program change has many advantages over the current methods of effectuating 340B pricing. Under the current *product* replenishment model, eligible 340B dispenses are identified after the fact, accumulated on a unit-by-unit basis until they reach the number of units in a package, and then entities get a rebate from a vendor in the form of discounted replacement products. This process is slow, indirect, and opaque. Lilly's new *cash* replenishment model will be fast, direct, and transparent. It will provide cash payments directly to covered entities, while ensuring they still pay no more than the ceiling price. Payments will be made weekly, rather than waiting for product orders to accumulate, and submissions can be made either for individual dispenses or for batches of dispenses, at the covered entity's discretion. It will also provide covered entities, rather than other parties, with direct cash replenishments for 340B medicines they dispense. In that way, Lilly's cash replenishment model will put control back in the hands of the covered entities by empowering them to pay their vendors, rather than wait for vendors to pay them. Indeed, in some cases—depending on a covered entity's billing arrangements with wholesalers and how quickly a covered entity chooses to submit a cash replenishment claim—covered entities will receive the cash replenishment payment *even before* they pay the upfront cost for the drug itself. Importantly, these changes should have no impact on patients, nor should it impact the number of lawful 340B purchases by covered entities. We also believe the transparent nature of the Truzo™ platform will help parties more easily resolve any potential disputes prior to needing HRSA's ADR process.

Working with Kalderos, we have put together a robust communications plan to make this change as seamless as possible for covered entities and ensure patients are not impacted. We will endeavor to contact every covered entity directly, via mail and/or email in advance of implementation and inform wholesalers and other vendors. We will also send a notice to HRSA advising covered entities of this change for posting on your website if you are so inclined.

---

[2] As discussed at our September 4 meeting, Lilly will continue its contract pharmacy limited distribution program via the Truzo™ platform.

## II. The Statute Supports a Cash Replenishment Rebate Program

The first line of the 340B statute clearly states that rebates are a permissible form for offering and effectuating a 340B ceiling price: "The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (***taking into account any rebate or discount***, as provided by the Secretary)…does not exceed an amount [describing the 340B ceiling price]…" 42 U.S.C. § 256(a)(1). Indeed, the very next paragraph in the statute, which defines the 340B ceiling price, refers to the price concession designed to achieve that price as the "***rebate*** percentage." 42 U.S.C. § 256(a)(2). Other statutory provisions also strongly suggest that, while not mandatory, Congress likely envisioned the 340B price as a rebate. Notably, the prohibition on duplicate discounts is actually a prohibition on "duplicate discounts or ***rebates***." 42 U.S.C. § 256(a)(5) and the initial version of the statute specified the establishment of an alternative mechanism to "ensure against duplicate discounts or ***rebates***." Thus, as a matter of law, the statutory requirement to offer covered entities covered outpatient drugs at the ceiling price can be effectuated *either* with an upfront discount *or* a post-purchase rebate. Were the law otherwise—despite the plain text requiring taking into account any rebate in determining whether the amount paid exceeds the 340B ceiling price—then the provision of rebates under AIDS Drug Assistance Programs, which HRSA has supported, would be legally impermissible. Likewise, product replenishment—which contemplates that product is initially purchased into general inventory at full price, and then replenished with 340B-priced product—would be impermissible if the statute were wrongly read to always require upfront discounts. Here, with rebates being weekly (perhaps before the covered entity even pays for the purchase of the drug itself), the statutory requirement to offer drugs to covered entities at the ceiling price is plainly satisfied.

The legislative history likewise suggests that Lilly's cash replenishment model is consistent with the 340B Program. While pending in Congress, the bill that would become 42 U.S.C. § 256b was referred to the Committee on Energy and Commerce, which subsequently issued a report recommending that the bill pass. The Committee report indicated that while the bill for the 340B program did not "specify" the "mechanism" by which "'covered entities' would receive these favorable prices," a "manufacturer rebate" was among the available options. H.R. REP. 102-384(II), *16 (1992).

## III. Multiple Statutory Provisions, including those in the Inflation Reduction Act, Compel a 340B Cash Replenishment Option

On May 3, 2024, CMS unambiguously announced that it "will not … assume responsibility for deduplicating discounts between the 340B ceiling price and MFP" and that, at most, it will pass along information of potential 340B duplicates, but only "[t]o the extent dispensing entities *choose to voluntarily and proactively* indicate on a submitted claim that the claim is 340B eligible."[3] HRSA has not issued any guidance to covered entities on this topic, let alone issued any legally binding requirements. And our experience is that covered entities will not proactively provide such data.

Practically, then, this regulatory vacuum leaves the responsibility for avoiding duplicates entirely to manufacturers. Absent binding and enforceable agency rules, an alternative to the wholesaler product replenishment model is needed and some form of cash replenishment such as the Kalderos Truzo™ model, is the only workable alternative. This is so for two reasons. First, because

---

[3] CMS, "Medicare Drug Price Negotiation Program: Draft Guidance, Implementation of Sections 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price (MFP) in 2026 and 2027" (May 4, 2024) at 49. Lilly does not presently market any products subject to the Maximum Fair Price program for IPAY 2026, but we anticipate having products selected in the future.

manufacturers cannot audit for duplicate MFP-340B discounts under either the 340B statute or the IRA, there is simply no way to honor an "upfront" discount in time period "one" only to reverse it or claw it back in time period "two," when – or if – the duplicate is identified. Second, there is no mechanism for manufacturers to compel repayment or refunds from covered entities because no agency or administrative process exists that would contemplate such repayments to manufacturers.

The IRA also created so-called "inflation rebates" for Medicare Part B and Part D utilization that are subject to subject to a similar prohibition against 340B duplicate discounts. With respect to those programs, CMS has, again, effectively disclaimed oversight for ensuring that the statutory command is applied and enforced.

In July 2024, CMS issued the proposed 2025 Physician Fee Schedule rule, in which it addressed the prohibition on 340B duplicate discounts with both Part B and Part D inflation rebates. *See* 89 Fed. Reg. 61596, 61934-84 (July 31, 2024). For Part D, CMS proposes to estimate what percentage of Part D sales are 340B using existing data, and then exclude that number of Part D dispenses from the rebate as presumed 340B duplicates. *Id*. at 61969-73. Besides inaccuracies in the data CMS proposes to use, including undercounting in the Apexus data that HRSA is aware of, this reflects an abdication of regulatory responsibility from CMS similar to the approach taken with MFP deduplication. CMS also proposes, relying on the statutory prohibition on administrative and judicial review in the IRA, to not have any dispute resolution process, and will only receive comments related to mathematical errors. *Id*. at 61979.

In this same proposed rulemaking, CMS also proposes to codify its approach to Part B deduplication that it previously announced in guidance in December 2023. While CMS's guidance directs covered entities to use a 340B claims modifier for Part B claims, CMS failed to address commenters' concerns about the accuracy of such modifiers. CMS also rejected requests to create enforcement mechanisms, a claims clearinghouse, or an audit process, simply saying the agency "expects providers to submit accurate claims and utilize correct modifiers."[4]

For Part B, CMS also rejected calls for a dispute resolution process between Part B inflation rebates and 340B, pointing to the statutory prohibition on administrative or judicial review as preventing such a process and providing that if a manufacturer believes there was a "mathematical error" the issue can be submitted and "CMS may consider [it] at its discretion."[5] In this same guidance CMS also rejected commenters' request that the 340B modifiers be included in the Preliminary Rebate Reports provided to manufacturers.[6]

As such, manufacturers will have no insight into the data used to identify duplicate 340B and Part B or Part D inflation rebates out of the IRA and no recourse when duplicate discounts are paid. Accordingly, the only practical option that Lilly has identified to ensure that the appropriate MFP/340B amounts are paid and to avoid duplicate Part B and Part D inflation rebates is through a rebate operated as a cash replenishment option.

---

[4] CMS, "Medicare Part B Drug Inflation Rebates Paid by Manufacturers: Revised Guidance, Implementation of Section 1847A(i) of the Social Security Act" (Dec. 14, 2023) at 20.
[5] *Id*. at 25.
[6] *Id.* at 40.

## IV. The ADR Regulations Also Necessitate a 340B Cash Replenishment Option

On April 19, 2024, HRSA published a final ADR rule. 89 Fed. Reg. 28643 (Apr. 19, 2024). This rule includes several provisions that necessitate and support a 340B cash replenishment option.

First, 42 C.F.R. § 10.22(c)(1) states that "[a] manufacturer is responsible for obtaining relevant information or documents from any wholesaler or other third party that may facilitate the sale or distribution of its drugs to covered entities." This broad obligation to compel production by a third-party who is not required, and may not be inclined to voluntarily turn over data, documents or records puts manufacturers is a difficult position. They can either "hope" that a third-party furnishes records in a timely way or face potential penalties. Moving to a rebate model effectuated as cash replenishment puts manufacturers in control of the relevant data and information needed to comply with HRSA's ADR requirements.

Second, 42 C.F.R. § 10.22 is broadly styled as "Covered Entity Information and Document Requests" and permits only covered entities to seek and obtain information at will through the ADR process. HRSA expressly declined to provide any parallel opportunity for manufacturers to obtain data that they could use to potentially defend themselves or disprove covered entity claims, absent specific approval by an ADR panel. This access-to-information asymmetry is compounded by the currently pervasive 340B replenishment model, which relies on providing the 340B price on products acquired in arrears (i.e., *after* dispensing product to a customer) through wholesalers, requested by third-party administrators after *post-hoc* eligibility determinations, using black-box accumulator programs and unspecified replenishment logic. A cash replenishment program provides much greater transparency and provides manufacturers with information it is responsible for producing under the ADR rules.

Third, the preamble to the ADR rule recognizes that manufacturer-provided rebates on Managed Medicaid utilization are among the claims permitted under 42 C.F.R. § 10.21. Specifically, HRSA notes that Managed Medicaid utilization is subject to the prohibition on duplicate discounts, under 42 U.S.C. § 256b(a)(5)(C). 89 Fed. Reg. at 28649. This is a welcome development, as many covered entities disclaimed the absolute nature of the statutory prohibition on Medicaid/340B duplicate discounts in comments submitted on the ADR rule, particularly when roughly 85% of Medicaid prescription drug utilization is through Managed Medicaid rather than Medicaid Fee-for-Service. To ensure that manufacturers have the data necessary to develop "reasonable cause" for an audit, and thus the potential to use ADR, a cash replenishment model is needed as that is the only way to "tick-and-tie" Medicaid Managed Care rebate requests to 340B discount requests. Lilly's own recent audit experience demonstrates how deficient the compliance controls related to Managed Medicaid are.

Finally, Lilly still encounters duplicate discounts on Medicaid Fee-for-Service, even though duplicate discounts should be prevented by the so-called "Medicaid Exclusion File" (MEF). Here HRSA has endeavored to create a mechanism to avoid duplicate Medicaid discounts—and we encourage HRSA to do the same for Managed Medicaid— but it only applies to those 15% of Medicaid drug claims covered by "fee-for-service" Medicaid. While duplicate discounts here are generally lower than in the Managed Medicaid context, they still exist. A cash replenishment model improves the compliance environment in this area as well.

***

We appreciate your partnership in this step toward the improved administration of the 340B program. If you have any questions, concerns, please do not hesitate to contact me at your earliest convenience.

Sincerely,

Derek L. Asay
Senior Vice President, Government Strategy, Lilly USA

# Addendum A:

# Information Provided by Kalderos in Response to HRSA Requests for Additional Information

## Covered Entity Experience

Kalderos is committed to the success of covered entities and will be providing white glove support throughout their entire journey via a dedicated success team. From notification, through onboarding, and into regular platform use, we will be supporting the covered entities along the way via a dedicated Customer Success team, on-demand resources, and proactive outreach, all in addition to the easy to use and intuitive Truzo platform.

The Kalderos Customer Success team is aligned to 5 geographic regions. The assigned Customer Success Manager owns the Covered Entity (CE) relationships in their region and will be hand-on to ensure a seamless experience for CEs throughout their journey.

- **Initial Outreach:** Public communication supported by personalized outreach by Kalderos to Authorizing Official and Primary Contact.
- **Enablement:** The Kalderos Truzo Resource Center will include training materials, videos and FAQs. This will be combined with a cadence of CE Webinars and Office Hours.
- **Tailored Support:** Content will be tailored by hospital and non-hospital CE type to provide specific, nuanced support appreciating the different stakeholders profiles, depth of 340B knowledge, resourcing, and retail / acute channel usage across CE types.
- **Monitoring for success:** Proactive monitoring of the CE Onboarding process will occur to ensure CE's have support if needed to get signed up and registered on the Truzo platform.
    - Outreach activities will be tracked to ensure comprehensive coverage across all regions and CE types
    - KPIs to track progress of onboarding by total CEs, regions and types
    - Alerts to call attention to CEs that have stalled in their onboarding process in order to trigger additional outreach
    - The Customer Success Team will review what type of CEs are signing up and if we need to adjust outreach strategy
- **Inbound support:** Covered entities will be directed to the Truzo resource center upon initial outreach and will be able to access the resource center directly from the platform at any time. Covered entities can submit a ticket with any issues or email their assigned customer success manager directly.

The CE platform onboarding process includes the following:

1. **Claiming the profile** - the Authorizing Official claims the profile by confirming their information, reviewing assigned Covered Entities, signing Terms and Conditions, and designating Admins for your Covered Entities.
2. **Connecting a bank account -** the Financial Administrator inputs their bank account information and the platform verifies the connection

3. **Assigning roles to team members -** The administrator can then add other team members requiring access to the Truzo platform and assign the appropriate level of permissions.

After onboarding, covered entities will have enablement resources available to them to ensure they are seeing maximum benefit and success with the platform. The Client Success team will continue to offer proactive support, as well as be available at request of the covered entity. Additionally, we plan to continue our ongoing education through informational content, webinars, and events. These topics include but are not limited to:

- Submitting claims to manufacturers
- Reviewing statuses of their claims and rebates in the platform
- Updating any account information, including contract pharmacy designations
- Requesting discounts for dispenses that occurred prior to cutover but only resulted in a partial accumulations and did not result in a 340B price replenishment
- Understanding reasons for any further inquiries or failed claims

## Data Submission Elements

A covered entity requesting a cash replenishment for a 340B dispense will provide the data fields listed below. Each field included can be mapped directly back to one or more of the Payment Confirmation Checks described in the next section. With this routine, easily accessible claim level detail, the platform can effectuate the 340B discount quickly and proactively identify potential duplicate discounts, so they can be mitigated before they happen - ultimately leading to fewer Good Faith Inquiries and decreased burden on CEs and other stakeholders.

Only one set of data elements will be needed per claim, as a claim will either be "Retail" (for medicines that are usually self-administered) or "Medical" (for medicines that are usually administered by healthcare providers).

### Retail Claim Fields

| Field | Commonly Provided to TPA |
|---|---|
| Unique Transaction ID | Yes |
| RX Identifier (RXID) | Yes |
| Fill Number | Yes |
| NDC11 | Yes |
| Quantity | Yes |
| Unit of Measure | Yes |
| Days Supply | Yes |
| Ordering Physician NPI | Yes |
| CE Submitter (340B ID) | Yes |
| Pharmacy ID (DEA, HIN or NPI) | Yes |
| Date of Service | Yes |
| Paid Date | Yes |
| BIN | Yes |
| PCN | Yes |
| GRP | Yes |
| Claims Modifiers | Yes |

### Medical Claim Fields

| Field | Commonly Provided to TPA |
|---|---|
| Unique Transaction ID | Yes |

| Field | Commonly Provided to TPA |
|---|---|
| NDC11 | Yes |
| Quantity | Yes |
| Unit of Measure | Yes |
| Days Supply | Yes |
| Patient ID (Tokenized) | Yes |
| Ordering Physician NPI | Yes |
| CE Submitter (340B ID or NPI) | Yes |
| CE Administration Location (340B ID) | Yes |
| CE Administration Location - Medical (NPI) | Yes |
| Date of Service | Yes |
| Paid Date | Yes |
| Insured's Plan Name or Program Name | Yes |
| Insured's Policy Group or FECA Number | Yes |
| Claim Modifiers | Yes |

** For purposes of comparison, the Medicare Coverage Gap Discount Program requires submission of 19 data elements per claim, which CMS provides to manufacturers; standard rebate agreements with commercial entities typically include up to 83 data elements per claim.*

## Payment Confirmation Checks

The following checks are performed in the Truzo platform as part of the payment authorization process. If a request is flagged for further review based on one of these checks, the submitting party will be notified and also:

- Will have clear visibility into the underlying reason;
- Will have access to a dedicated Kalderos customer success representative to ask additional questions or raise any concerns;
- Will have the ability to re-submit the claim (if necessary) once any corrections are made.

Outside of these Kalderos-managed solutions, the covered entity is also encouraged to reach out to Lilly directly. As has always been Lilly's policy, the company is willing to work with covered entities on any issues on a case-by-case basis.

| Validation Number | Description |
|---|---|
| 1 | **CE Active in OPAIS:** To be eligible to participate in the 340B program, an entity must be validated as an eligible covered entity in HRSA OPAIS database as of the date of service (DOS) of the claim. |
| 2 | **Contract Pharmacy Relationship:** Where a contract pharmacy is involved, the CE must have an active affiliation with the contract pharmacy on the DOS in the HRSA OPAIS database and conform with specific manufacturer policies. |
| 3 | **Duplicate Claim Submission:** Submitted claim flagged as a duplicate of a previously submitted claim. |
| 4 | **Orphan Drug:** CE type is not eligible for 340B prices on orphan drugs. |
| 5 | **Claim Submission Timing:** Reasonability check for claim submission relative to DOS. |