# EXHIBIT 5

Lilly USA, LLC

Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1.317.276.2000
www.lilly.com

September 23, 2024

*SUBMITTED VIA EMAIL (340BPricing@hrsa.gov)*

Dir. Chantelle V. Britton
Director, Office of Pharmacy Affairs (OPA)
Health Resources and Services Administration (HRSA)
Department of Health and Human Services
5600 Fishers Boulevard
Rockville, MD 20857

**RE: HRSA Questions Related to the Kalderos Cash Replenishment Model**

Dear Director Britton,

I am writing in response to your letter of September 18, 2024. We are disappointed by HRSA's decision to reject Lilly's cash replenishment model and your determination that implementing a rebate model without affirmative approval would violate the 340B statute. We disagree that the Secretary or HRSA has the statutory authority to reject a cash replenishment model on an ad hoc basis. And here the decision to do so is arbitrary and capricious, especially when HRSA has offered no explanation. It is also inconsistent with the agreed-to Pharmaceutical Pricing Agreement, which imposes no such restriction.

Nevertheless, in the interest of transparency, Lilly is providing HRSA with additional information to help the agency better understand the cash replenishment model. To that end, we reproduce below your questions from your September 18, 2024 letter and provide specific answers. We trust they demonstrate that Lilly is acting in good faith and that any concerns about the cash replenishment model are unfounded. At bottom, the cash replenishment model is not only permitted under the 340B statute, it is faster, more direct, and more transparent than the current product replenishment model. And, unlike that existing model, the cash replenishment model will detect and address illegal claims, ensuring compliance with existing laws and new requirements under the Inflation Reduction Act that have made the need for transparency and oversight even more acute.

**1. Shifting to the rebate model would disrupt how the 340B Program has operated for over thirty years. As a result of this shift, covered entities, including those which primarily serve rural and underserved populations, would need to pay significantly higher prices on prescription drugs at the time of purchase.**[1]

The cash replenishment model is not going to disrupt any decades-old operation. It instead is designed to replace a far more recent *product* replenishment model—an after-the-fact system of "replenishing" alleged 340B dispenses of non-340B product with 340B-priced product.

In all events, Lilly disagrees that its cash replenishment model would disrupt the operation of the 340B program or strain covered entities' cash flow. To the contrary, Lilly's model will put money in the hands of covered entities sooner than the contorted product-replenishment model that currently prevails. Regardless, Lilly's cash replenishment model is structurally very similar to the prevailing product replenishment model, while protecting against illegal duplicate discounts and diversion, increasing transparency and compliance, and ensuring covered entities are either better off or in the same position from a cash flow perspective.

[1] We note that bolded text in this letter are the questions HRSA posed to Lilly in its September 18, 2024 letter.

Replenishments and rebates are both *post facto* methods for offering a 340B price. The current 340B inventory replenishment models (and there are two: one for contract pharmacies and a different one for in-house dispenses) both rely on upfront purchases of a medicine at the list price followed by a subsequent "replenishment" of that medicine at the 340B price.[2] Similarly, a cash rebate relies on an upfront purchase of the drug at list price and a replacement of the cash expended in excess of the 340B price. The economic effect is the same: 340B pricing is achieved after the fact. But the cash-rebate process is swifter and more efficient.

Under the current contract pharmacy product "replenishment" model, covered entities are billed for units that a contract pharmacy has ordered to replenish a dispense from general inventory. The covered entity must pay that bill up front, and wait a significant period of time for the contract pharmacy to pay the covered entity the amount collected from the patient or the insurer. Under the Kalderos cash replenishment model, covered entities will receive a rebate before having to pay the bill for the contract pharmacy's 340B purchase, which ensures that they get the full benefit of the 340B ceiling price and are equally or better off than under the product replenishment model. And with respect to in-house dispenses, as we discussed during our September 5 meeting and stated in our September 9 letter, cash flow is improved because a cash (as opposed to product) replenishment model puts cash-in-hand every week on a unit-by-unit basis rather than waiting for whole package dispenses. Entities that serve rural and underserved populations should welcome this change, as should all entities.

> **a. Lilly asserts that the rebate model will have no impact on patients. Has Lilly conducted an evaluation of the impact of this proposal on the scope and breadth of health care access for patients served by affected covered entities?**
>
> Yes. To Lilly's disappointment, the 340B program does not directly benefit patients. It is a revenue maximization program for hospitals, many of which are large and profitable, serve affluent communities, and offer less charity care than their non-340B counterparts.[3] That fact has been confirmed both by court filings[4] and Lilly's own studies. Lilly's cash replenishment model will therefore have no impact on patients.
>
> In late 2019 and early 2020, Lilly conducted a survey of contract pharmacy purchases that confirmed patients were not identified at point-of-sale and did not benefit from 340B prices. Nor could they be, given that they are not even identified as 340B patients until after the product is dispensed and the patient has paid for the medication. This has been confirmed over the last four years. Lilly has not received any complaints from patients related to contract pharmacy policies. These findings show that a cash replenishment model will not harm 340B patients that access medicines through a contract pharmacy.

---

[2] "[The virtual replenishment] model works by establishing a "neutral" inventory, collecting data about each drug dispensed and administered, and then reordering that drug based on accumulations for 340B eligible patients" *See*, Apexus, "340B Split Billing Software Key Attributes" at 1; *see also* Decl. Of Krista M. Pedley ¶ 11, *Eli Lilly and Co. v. HRSA*, No. 1:21-cv-81 (S.D. Ind. June 25, 2021), ECF No. 125-2 (HRSA official stating that under the replenishment system, contract pharmacies use stock replenished at 340B prices as "neutral inventory" that "may be dispensed to any subsequent patient").

[3] *See* Neal Masia, Ph.D., *Comparing the Financial Health and Charitable Care of 340B and Non-340B Hospitals* (2023), *available at* https://www.healthcapitalgroup.com/340b-hospitals-and-charity-care-2023.

[4] "[T]he 340B program does not require passing 340B discounts on to patients" and instead covered entities make a profit because they "receive their drugs at a discount and are reimbursed by insurers, including Medicare, at the non-discounted price of the drug." Amicus Brief of 340B Health 2-3, *Genesis Healthcare v. Becerra*, No. 4:19-cv-1531 (D.S.C., Sept. 20, 2023), ECF No. 124-2.

With respect to in-house dispensing, Lilly engaged consultants and experts who advised us on cash flow dynamics for covered entities. Those experts have shared their opinions that covered entities may actually enjoy better cash flow under the cash replenishment model. We also asked Kalderos to conduct a cash flow analysis for in-house dispensing. This analysis was shared with HRSA at our September 4 meeting.

More fundamentally, the cash replenishment model does nothing to discourage or reverse any lawful 340B purchase so should have no effect on patients whatsoever. Indeed, to the extent that any covered entity ever were to pass on a portion of the 340B discount to a patient, the cash replenishment model would enable the covered entity to do so more readily.

**b. Has Lilly conducted an analysis of the extent of the additional burden and/or costs to the affected covered entities, particularly those that are the sole or primary source of health care in a rural or underserved community?**

There will be no additional burdens or costs to any covered entities, as the data necessary for the cash replenishment model are all readily available and required to be submitted to payors. Covered entities with limited personnel are free to provide access to the Kalderos platform to their vendors. And Lilly will cover all costs associated with the platform.

**c. Lilly indicated that in "some" cases covered entities will receive the cash rebate before paying the upfront cost for the drug itself. Does Lilly have any estimates or has it performed any analysis indicating the proportion of transactions for which this might occur?**

Based on conversations with outside consultants, Lilly understands that many smaller covered entities, which likely describes those that serve rural or underserved populations, have longer payment terms with wholesalers, commonly 30 days. For those entities, weekly payments under the new cash replenishment model mean that rebates should come before wholesaler bills must be paid, meaning entities can leverage the "float" on the rebates that are in their accounts, a benefit they do not enjoy today.

**2. Lilly states that it will require covered entities to submit rebate claims to the rebate platform.**

**a. What other parties, if any, would Lilly share the claims data with?**

Lilly will only share data with State Medicaid Agencies and CMS (or their subcontractors) in limited circumstances: if those entities already possess such claim level data and where Lilly has identified the claim as duplicative of another statutorily prohibited rebate or discount.

**b. What protections and safeguards would Lilly plan to implement to ensure such information would be used in support of the 340B Program?**

The Kalderos platform is designed to collect only the information that is necessary to process a cash replenishment payment to the covered entity and identify statutorily prohibited duplicate discounts. It therefore *is* the plan to ensure that information is used in support of the 340B program, as the program is improved when integrity is assured, and transparency is increased. To that end, identifying and avoiding unlawful duplication helps all 340B stakeholders.

The data collected via Lilly's cash replenishment model is also necessary for any disputes that may arise under the Administrative Dispute Resolution (ADR) process. HRSA regulations purport to require manufacturers in the ADR process to produce documentation currently in the sole possession of wholesalers due to the unique nature of the current product replenishment model. It is unclear if the wholesalers, who are not a party to any ADR dispute, are willing or able to produce this documentation.

Finally, these data could serve as the basis for establishing "reasonable cause" to support a manufacturer audit—another program integrity enhancement.

**c. What protections and safeguards would Lilly plan to implement to ensure the privacy and security of such information?**

Lilly, Kalderos, and JP Morgan (the payment processor) employ robust data security and privacy safeguards. Lilly has established a cybersecurity program aligned to industry best practices aligned with the National Institute of Standards and Technology (NIST) Special Publication 800.53. The program includes requirements to conduct comprehensive third-party assessments to verify the cybersecurity controls, policies, and procedures of its third parties. Additionally, Lilly contractually requires vendors to comply with key cyber security controls through its Information Security Standard.

**d. If available, please provide a copy of the Privacy Policy &Terms of Service (or similarly titled agreements) that would govern Kalderos, covered entities, and any other parties in this process.**

The Kalderos Privacy and Security Policy is available here Kalderos' Privacy Policy. The Lilly Privacy and Security Policy is available here Lilly Supplier Privacy Standards 07.16.24.

**3. If Lilly identifies a potential 340B duplicate discount, how will the rebate claim be adjudicated?**

Under Lilly's cash replenishment model, neither Lilly nor Kalderos would "adjudicate" a claim (which is a pharmacy concept). Instead, Lilly and Kalderos will evaluate whether the necessary data has been submitted to justify a payment to the covered entity. If there is a problem with the covered entities' data submission, Lilly will engage in good faith discussion with the covered entity to resolve the issue.

To be clear, Lilly's cash replenishment model will not involve the rejection of eligible claims *from covered entities*—*i.e.*, claims from covered entities listed on the OPAIS database and that are not prohibited from purchasing orphan drugs, that have not already been submitted by a covered entity for a rebate, and that are for quantities of a medicine that could have been dispensed to a patient. Because Lilly will be processing payments weekly, the covered entities' cash replenishment request will be first in right and will be entitled to the 340B price in the first instance. We fully expect that Lilly will withhold or dispute payment with the other party receiving a duplicate discount—*i.e.*, the state Medicaid program or CMS, as appropriate. Covered entities will not have payments withheld for eligible claims.

**a. What is the timeframe that Lilly will process any such adjudication?**

Lilly will not "adjudicate" any claims. All claims will be evaluated within ten business days of submission by the covered entity or its vendors.

**b. What reconsideration or appeals process will Lilly implement?**

Lilly and Kalderos are committed to high-customer service and quality so that covered entities will always have a live person to engage with on questions or concerns. Finally, under the ADR Rule, any request for appeal or reconsideration necessarily starts with "good faith" dispute resolution—which is consistent with how Lilly operates today and how it operates with all customers in the supply chain.

**c. Will Lilly automatically deny covered entities' 340B rebate claims if Lilly believes a Medicaid rebate was already paid?**

No. In that case, we expect that Lilly will withhold or dispute payment with the state Medicaid program. We expect that covered entities will not have payments withheld and, in many cases, need not even know that a duplicate has occurred.

**d. Will Lilly automatically deny Medicaid rebate claims if Lilly believes a covered entity's 340B rebate claims have already been paid?**

No. Lilly will not deny the Medicaid rebate claim; where appropriate, Lilly will "dispute" the claim in accordance with state and federal Medicaid dispute procedures and work with the states to resolve those disputes, as it does today. This simply provides better data and transparency, which will help make that process more efficient.

**4. Will covered entities receive claim-by-claim information from Lilly regarding which claims were rejected and on what basis?**

Lilly will not be "rejecting" eligible cash replenishment claims. As we explained and demonstrated at our September 4 meeting, covered entities will see the exact same data—on a claim-by-claim basis—that Lilly will see in the Kalderos platform. We think this represents a significant and meaningful advance over the current opaque product replenishment model in terms of fostering transparency and trust between covered entities and manufacturers.

**5. What reconsideration or appeals process will Lilly implement to ensure covered entities receive any 340B discounts that are required by statute?**

As discussed at Question 3 above, in the rare event where there is a problem with the covered entities' data submission, Lilly will engage in good faith discussions with covered entities, as we always have, as required by the ADR, and as already happens in the routine course of dealing with all of our customers. This will all be consistent with current practice.

**6. Lilly provided a listing of the data elements that it will collect for the validation of claims. Please indicate how these data elements align with the compliance requirements in the 340B statute. The documentation submitted by Lilly refers to a "reasonability check" for claim submissions relative to the date of service. Please explain what will be involved in this "reasonability check."**

See Exhibit 1 in response to the request for information related to specific data elements and why they are necessary to comply with the 340B statute and other legal requirements. With respect to the "reasonability check" referenced in the September 9 letter, that related solely to issues around claims submission timing. Claims that are very old or stale may need to be compared against Medicaid or Medicare rebate claims or prior entity submissions from different time periods. Lilly

might also have questions about why such claims took so long to submit, given such submissions are not consistent with ordinary course practice.

**7. With respect to the use of pharmacies with which covered entities contract:**

**a. Will covered entities need to demonstrate that they purchased individual drugs subject to the rebate claim at wholesale acquisition cost?**

No. Lilly plans to issue rebates in an amount equal to WAC – 340B.

**b. Will this process require covered entities to maintain a separate stock of drugs at the contract pharmacy?**

No. Indeed, this process resolves one of the most troubling—and unlawful—elements of the current "product replenishment model," which is the commingling of 340B product and non-340B product in pharmacy stores and dispensing of 340B replenishment product to non-patients, which leads to diversion in violation of the 340B statute.

**c. If so, how does Lilly plan to ensure this process does not functionally deny covered entities access to the 340B price required by the statute given the additional upfront cost and administrative burden for covered entities, particularly low-margin safety net providers?**

No answer is required here because Lilly's cash replenishment model does not require covered entities to maintain a separate stock of drugs at a contract pharmacy.

**8. In 2023, Lilly requested that HRSA post two different refund notices to covered entities on its website as part of standard restatements of 340B drugs. As part of that process, Lilly issued refunds using wholesaler chargeback data. Under this model, how will Lilly operationalize refunds when there are standard restatements in a way that supports the requirement to provide the 340B price?**

Today, for routine restatements of Medicaid prices (authorized under 42 C.F.R. 447.510), Lilly generates and sends physical (paper) checks to covered entities via US Mail—some of which go uncashed because of human error. For restatements related to launch product differences, Lilly provides a wholesaler credit, which may not be drawn down or may be drawn down with a lag. The cash replenishment model makes the overcharge refund process (and thus improved compliance with HRSA's rules) much more straightforward. Using Kalderos, Lilly can authorize automatic deposits of any refund amounts directly into covered entity accounts via ACH or wire transfer. Moreover, using Kalderos, Lilly can efficiently issue payments as small as one penny, even though Lilly already leads the industry in its automatic refund method by issuing checks or credits for refunds as low as $1.00 (entities seeking refunds below that can contact Lilly).

**9. Under this proposal, how would Lilly treat current unreplenished accumulations?**

Covered entities that have unreplenished accumulations can submit for cash replenishment by submitting the unit level claims data to Lilly beginning on the effective date of the program. As the date of dispense will be prior to effective date for providing claim level data, covered entities will be asked to provide a screenshot of their inventory accumulations from their split-billing/virtual inventory system to substantiate the units submitted that have been dispensed prior to go-live that have been accumulated against a saleable package.

**10. Under Lilly's plan, contract pharmacy restrictions would be managed by Kalderos and the 340B ESP model would no longer be used. What transition time will be provided to covered entities that need to designate contract pharmacies in a new system? HRSA has received a number of reports of technical and customer service difficulties with 340B ESP. How would Lilly ensure covered entities could submit claims without technical difficulties or delays and would be able to access customer support without any significant issues under the Kalderos model?**

Lilly is planning to seek consent from covered entities to handle, on behalf of the covered entity, the transition of existing contract pharmacy designations from BRG ESP to Kalderos and send confirmation of the transition upon completion, so no action should be needed related to designations when the entity enrolls in Kalderos. However, if the covered entity wishes to terminate their enrollment in the 340B ESP program directly and re-enroll via Kalderos directly, it is also free to do that.

*****

While we disagree that HRSA has the authority to reject (or require approval of) a cash replenishment model on an ad hoc basis, we understand that HRSA has made a determination that Lilly implementing its cash replenishment model would violate the 340B statute. Our hope is that the information provided in this letter has caused HRSA to reconsider or change that decision. If that's the case, please let us know by October 7, 2024. Otherwise, we will assume HRSA stands by the position taken in its September 18, 2024 letter.

We stand ready to work with HRSA to ensure orderly and efficient administration of the 340B program. Please feel free to contact me at derek.asay@lilly.com directly if you have any questions or need any additional information. Thank you for your attention to this very important matter.

Sincerely,

Derek L. Asay
Senior Vice President, Government Strategy

**Exhibit 1:**
**Response to Question 6**
*(Note a drug is either retail or medical, not both)*

**Retail Claims Fields**

| Field | Purpose/340B Compliance/IRA Compliance |
|---|---|
| Unique Transaction ID | Allows covered entities to internally track of claims. |
| RX Identifier (RXID) | Allows Lilly to match claim with Medicaid and Part D Inflation Rebates and Maximum Fair Price claims to identify duplicate discounts. |
| Fill Number | Allows distinguishing between multiple fills made in the same day by the same patient to reconcile if flagged as a potentially duplicative claim. |
| NDC11 | Necessary to tie the discount request to a specific product and pricing. Allows Lilly to match claim with Medicaid and Part D Inflation Rebates and Maximum Fair Price claims rebate request to identify duplicate discounts. |
| Quantity | Necessary to calculate the discount amount. Allows Lilly to match claim with Medicaid and Part D Inflation Rebates and Maximum Fair Price claims to identify duplicate discounts. |
| Unit of Measure | Unit type must match the expected unit type in order to accurately calculate the discount amount (milliliter, tablet, pre-filled pen, etc.). |
| Days' Supply | Necessary for unit of measure / aberrant quantity validation. Assists in determining if dispense amount is reasonable based on Dosage and Administration as published in FDA label. |
| Ordering Physician NPI | Allows Lilly to match claim with Medicaid and Part D Inflation Rebates and Maximum Fair Price claims to identify duplicate discounts and necessary to identify duplicate claim identification across different CEs. |
| CE Submitter (340B ID) | Ensures CE is registered on HRSA OPAIS for the date at issue. Identifies origin of claim submission and ensures that this ID ties back to the appropriate CE account. |
| Pharmacy ID (DEA, HIN or NPI) | Ensures pharmacy is registered on HRSA OPAIS for the date of service. |
| Date of Service | Allows Lilly to match claim with Medicaid and Part D Inflation Rebates and Maximum Fair Price claims to identify duplicate discounts and ensures that entity or |

| Field | Purpose/340B Compliance/IRA Compliance |
|---|---|
| | pharmacy was 340B eligible based on HRSA database listing. |
| Paid Date | Allows Kalderos to determine whether adjustments or reversals were made that could identify if two claims were made on the same dispense. |
| BIN | Allows Lilly to match claim with Managed Medicaid plan rebate requests to identify duplicate discounts. |
| PCN | Allows Lilly to match claim with Managed Medicaid plan rebate requests to identify duplicate discounts. |
| GRP | Allows Lilly to match claim with Managed Medicaid plan rebate requests to identify duplicate discounts. |
| Claims Modifiers | Necessary for reimbursement on "wastage" amounts and to reconcile if flagged as duplicate claim. |

**Medical Claims Fields**

| Field | Purpose/340B Compliance/IRA Compliance |
|---|---|
| Unique Transaction ID | Unique ID helps CE track claim and tie back to a specific dispense / administration in their own EMR. Supports traceability to specific dispense for HRSA Audits. |
| NDC11 | Necessary to tie the discount request to a specific product and pricing. Allows Lilly to match claim with Medicaid rebate request to identify duplicate discounts. |
| Quantity | Necessary to calculate the discount amount. Allows Lilly to match claim with Medicaid and Part D Inflation Rebates and Maximum Fair Price claims to identify duplicate discounts. |
| Unit of Measure | Unit type must match the expected unit type in order to accurately calculate the discount amount (milliliter, tablet, pre-filled pen, etc.). |
| Days' Supply | Necessary for unit of measure / aberrant quantity validation. Assists in determining if dispense amount is reasonable based on Dosage and Administration as published in FDA label. |
| Patient ID (Tokenized) | Allows for internal tracking of claim as medical claims lack unique identifiers. If CE does not want to tokenize, Kalderos will automatically do so in the Truzo platform. |
| Ordering Physician NPI | Allows Lilly to match claim with Medicaid and Part D Inflation Rebates and Maximum Fair Price claims to identify duplicate discounts. |

| Field | Purpose/340B Compliance/IRA Compliance |
|---|---|
| CE Submitter (340B ID or NPI) | Ensures CE is registered on HRSA OPAIS for the date at issue. |
| CE Administration Location (340B ID) | Identifies origin of claim submission and ensures that this ID ties back to the appropriate CE account |
| CE Administration Location - Medical (NPI) | Identifies origin of claim submission. |
| Date of Service | Allows Lilly to match claim with Medicaid and Part D Inflation Rebates and Maximum Fair Price claims to identify duplicate discounts. |
| Paid Date | Allows Kalderos to determine whether adjustments or reversals were made that could identify if two claims were made on the same dispense. |
| Insured's Plan Name or Program Name | Allows Lilly to match claim with Managed Medicaid rebate request to identify duplicate discounts. |
| Insured's Policy Group or FECA Number | Allows Lilly to match claim with Managed Medicaid rebate request to identify duplicate discounts. |
| Claim Modifiers | Necessary for reimbursement on “wastage” amounts. |