# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELI LILLY AND COMPANY, *et al.,* | |
| *Plaintiffs*, | |
| v. | |
| ROBERT F. KENNEDY JR., *et al.,* | Case No. 1:24-cv-3220 (DLF) |
| *Defendants*. | |
| BRISTOL MYERS SQUIBB COMPANY, | |
| *Plaintiff*, | |
| v. | |
| ROBERT F. KENNEDY JR., *et al*, | Case No. 1:24-cv-3337 (DLF) |
| *Defendants*. | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| *Plaintiff*, | |
| v. | |
| ROBERT F. KENNEDY JR., *et al*, | Case No. 25-cv-0117 (DLF) |
| *Defendants*. | |
| SANOFI-AVENTIS U.S. LLC | |
| *Plaintiff*, | |
| v. | Case No. 1:24-cv-3496 (DLF) |
| ROBERT F. KENNEDY JR., *et al.*, | |
| *Defendants*. | |

**INTERVENOR DEFENDANTS 340B HEALTH, UMASS MEMORIAL MEDICAL CENTER, AND GENESIS HEALTHCARE SYSTEM'S BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

I.    STATUTORY BACKGROUND ............................................................................. 3

II.   THE 340B PROGRAM DELIVERS BENEFITS TO LOW-INCOME PATIENTS
      AND COMMUNITIES ......................................................................................... 6

III.  THE PRODUCT REPLENISHMENT MODEL................................................... 10

IV.   PLAINTIFFS' REBATE PROPOSALS ..............................................................11

LEGAL STANDARD ................................................................................................... 17

ARGUMENT ............................................................................................................... 18

I.    340B REQUIRES UP-FRONT PRICE REDUCTIONS, NOT POST-PURCHASE
      REFUNDS............................................................................................................ 18

   A.   The Plain Statutory Language Requires Up-Front Price Reductions ............... 18

   B.   Rebates are Inconsistent with the Structure of the 340B Statute as a Whole .................. 24

   C.   Plaintiffs' Reading Blesses Absurd Results That Threaten to Undermine the
        340B Statute Altogether............................................................................... 27

   D.   Plaintiffs' Attempts to Obfuscate the Statutory Text Fail ................................. 30

   E.   Plaintiffs' Justification for Rebate Models Is Without Merit............................. 33

II.   REQUIRING MANUFACTURERS TO OFFER PRE-PURCHASE PRICE
      REDUCTIONS AS MANDATED BY THE 340B STATUTE DOES NOT
      VIOLATE THE APA ........................................................................................... 38

   A.   Plaintiffs' APA Arguments Fail with its Incorrect Reading of the 340B Statute ............. 38

   B.   Even if a Rebate Model were Permissible, HRSA's Actions were not Arbitrary or
        Capricious .................................................................................................... 39

   C.   If the Court Determines that HRSA Acted in an Arbitrary and Capricious Manner,
        the Proper Remedy is to Send the Issue Back to HRSA Without Vacating HRSA's
        Policy Letters ............................................................................................... 41

III.  HRSA DID NOT VIOLATE THE CONSTITUTIONAL RIGHTS OF NOVARTIS
     AND BMS ................................................................................................................... 42

CONCLUSION ................................................................................................................................ 45

## TABLE OF AUTHORITIES

**CASES**

*Abbott Laboratories v. Portland Retail Druggists Ass'n,*
  425 U.S. 1 (1976)................................................................................................11

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
  429 F.3d 1136 (D.C. Cir. 2005)......................................................................... 42

*Am. Hosp. Ass'n v. Becerra,*
  596 U.S. 724 (2022).......................................................................................29-30

*Am. Radio Relay League, Inc. v. F.C.C.,*
  524 F.3d 227 (D.C. Cir. 2008)........................................................................... 40

*Astra USA, Inc. v. Santa Clara County,*
  563 U.S. 110 (2011).............................................................................. 3, 22, 26

*Boechler, P.C. v. Comm'r of Internal Revenue,*
  596 U.S. 199 (2022)........................................................................................... 23

*Bristol Myers Squibb v. Kennedy,* No.
  24-cv-3337 (D.D.C. Nov. 26, 2024) ............................................................ 12, 36

*Chickasaw Nation v. United States,*
  534 U.S. 84 (2001).............................................................................................. 23

*County of Sacramento v. Lewis,*
  523 U.S. 833 (1998)............................................................................................ 43

*Davis v. Michigan Dept. of Treasury,*
  489 U.S. 803 (1989))........................................................................................... 24

*Donnelly v. F.A.A.,*
  411 F.3d 267, 272 (D.C. Cir. 2005)................................................................... 17

*Eagle Pharms., Inc. v. Azar,*
  952 F.3d 323 (D.C. Cir. 2020)........................................................................... 30

*Eli Lilly v. Kennedy,*
  No. 24-cv-3220 (D.D.C. Nov. 14, 2024) ......................................2, 9, 11, 12. 33, 36

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018)............................................................................................ 44

*F.C.C. v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)....................................................................................... 39, 40

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
 592 U.S. 414 (2021) ........................................................................... 41

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000) ........................................................................... 23

*Griffin v. Oceanic Contractors, Inc.*,
 458 U.S. 564 (1982) ........................................................................... 27

*Henry v. Sec'y of Treasury*,
 266 F. Supp. 3d 80 (D.D.C. 2017) ...................................................... 17

*Johnson & Johnson v. Kennedy,*
 No. 24-cv-3188 (RC) (D.D.C. Nov. 12, 2024) ................................... 13

*King v. Burwell*,
 576 U.S. 473 (2015) ........................................................................... 24

*Liu v. Sec. & Exch. Comm'n*,
 591 U.S. 71 (2020) ............................................................................. 21

*Mackey v. Lanier Collection Agency & Service, Inc.*,
 486 U.S. 825 (1988) ........................................................................... 22

*Mapes v. Reed*,
 487 F. Supp. 3d 20 (D.D.C. 2020) ...................................................... 26

*Marshall Cnty. Health Care Auth. v. Shalala*,
 988 F.2d 1221 (D.C. Cir. 1993) .......................................................... 17

*Massachusetts v. E.P.A.*,
 549 U.S. 497 (2007) ........................................................................... 39

*Mathews v. Eldridge*,
 424 U.S. 319 (1976) ........................................................................... 44

*McDonough v. Mabus*,
 907 F. Supp. 2d 33 (D.D.C. 2012) ...................................................... 39

*Moss by Mutakabbir v. Smith*,
 794 F. Supp. 11 (D.D.C. 1992) ........................................................... 26

*Nat'l Ass'n for Advancement of Colored People v. DeVos*,
 485 F. Supp. 3d 136 (D.D.C. 2020) .................................................... 17

*Nat'l Min. Ass'n v. Fowler*,
 324 F.3d 752 (D.C. Cir. 2003) ............................................................ 43

*Novartis Pharmaceuticals Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) ........................................................... 5, 8, 22, 31, 32

*Novartis v. Kennedy*,
    No. 25-cv-117 (D.D.C. Jan. 15, 2025) ....................................................... 11, 12, 36

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
    587 U.S. 601 (2019) ........................................................................... 17

*Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*,
    43 F. Supp. 3d 28 (D.D.C. 2014) ............................................................. 29

*Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ............................................................ 17

*Rancho Vista del Mar v. United States*,
    640 F. Supp. 3d 112 (D.D.C. 2022) ........................................................... 39

*Roberts v. Sea-Land Servs., Inc.*,
    566 U.S. 93 (2012) ............................................................................ 24

*Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*,
    58 F.4th 696 (3d Cir. 2023) ............................................................ 5, 8, 18, 22, 31, 32

*Sanofi v. Kennedy*,
    No. 24-cv-3496 (D.D.C. Dec. 16, 2024) ..................................... 2, 11, 12, 14, 15, 16, 40

*St. Lawrence Seaway Pilots Ass'n, Inc. v. United States Coast Guard*,
    85 F. Supp. 3d 197 (D.D.C. 2015) ............................................................ 41

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) .............................................................. 42

*Sylvia Dev. Corp. v. Calvert County*,
    48 F.3d 810 (4th Cir. 1995) ................................................................. 42

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .......................................................................... 44

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011) .......................................................................... 22

*United W. Bank v. Off. of Comptroller of Currency*,
    928 F. Supp. 2d 70 (D.D.C. 2013) ............................................................ 40

*Universal Health Servs., Inc. v. United States*,
    579 U.S. 176 (2016) .......................................................................... 32

*Util. Air Regul. Grp. v. E.P.A.*,
   573 U.S. 302 (2014)...................................................................................................... 26

**STATUTES**

42 C.F.R. § 10.10 ................................................................................................................ 19, 20

42 C.F.R. § 438.3 ...................................................................................................................... 35

42 U.S.C. § 1396r-8 .................................................................................................... 4, 19, 28, 25

*42 U.S.C. § 256b.................................................. 1, 3, 4, 5, 6, 15, 18, 20, 22, 23, 24, 25, 33, 37

5 U.S.C. § 706............................................................................................................................ 41

**OTHER AUTHORITIES**

137 Cong. Rec. E3,138-02 (daily ed. Sept. 24, (1991))............................................................ 4

*340B Drug Pricing Program: Fact vs. Fiction*,
   Am. Hosp. Ass'n (Mar. 2021)............................................................................................ 7

340B Health Comment Letter to CMS relating to Medicare Drug Price Negotiation
   Program Draft Guidance, July 2, 2024 ............................................................................ 37

Allen Dobson et al., *340B DSH Hospitals Serve Higher Share of Patients with
   Low Incomes*, Dobson DaVanzo Health Economics Consulting 21 (Sept. 26, 2022) ............ 6, 8

B. Garner,
   Modern English Usage 1020 (4th ed. 2016))................................................................... 23

*Bristol Myers Squibb Reports Fourth Quarter and Full-Year Financial Results*........................... 2

Centers for Medicare and Medicaid Services, Medicaid Drug Rebate Notice for
   Participating Drug Manufacturers, (June 29, 2017) .................................................... 35

*Clarification on the Use of Medicaid Exclusion File*,
   HRSA (Dec. 12, 2014)...................................................................................................... 34

*Drugmakers pulling $8 Billion Out of Safety-Net Hospitals*,
   340B Health, (July 2023) (last accessed Feb. 27, 2025).......................................... 13

*FAQs*, HRSA (last visited Mar. 18, 2025) ............................................................................... 10

Federal Trade Commission,
   University of Michigan Advisory Opinion (Apr. 9, 2010) .......................................... 11

H.R. Rep. No. 102-384(I) (1991), 1991 WL 255976 ................................................................. 3

H.R. Rep. No. 102-384(II) (1992), 1992 WL 239341 .................................................. 4

*HRSA Program Integrity, FY 22 Audit Results,*
    HRSA (Oct. 28, 2024)........................................................................................... 34

KNG Health Consulting,
    *340B Hospitals Increased Contributions to Uncompensated and Unreimbursed*
    *Care During the Pandemic* (February 2025), 340B Health ........................................ 7

Letter from Brett A. Shumate, Counsel for Sanofi-Aventis U.S., LLC to
    Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA (Nov. 1, 2024) ................11

Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs to Paul Hudson, Chief
    Executive Officer, Sanofi-Aventis U.S. LLC (Dec. 13, 2024) .......................................... 12, 40

Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs,
    HRSA to Linda Kamin, Executive Director, Contract Operations and Government
    Reporting, Bristol Myers Squibb (Nov. 4,2024)........................................................ 12, 13

Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA,
    to Lucas  Montarce, Executive Vice President and Chief Financial Officer, Eli Lilly
    and Company (Sept. 18, 2024) ................................................................................... 12

Letter from Derek L. Asay, Senior VP, Government Strategy, Lilly USA, to
    Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA et al.
    (Sept. 9, 2024)..........................................................................................................2, 11

Letter from Perry E. Knight, Vice President, Law – Strategic Customer Group,
    Johnson & Johnson, to Rear Admiral Krista M. Pedley, Director, Office of
    Special Health Initiatives, HRSA, et al. (July 31, 2024) ............................................ 13

Medicare Drug Price Negotiation Program: Draft Guidance, Implementation of
    Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability
    Year 2027 and Manufacturer Effectuation of the Maximum Fair Price (MFP)
    in 2026 and 2027 (May 3, 2024)........................................................................... 37, 43

*Oversight and Administration of the 340B Drug Discount Program: Improving*
    *Efficiency and Transparency: Hearing before the Subcommittee on Oversight*
    *and Investigations of the Committee on Energy and Commerce,* 109th Cong. 47–48
    (Dec. 15, 2005) ..................................................................................................... 38

*Preliminary Results of 340B Health Survey: Impact of Rebates on 340B Hospitals,*
    340B Health (Mar. 18, 2025) ................................................................................. 14

Public Law 111-1148, 124 Stat. 119 (a) ....................................................................... 6

Report to Congressional Committees, GAO-11-836,
*Manufacturer Discounts in the 340B Program Offer Benefits, but Federal*
*Oversight Needs Improvement*, GAO (Sept. 2011)...................................................... 7

Sanofi Notice to Covered Entities (November 22, 2024) ................................... 2, 16, 17

*Setting the Record Straight on 340B: Fact vs. Fiction*,
Am. Hosp. Ass'n (Jan. 2025)...................................................................................... 8

Steven Heath et al.,
*340B DSH Hospitals Increased Uncompensated Care in 2020 Despite Significant*
*Financial Stress*, (Dobson DaVanzo Health Economics Consulting (2022)) ...................... 7, 18

U.S. Gov't Accountability Off., GAO-20-212,
*340B Drug Discount Program: Oversight of the Intersection with the Medicaid*
*Drug Rebate Program Needs Improvement* (Jan. 27, 2020) ...................................... 35

*UPDATED: Drugmakers Cutting 340B Discounts Reported Record Revenues in 2021*,
340B Health (Jan. 13, 2023) (last accessed Feb. 27, 2025) ...................................... 13

## REGULATIONS

340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties
Regulation, 82 Fed. Reg. 1210 (Jan. 5, 2017) ................................................... 19, 20

Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate
Option, 63 Fed. Reg. 35,239 (June 29, 1998)........................................................ 5, 6

Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19,
61 Fed. Reg. 65406 (Dec. 12, 1996)...................................................................... 15

Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and
Entity Eligibility, 61 Fed. Reg. 207 (Final Notice October 24, 1996)...................... 16

Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate
Option, 62 Fed. Reg. 45823 (Aug. 29, 1997) .......................................................... 4

Notice Regarding the Section 340B Drug Pricing Program – Program Guidance
Clarification, 65 Fed. Reg. 13983 (March 15, 2000)................................................ 5

## INTRODUCTION

This case presents a narrow question of statutory interpretation. Despite Manufacturer-Plaintiffs', Eli Lilly and Company and Lilly USA, LLC (Lilly), Bristol Myers Squibb Company (BMS), Sanofi-Aventis U.S. LLC (Sanofi), and Novartis Pharmaceuticals Corp. (Novartis) (together, Plaintiffs), best efforts to distract the Court with irrelevant and unfounded allegations about the 340B Drug Discount Program (340B Program), this case boils down to reading and giving meaning to the full text of the statute that established the 340B Program, 42 U.S.C. § 256b. In line with the 340B Program's venerable goals, Congress required, as set forth in the statute's text, that drug manufacturers provide up-front reductions in the price of covered drugs at the time those drugs are sold to certain public and not-for-profit hospitals, community health centers, and other federally funded clinics that provide care to communities with a large number of low-income and other vulnerable patients (340B Providers, described in the statute as "covered entities"). That command resolves this case.

Under the 340B Program, drug manufacturers, including Plaintiffs, must provide up-front discounts on certain covered drugs to 340B Providers. 340B Providers use the cost savings from these discounts to provide, among other benefits, community programs to support low-income and vulnerable populations, exactly as Congress intended when it created the program.

Plaintiffs disagree with how the 340B Program works and make unsubstantiated claims about non-compliance. But rather than take those complaints up with Congress or use the compliance and audit mechanisms available to them under the 340B statute, Plaintiffs seek to rewrite the statutory language. Based on their flawed interpretations, Plaintiffs wish to impose rebate models that are fundamentally at odds with the 340B statute and the way the 340B Program has functioned since its inception in 1992. These rebate models would require hospitals eligible to participate in 340B (340B Hospitals) and, under some models, other 340B providers, to purchase

1

certain, or in some cases, all 340B-eligible drugs at their (often shockingly high) full price, collect and submit patient data, and then wait to receive a rebate.[1] Any such process removes a critical component of the 340B Program: 340B Hospitals' access to up-front 340B discounts.

Delaying access to up-front discounts means that 340B Hospitals would have to spend significantly more to maintain their drug inventory and effectively float Plaintiffs, whose annual profits are as high as 34.3 billion dollars,[2] the difference between the full price of the 340B drug and the 340B discount price. This would reduce the funds that 340B Providers have available to serve their low-income, rural, and underserved patients, an outcome that undermines the very goals of the 340B Program. Rebate models would also give Plaintiffs nearly unchecked discretion over which prescriptions will receive the 340B rebate, and there is no mechanism that guarantees the rebate will be issued. As just one example, and as further discussed *infra*, Sanofi is attempting to re-write the requirements for a drug's eligibility for the 340B discount price through the terms of its proposed rebate model.[3] That discretion creates a completely new statutory regime whereby drug manufacturers, which have every incentive to limit the 340B Program, determine the implementation and compliance rules of the 340B Program. The 340B statute plainly bars this scheme.

---

[1] Eli Lilly's rebate model would apply to all 340B Providers and to all the company's 340B drugs. Letter from Derek L. Asay, Senior VP, Government Strategy, Lilly USA, to Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA et al. (Sept. 9, 2024), *Eli Lilly v. Kennedy,* No. 24-cv-3220 (D.D.C Nov. 14, 2024), Dkt. No. 1-4. Other rebate models would apply, at least initially, to specific categories of 340B Providers and to some or all the manufacturers' 340B drugs.

[2]    For example, BMS's net income in fiscal year 2024 was approximately $34.3 billion. *Bristol Myers Squibb Reports Fourth Quarter and Full-Year Financial Results,* https://tinyurl.com/yc7jn27v.

[3]    Sanofi Notice to Covered Entities (Nov. 22, 2024) at 4-5, *Sanofi v. Kennedy,* No. 24-cv-3496 (D.D.C. Dec. 16, 2024), Dkt. No. 1-6.

The relevant statutory text, 42 U.S.C. § 256b(a)(1), contains only two sentences. Plaintiffs reach their conclusion that the statute permits them to impose rebate models by misunderstanding the first sentence and by failing to give meaning to the second sentence, which Congress added in 2010. Read together and in the context of the entire statute as required by proper statutory interpretation principles, the two sentences in 42 U.S.C. § 256b(a)(1) make clear that up-front price reductions are required. At bottom, Plaintiffs urge an improper interpretation of the statute because they do not like—and have never liked—the 340B Program, which reduces Plaintiffs' substantial profits by reducing the cost of essential drugs paid for by 340B Providers.

Plaintiffs' Complaints are just the latest of drug manufacturers' attempts to undermine the 340B Program. But Congress made the exact policy choices that Plaintiffs criticize throughout their briefing through the text and structure of the 340B statute. This Court should reject Plaintiffs' blatant attempts to subvert the will of Congress and to substitute their own vision in place of a system that meets the goals of the 340B Program.

## **BACKGROUND**

### I.    STATUTORY BACKGROUND

Congress enacted the 340B Program in 1992 to cap the amount that 340B Providers must pay for drugs that are prescribed to their patients. *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). The statute was intended to curb the significant drug price increases that followed the Omnibus Budget Reconciliation Act of 1990, which required manufacturers to offer rebates for Medicaid drugs that would match their lowest prices, or "best prices," offered to other purchasers. The House Committee on Veterans' Affairs found that manufacturers had significantly increased their prices to reduce the financial impact of the new Medicaid rebates on their profits. H.R. Rep. No. 102-384(I) (1991), 1991 WL 255976. The 340B statute was passed to require manufacturers to pass on the value of the new Medicaid rebates to safety net hospitals, community

3

clinics, and other public health providers. 137 Cong. Rec. E3,138-02 (daily ed. Sept. 24, (1991)) (statement of Rep. Wyden), 137 Cong Rec E 3,138-02, at *E3,138-02 (Westlaw). Congress's intent was to "reduce the costs of operations" for 340B Providers and allow them to "stretch scarce Federal funding as far as possible" so that they could reach more eligible patients. H.R. Rep. No. 102-384(II), at 12 (1992), 1992 WL 239341.

Under the 340B Program, drug manufacturers enter into agreements with the Secretary of Health and Human Services (HHS) known as Pharmaceutical Pricing Agreements (PPAs). 42 U.S.C. § 256b(a)(1). PPAs reiterate the statutory formula through which the prices for covered drugs are calculated: the average manufacturer price (AMP) as understood under the Social Security Act less a rebate percentage, which is determined through a formula set out in the 340B Statute using calculations made in the prior quarter under the Medicaid Drug Rebate Program (MDRP). *Id.* § 256b(a)(1), (a)(2)(A).[4] Since the inception of the 340B Program more than 30 years ago, drug manufacturers have met their price reduction obligations under the 340B statute and PPAs through up-front price reductions in the cost of covered drugs. Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45823, 45824 (Aug. 29, 1997).[5]

---

[4]   The minimum amount of the discount is the greater of: (a) the "minimum [statutory] rebate percentage," currently either 23.1, 17.1 or 13 percent depending on the type of drug; or (b) the difference between AMP and "the lowest price" the drug company has charged during the "rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity," whichever is greater. The discount is further increased when AMP increases faster than the consumer price index for all urban consumers. 42 U.S.C. § 1396r-8(c)(1), (2).

[5]   HRSA recognized one exception to up-front price reductions under 340B. State AIDS Drug Assistance Programs (ADAPs) are permitted to participate in the 340B Program through rebates, rather than discounts, because they reimburse pharmacies for drugs and do not always purchase covered drugs directly. Because the ADAP drug purchasing mechanism prevented most ADAPs from accessing the benefits of 340B, in 1998 HRSA authorized ADAPs to utilize rebates as "an optional alternate means of accessing section 340B discount pricing" and made clear that it was doing so to meet "the unique needs" of ADAPs and was not authorizing a rebate option beyond

Beyond the most basic purpose of capping the cost of drugs for 340B Providers, the 340B statute lays out a comprehensive scheme through which drug manufacturers and 340B Providers participate in the 340B Program under the supervision of the Health Resources and Services Administration (HRSA) in HHS. For example, the 340B statute allows manufacturers and HRSA to audit 340B Providers to ensure compliance with the prohibition on diversion (selling a 340B drug to an ineligible patient). The Secretary has also implemented a policy to prevent Medicaid duplicate discounts (wherein after selling a drug at the 340B discount, the manufacturer subsequently provides a Medicaid rebate on that same drug in response to a request from a State Medicaid agency) which requires 340B Providers to report their Medicaid billing numbers to HRSA if they use 340B for Medicaid patients. 42 U.S.C. §256b(a)(5)(A)–(C), *Notice Regarding the Section 340B Drug Pricing Program – Program Guidance Clarification,* 65 Fed. Reg. 13983 (March 15, 2000); *see also, Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). Should a manufacturer or HRSA discover through an audit that a 340B Provider has violated these provisions, various sanctions may be imposed by the Secretary. 42 U.S.C. § 256b(a)(5)(D); *see also Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 700 (3d Cir. 2023). The statute channels certain disputes that arise between manufacturers and 340B Providers into an Administrative Dispute Resolution (ADR) process. 42 U.S.C. § 256b(d)(3). Through ADR, 340B Providers may bring complaints that they were overcharged for covered drugs and manufacturers (after conducting an audit) may bring

---

ADAPs. Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35,239, 35,242 (June 29, 1998). In allowing ADAPs to access 340B pricing through rebates, HRSA cautioned manufacturers that they may not "condition a rebate contract or agreement upon . . . entities' compliance with the provisions of section 340B." *Id.* at 35,239.

complaints that 340B Providers are violating the prohibition on diversion and/or duplicate discounts. *Id.*

Recognizing the value it provides, Congress expanded the 340B Program as part of the 2010 Affordable Care Act (ACA) to include additional 340B Providers. Public Law 111-1148, 124 Stat. 119 (a). In addition to expanding the types of 340B Providers that could access the 340B discount, the ACA added a provision that the PPAs "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1).

## II.    THE 340B PROGRAM DELIVERS BENEFITS TO LOW-INCOME PATIENTS AND COMMUNITIES.

340B Providers, including 340B Hospitals such as Intervenor Defendants UMass Memorial Medical Center (UMass) and Genesis HealthCare System (Genesis), play a critical role in creating a safety net for low-income and other vulnerable patients. Hospitals participate in 340B only if they can demonstrate that they serve a disproportionate number of low-income patients or that they are designated by Medicare as "critical access" hospitals (CAH). In 2020, the low-income share for 340B Hospitals was 40.6% compared to 26.2% for non-340B hospitals.[6] As a result, 340B Hospitals treat a high percentage of patients for which they are underpaid or not paid at all, consequently providing three-quarters (77%) of all hospital care for Medicaid patients, a program known for low reimbursement that does not typically cover the cost of care, and two-thirds (67%) of hospital uncompensated and unreimbursed care.[7] Not surprisingly, 340B Providers have

---

[6]    Allen Dobson et al., *340B DSH Hospitals Serve Higher Share of Patients with Low Incomes*, Dobson DaVanzo Health Economics Consulting 21 (Sept. 26, 2022), https://tinyurl.com/4vxkvxrm.

[7]    *Id.* at 7.

substantially lower operating margins—often *negative* margins—compared to non-340B providers.[8]

The discounts provided under the 340B program allow 340B Hospitals to provide care to low-income and vulnerable patients. As found by the U.S. General Accountability Office (GAO), "the up-front savings [340B Providers] realized on the cost of drugs, allowed [340B Providers] to support their missions by maintaining services and lowering medication costs for patients, which is consistent with the purpose of the program."[9] Moreover, the GAO found that 340B Providers "used the 340B revenue generated by certain patients to offset losses incurred from other patients, which helped support the financial stability of the organization and allowed them to maintain services."[10] As a result, 340B Providers "serve more patients and . . . provide services that they might not have otherwise provided."[11]

As a result of the financial support from the 340B Program, 340B Hospitals have *increased* the amount of net patient revenue spent on uncompensated and unreimbursed care when compared to non-340B hospitals, with the gap widening from 17.5% higher for 340B Hospitals in 2019, to 29.1% higher in 2022.[12] Similarly, in 2020 alone, 340B Hospitals provided nearly $85 billion in

---

[8]    Steven Heath et al., *340B DSH Hospitals Increased Uncompensated Care in 2020 Despite Significant Financial Stress*, (Dobson DaVanzo Health Economics Consulting (2022)), https://shorturl.at/0Vpm6; *340B Drug Pricing Program: Fact vs. Fiction*, Am. Hosp. Ass'n 3 (Mar. 2021), https://shorturl.at/YpmW8.

[9]    Report to Congressional Committees, GAO-11-836, *Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement*, GAO 17–18 (Sept. 2011), https://www.gao.gov/assets/gao-11-836.pdf (2011 GAO Report).

[10]    *Id.* at 17.

[11]    *Id.*

[12]    KNG Health Consulting, *340B Hospitals Increased Contributions to Uncompensated and Unreimbursed Care During the Pandemic* (February 2025), 340B Health, https://tinyurl.com/29dfbbky.

community benefits, an increase of nearly 25% from 2019.[13] Compared to their non-340B counterparts, 340B Hospitals offer significantly more un- or under-reimbursed essential community services, including those that address broader health, wellness, and social needs.[14] 340B Hospitals further account for 80% of hospitals offering burn care and transplants of lung, liver, and bone marrow, all of which are relatively unprofitable services.[15]

The 340B Program funds the provision of care to low-income and underserved communities by allowing 340B Providers to purchase necessary drugs at discounted prices but still receive the full reimbursement for those drugs from insurers. *See Sanofi*, 58 F.4th at 699; *Novartis*, 102 F.4th at 455. The 340B Program works by empowering 340B Providers—those best suited to understanding the patients that they serve and the communities in which they operate—to use the savings and funds generated by purchasing drugs at the 340B discount to serve their patients and communities. The 340B Program does not require that 340B funds be used to provide drug discounts to patients, although 340B Providers sometimes do so if they determine that such is the best use of the 340B savings for their patients and communities.

Like other 340B Providers, UMass uses the cost savings and funds generated by the 340B Program to serve the vulnerable communities in which it operates. Among other care, UMass currently uses 340B savings to fund free care to low-income patients and to provide several community services, including a program that provides free prescription medications to uninsured

---

[13]  *Setting the Record Straight on 340B: Fact vs. Fiction*, Am. Hosp. Ass'n, 2 (Jan. 2025), https://shorturl.at/dhlTx; Steven Heath et al., *340B DSH Hospitals Increased Uncompensated Care in 2020 Despite Significant Financial Stress*, Dobson DaVanzo Health Economics Consulting (2022), https://tinyurl.com/2skct63s.

[14]  Allen Dobson et al., *340B DSH Hospitals Serve Higher Share of Patients with Low Incomes* (Dobson DaVanzo Health Economics Consulting (Sept. 26, 2022)), https://tinyurl.com/4vxkvxrm at 14.

[15]  *Id.* at 15.

patients, a program that provides free health and dental care to underserved populations, and its Road to Care Mobile Addiction Team, which provides health services to individuals with behavioral health and substance use disorders at sites frequented by the homeless. Desai Decl. to Mot. to Intervene ("Desai Decl.") ¶¶ 8–14 (Dkt. No. 18-4).[16] In 2023, UMass's Road to Care Mobile Addiction Team had 3,699 clinical encounters and served nearly 869 patients, a 76% increase over the previous year, reflecting the increase in demand for the program. *Id.* ¶ 12. UMass also provides medical services at the Hector Reyes House, a residential substance abuse treatment program for Latino men. *Id.* ¶ 10. Through these services and others, in fiscal year 2023 alone, UMass served over 14,631 individuals and provided 669 prescriptions at no cost to qualifying patients. *Id.* ¶ 7.

Similarly, Genesis relies on 340B savings to fund several community health programs, including its 340B Patient Assistance Program, which provides medications at a discount to eligible patients in underserved communities, allowing them to access essential drugs at a lower cost. Carr Decl. to Mot. to Intervene ("Carr Decl") ¶ 8 (Dkt. No. 18-2). Genesis also uses 340B savings to fund its Meds to Bed Program, which ensures that patients have access to necessary medications once they are discharged from the hospital. *Id.* ¶ 9. Genesis additionally offers a shuttle service free of charge to discharged patients who need a ride home from the hospital and have no other means of transportation. *Id.* ¶ 10. This service provided transportation to 1,200 patients in the past two years. *Id.*

---

[16]   As this consolidated brief is being filed in four separate cases, for convenience the Intervenor Defendants will cite to the docket numbers from the earliest filed case, *Eli Lilly and Company v. Kennedy*, 24-cv-3220, in this brief.

### III.    THE PRODUCT REPLENISHMENT MODEL

For decades, most 340B Hospitals have used virtual inventory (replenishment) models to manage their different drug inventories for 340B and non-340B drugs. Testoni Decl. ¶ 3**.** It is important to understand how virtual inventory works in order to understand why, contrary to their claims, Plaintiffs' rebate models are not at all similar to product replenishment. 340B drugs can only be used for eligible outpatients and may not be used for hospital inpatients.[17] Virtual inventory systems used by 340B Hospitals act as a program integrity safeguard to ensure that drugs purchased at 340B prices are used only for eligible hospital outpatients. Testoni Decl. ¶¶ 3-4. The initial purchase of a particular drug is made at the drug's list price, since at that point the drug has not yet been dispensed to a patient. *Id.* ¶ 6. The virtual inventory system then tracks drug dispenses, recording those that are made to 340B patients. *Id.* Once an entire package of a drug has been dispensed to 340B patients, the hospital repurchases that drug at the 340B price to replenish its stock and will forever replenish its stock by purchasing the drug at the 340B price. *Id.* Thus, unlike Plaintiffs' proposed rebate models, which require 340B Hospitals to continuously purchase 340B drugs at market price and then wait for a rebate to be issued, the virtual inventory system only has the 340B Hospital paying market price for a drug one time. *Id.* ¶ 9. Plaintiffs' rebate models would delay 340B Hospitals' access to the 340B price for every purchase and significantly increase their drug inventory costs.

The process is somewhat different for drugs dispensed to 340B Hospital patients through a contract pharmacy. In that situation, the pharmacy dispenses drugs from its regular inventory, which has been purchased at market price. *Id.* ¶ 7. Then, a third-party administrator or the pharmacy itself identifies the patients who received those drugs that are eligible for 340B

---

[17]    *See FAQs*, HRSA, https://www.hrsa.gov/opa/faqs (last visited Mar. 18, 2025).

discounts. *Id*. Once identified, the 340B Hospital purchases the drug at the 340B discounted price and the manufacturer (or its wholesaler) ships the drug to the pharmacy that dispensed the drug, replenishing the pharmacy's stock for the drug it dispensed to the 340B patient.[18] *Id.* The pharmacy then passes on to the 340B Hospital (which had purchased the drug at the 340B price) the payment it received when it dispensed the drug at the non-discounted price, less an agreed upon dispensing fee. *Id.* For drugs dispensed by a contract pharmacy, the 340B Hospital never purchases drugs at the market price. *Id.* ¶ 10. Instead, it purchases drugs at the 340B price and uses those drugs to replenish the contract pharmacy's inventory of drugs dispensed to the 340B Hospital's patients. *Id.* The contract pharmacy is the only purchaser which pays the up-front market price; no rebate is involved. *Id.* Despite Plaintiffs' claims to the contrary, the replenishment model is in no way similar to the proposed rebate models.

## IV.    PLAINTIFFS' REBATE PROPOSALS

In the fall of 2024, Plaintiffs informed HRSA and HHS that they intended to implement rebate models, replacing the up-front discounts on covered drugs they (and every other drug manufacturer) have provided since the inception of the 340B Program.[19] In response to Lilly,

---

[18]    Both the United States Supreme Court and the Federal Trade Commission have endorsed accounting systems similar to the product replenishment model as appropriate ways for entities to distinguish between drugs that qualify for discounts and those that do not so as to prevent diversion. *See Abbott Laboratories v. Portland Retail Druggists Ass'n*, 425 U.S. 1, 20 (1976); Federal Trade Commission, University of Michigan Advisory Opinion, at 1 (Apr. 9, 2010) https://tinyurl.com/bddasrpa.

[19]    *See e.g.,* Letter from Derek L. Asay, Senior VP, Government Strategy, Lilly USA, to Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA et al. (Sept. 9, 2024), *Eli Lilly v. Kennedy,* No. 24-cv-3220 (DLF) (D.D.C. Nov. 14, 2024), Dkt. No. 1-4; Letter from Brett A. Shumate, Counsel for Sanofi-Aventis U.S., LLC to Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA (Nov. 1, 2024), *Sanofi v. Kennedy,* No. 24-cv-3496 (DLF) (D.D.C. Dec. 16, 2024), Dkt. No. 1-2; Novartis Complaint ¶ 75, *Novartis v. Kennedy,* No. 25-cv-117 (DLF) (D.D.C. Jan. 15, 2025), Dkt. No. 1; BMS Complaint ¶ 63, No. 24-cv-3337 (DLF) (D.D.C. Nov. 26, 2024), Dkt. No. 1.

Novartis, BMS, and Sanofi's requests to impose rebate models, HRSA raised several concerns about the proposed rebate models, requested more information, and informed Plaintiffs that because the Secretary of HHS had not approved the rebate models, implementation of the models would be inconsistent with statutory requirements.[20] In those letters, HRSA noted that the rebate models represent a "shift" that "would disrupt how the 340B Program has operated for over thirty years. As a result of this shift, covered entities, including those which primarily serve rural and underserved populations, would need to pay significantly higher prices on prescription drugs at the time of purchase."[21] HRSA also had questions about how the rebate claims submitted by 340B Providers would be adjudicated, how long any such adjudication would take, and what appeals or reconsideration mechanisms would be in place.[22]

---

[20]  *E.g.,* Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA, to Lucas Montarce, Executive Vice President and Chief Financial Officer, Eli Lilly and Company (Sept. 18, 2024), *Eli Lilly v. Kennedy,* No. 24-cv-3220 (DLF) (D.D.C. Nov. 14, 2024), Dkt. No. 1-5; Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs to Paul Hudson, Chief Executive Officer, Sanofi-Aventis U.S. LLC (Dec. 13, 2024), *Sanofi v. Kennedy,* No. 24-cv-3496 (DLF) (D.D.C. Dec. 16, 2024), Dkt. No. 1-7; Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA to Linda Kamin, Executive Director, Contract Operations and Government Reporting, Bristol Myers Squibb (Nov. 4,2024), *Bristol Myers Squibb v. Kennedy,* No. 24-cv-3337 (DLF) (D.D.C. Nov. 26, 2024), Dkt. No. 1-1; Novartis Complaint ¶¶ 26, 27, *Novartis v. Kennedy,* No. 25-v-117 (DLF) (D.D.C. Jan. 15, 2025), Dkt. No. 1.

[21]  *E.g.,* Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA, to Lucas Montarce, Executive Vice President and Chief Financial Officer, Eli Lilly and Company (Sept. 18, 2024) at 1; Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs to Paul Hudson, Chief Executive Officer, Sanofi-Aventis U.S. LLC (Dec. 13, 2024) at 1, *Eli Lilly v. Kennedy,* No. 24-cv-3220 (DLF) (D.D.C. Nov. 14, 2024), Dkt. No. 1-5; Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA to Linda Kamin, Executive Director, Contract Operations and Government Reporting, Bristol Myers Squibb (Nov. 4,2024) at 1, *Bristol Myers Squibb v. Kennedy,* No. 24-cv-3337 (DLF) (D.D.C. Nov. 26, 2024), Dkt. No. 1-1.

[22]  *E.g.,* Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA, to Lucas Montarce, Executive Vice President and Chief Financial Officer, Eli Lilly and Company (Sept. 18, 2024) at 2-3, *Eli Lilly v. Kennedy,* No. 24-cv-3220 (DLF) (D.D.C. Nov. 14, 2024), Dkt. No. 1-5; Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs to Paul Hudson, Chief Executive Officer, Sanofi-Aventis U.S. LLC (Dec. 13, 2024) at 2-3, *Sanofi v. Kennedy,* No. 24-cv-3496 (DLF) (D.D.C. Dec. 16, 2024), Dkt. No. 1-7; Letter from Chantelle V. Britton, Director,

Plaintiffs' announcement of their rebate models followed on the heels of a similar announcement by Johnson & Johnson Health Care System (J&J) in August 2024[23] regarding its intention to impose a rebate model on two of its most expensive 340B drugs.[24] If this Court determines that the rebate models are lawful, more drug manufacturers will almost certainly announce their own rebate models, eventually converting the entire 340B Program into a rebate model, following a similar pattern to four and a half years ago when Lilly announced that it would restrict the number of pharmacies that 340B Providers could contract with to distribute 340B drugs. While that restriction was initially limited to a single drug, Lilly subsequently expanded the limitation to cover all of its 340B drugs, and thirty-eight additional drug companies followed with similar restrictions.[25]

Should the entire 340B Program shift to a rebate model, 340B Providers will be forced to front significant funds to purchase 340B drugs, significantly hampering 340B Providers' ability to continue providing the type of services to low-income patients and communities discussed above. *See* Carr Decl. ¶ 18; Desai Decl. ¶ 21. A recent survey conducted by 340B Health of over two hundred 340B Hospitals found that if the entire 340B Program turned into a rebate model and 340B Hospitals were forced to purchase 340B drugs at their full, up-front prices and then wait—

---

Office of Pharmacy Affairs, HRSA to Linda Kamin, Executive Director, Contract Operations and Government Reporting, Bristol Myers Squibb (Nov. 4,2024) at 2-3.

[23]    HRSA denied J&J's proposed rebate model. J&J has also filed suit against HRSA in this District, and that case is pending in front of Judge Contreras. Case No. 24-cv-3188-RC.

[24]    Letter from Perry E. Knight, Vice President, Law – Strategic Customer Group, Johnson & Johnson, to Rear Admiral Krista M. Pedley, Director, Office of Special Health Initiatives, HRSA, et al. (July 31, 2024), *Johnson & Johnson v. Kennedy,* No. 24-cv-3188 (RC) (D.D.C. Nov. 12, 2024), Dkt. No. 1-4.

[25]    *Drugmakers pulling $8 Billion Out of Safety-Net Hospitals*, 340B Health, (July 2023) https://tinyurl.com/y767zwh7(last accessed Feb. 27, 2025); *UPDATED: Drugmakers Cutting 340B Discounts Reported Record Revenues in 2021*, 340B Health (Jan. 13, 2023) https://tinyurl.com/2s48z683 (last accessed Feb. 27, 2025).

even just a month—to be reimbursed, 90% of those hospitals would be unable to maintain their current levels of uncompensated care. 90% of responding hospitals also reported the rebate models would negatively impact access to patient care services for low-income and rural populations.[26]

340B Providers will also have to spend funds to comply with the Plaintiffs' rebate models' data collection and reporting requirements, requirements which will become more onerous when more drug manufacturers impose their own, individual rebate models with different requirements. *See* Desai Decl. ¶¶ 17, 21; Carr Decl. ¶¶ 17–18. This has been the experience of 340B Hospitals under manufacturers' restrictive contract pharmacy policies, which require 340B Hospitals to collect and report data to a vendor employed by the relevant manufacturer. 340B Health's survey found that nearly 75% of the hospitals that have had to collect and submit contract pharmacy claims data needed to allocate additional resources to address the issues that arose while working with the vendor.[27]

Despite Plaintiffs' claims that they need greater visibility into the 340B Program, the data collection and reporting requirements serve other purposes for manufacturers, especially Sanofi. As Sanofi's rebate model states, the data uploaded by covered entities will be used, in part, to "resolve duplicate Medicaid and commercial rebates."[28] However, that purpose is not connected to any 340B statutory directive. Rather than negotiating more favorable terms for its voluntary agreements with commercial partners, manufacturers, such as Sanofi, would instead require that

---

[26] *Preliminary Results of 340B Health Survey: Impact of Rebates on 340B Hospitals*, 340B Health (Mar. 18, 2025), https://tinyurl.com/4jj3ukjf at 2.

[27] *Id.*

[28] Sanofi Notice to Covered Entities (Nov. 22, 2024) at 7, *Sanofi v. Kennedy,* No. 24-cv-3496 (DLF) (D.D.C. Dec. 16, 2024), Dkt. No. 1-6.

340B Providers incur the cost of data collection and purchasing 340B drugs at their full price to assist Sanofi in policing its commercial agreements.

If a rebate claim is denied, Plaintiffs' rebate models provide no effective way to challenge the unilateral decision that the claim is not eligible for the 340B discount. While the 340B statute allows manufacturers to audit 340B Providers if they suspect that they have received discounts for unqualified patients or they failed to comply with the mechanism established by the Secretary pertaining to billing Medicaid for 340B discount drugs, there is no analogous statutory provision for 340B Providers to audit manufacturers. 42 U.S.C. § 256b(a)(5)(C).[29] The only meaningful recourse that a 340B Provider would have under Plaintiffs' proposed rebate models would be to file a claim through the statutorily created ADR process, and to appeal any adverse decision in federal court. Participation in ADR and the federal court appeals process would likely require significant delays, the retention of outside counsel and hundreds of thousands of dollars in legal fees. *See* Desai Decl. ¶ 18.

There is even greater cause for concern regarding improper denials under Sanofi's proposed rebate model, which it refers to as a "credit model," because Sanofi plans to apply its own rules for 340B Hospitals subject to the model to deny rebates for prescriptions that do not meet Sanofi's criteria for who qualifies as a 340B "patient." However, Sanofi's criteria have not been published nor authorized by HRSA and differ significantly from HRSA's 1996 Patient Definition Guidelines. For example, Sanofi will require that to qualify as a patient, an individual must have received medical care from the hospital within the past two years; and that the

---

[29] Manufacturers must meet a fairly low bar in order to audit 340B Providers. A manufacturer must (1) submit an audit plan to HRSA prior to auditing a 340B Provider; and (2) establish "reasonable cause" to audit—that is, establishing "that a reasonable person could believe that a [340B Provider] may have violated a requirement." Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19, 61 Fed. Reg. 65406, 65409 (Dec. 12, 1996).

prescription was issued "in connection with health care services" provided by the hospital, two requirements that are not present in HRSA's 1996 Patient Definition Guidelines.[30] This change to the patient definition could have a large impact on patient care. For example, imagine a scenario in which an individual who lives in a rural area is diagnosed with cancer, travels to a large urban hospital several hours away to receive a treatment plan, but wants to implement their treatment plan and receive the prescribed chemotherapy at a local hospital closer to their home. In that situation, the prescription was written outside the 340B Hospital, yet there is no question that such individuals are "patients" of the 340B Hospital when the hospital is administering the chemotherapy. Under Sanofi's rebate model, that individual's prescription for chemotherapy would not qualify for the 340B discount solely because the initial prescription was not written at the local hospital.

Additionally, HRSA's patient definition guidelines permit prescriptions issued by health care professionals who are employed by the hospital or provide health care under contractual or other arrangements (*e.g.*, referral for consultation), *such that responsibility for the care provided remains with the 340B hospital*.[31] Sanofi's rebate model will only allow rebates for prescriptions issued by health professionals who are either employed by a hospital or "similarly affiliated" with the hospital.[32] Sanofi provides no explanation for the difference between "employment" and

---

[30]    *Compare* Sanofi Notice to Covered Entities (November 22, 2024) at 4-5, *Sanofi v. Kennedy,* No. 24-cv-3496 (DLF) (D.D.C. Dec. 16, 2024), Dkt. No. 1-6, *with* Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 207 (Final Notice October 24, 1996), https://www.govinfo.gov/content/pkg/FR-1996-10-24/pdf/96-27344.pdf.

[31]    Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 207 (Final Notice October 24, 1996), https://www.govinfo.gov/content/pkg/FR-1996-10-24/pdf/96-27344.pdf.

[32]    Sanofi Notice to Covered Entities (November 22, 2024) at 4-5, *Sanofi v. Kennedy,* No. 24-cv-3496 (DLF) (D.D.C. Dec. 16, 2024), Dkt. No. 1-6.

"affiliation," creating uncertainty as to how the patient definition guidelines will be applied. HRSA's definition, on the other hand, is clear in that it requires that the hospital to be responsible for the care the health professional provides. It is generally accepted that hospitals are responsible for medical services provided on their premises, even if the health professional providing the services is not an employee but has some other affiliation with the hospital, such as having privileges at a hospital; however, it is unclear whether that arrangement would satisfy Sanofi's policy requirements. Sanofi's policy is similarly unclear for rebate claims related to referrals and simply states that Sanofi itself will analyze the claim data to determine if the claim is eligible to receive the 340B discount.[33] It provides no information as to the criteria it will use during that analysis. These changes to the patient definition are nothing more than Sanofi's attempt to unlawfully limit the scope of the 340B Program by reducing the number of prescriptions that will qualify for the 340B discount price.

Shortly after HRSA denied their rebate models, Plaintiffs filed their respective suits.

## LEGAL STANDARD

When reviewing agency action under the summary judgment standard, "[t]he district court sits as an appellate tribunal." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225 (D.C. Cir. 1993). Because "the reviewing court generally will not resolve factual disputes, but instead reviews the decision as an appellate court addressing issues of law," *Henry v. Sec'y of Treasury*, 266 F. Supp. 3d 80, 86 (D.D.C. 2017), the court has no role as a fact-finder and treats the issues presented as questions of law, *see, e.g., Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018); *Nat'l Ass'n for Advancement of Colored People v. DeVos*, 485 F. Supp. 3d 136, 141 (D.D.C. 2020).

---

[33]  *Id.*

# ARGUMENT

## I.    340B REQUIRES UP-FRONT PRICE REDUCTIONS, NOT POST-PURCHASE REFUNDS.

### A.    The Plain Statutory Language Requires Up-Front Price Reductions.

By its plain terms, the 340B statute requires up-front price reductions from manufacturers when 340B Providers purchase covered drugs. The relevant text, 42 U.S.C. § 256b(a)(1), contains two relevant provisions. The first, known as the "purchased by" provision, *Sanofi*, 58 F.4th at 699–700, states that:

> The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs . . . purchased by a covered entity . . . does not exceed an amount equal to the average manufacturer price for the drug . . . reduced by the rebate percentage described in paragraph (2).

42 U.S.C. § 256b(a)(1). The very next sentence of the statute, known as the "shall offer" provision, *Sanofi*, 58 F.4th at 703, reads:

> Each such agreement shall require . . . that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price.

42 U.S.C. § 256b(a)(1). Under the statute, "ceiling price" means "the maximum price that covered entities may permissibly be required to pay for the drug." *Id.*

These two provisions work in tandem to establish the basic function of the 340B statute. The "purchased by" provision establishes the maximum price that 340B Providers can be asked to pay for 340B drugs. That price is determined under the 340B statute by reducing a drug's "average manufacturer price" (AMP) by the average Medicaid rebate paid by the drug manufacturer to state Medicaid agencies in the prior quarter. Essentially, to determine the "amount to be paid" under the

340B discount, the Secretary reduces a drug's AMP by the Medicaid rebate amount calculated in the prior quarter.

The Medicaid rebate amount for each drug and the 340B discount for each drug are intended to reflect the same percentage reduction. However, because 340B is an up-front discount, the Medicaid rebate calculation cannot always serve as the basis for the 340B discount. Two examples of when the Secretary makes adjustments to achieve a 340B discount that is different from the ceiling price calculation in the 340B statute illustrate the point. The first example pertains to setting the 340B discount for new drugs, and the second pertains to setting the 340B discount for drugs for which the Medicaid rebate calculation results in a 340B price of $0 or a negative number, which may occur due to a statutory penalty designed to limit excessive price increases by manufacturers.

Drugs new to the market have no Medicaid "rebate percentage," as that percentage is calculated after the drugs have been on the market for a minimum of a calendar quarter. 42 U.S.C. § 1396r-8(k)(8). Thus, the Secretary cannot use the formula set out in the 340B statute to determine the 340B price. Accordingly, the Secretary has issued regulations that establish the 340B price by taking the drug's list price and reducing it by the appropriate minimum percentage required under the Medicaid rebate formula. 42 C.F.R. § 10.10(c); *see also* 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017). This price is temporary until an average manufacturer price can be determined, which could take several quarters. *Id.* Thus, in establishing the 340B price for new drugs, the Secretary has determined "the amount required to be paid," by using the rebate and discount authority in the subsection (a)(1) parenthetical which provides the flexibility to make these adjustments in these circumstances.

Similarly, the Secretary has issued a regulation that establishes the 340B price to accommodate operational challenges when the calculated Medicaid rebate amount is higher than or equal to the drug's price, resulting in a negative ceiling price or a ceiling price of zero. 42 C.F.R. § 10.10(b). This can occur when manufacturers raise their prices faster than the rate of inflation, as this action triggers an inflationary penalty in the Medicaid rebate statute that will increase the rebate amount. 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017). If the Secretary followed the 340B ceiling price calculation in the 340B statute in this scenario, then manufacturers would be required to forgo payment or pay 340B Providers that use their drug. The Secretary determined that the 340B statute does not require manufacturers to remit payment to 340B Providers and that permitting zero payment at purchase would "lead to operational challenges," which do not exist under the Medicaid rebate structure. 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017). Accordingly, the Secretary adjusted the amount to be paid to $0.01. *Id.;* 42 C.F.R. § 10.10(b).

Standing alone, the "purchased by" provision says nothing about *how* the "amount required to be paid" is effectuated. Instead, it simply describes how much the manufacturer may charge. The issue of how the amount required to be paid is effectuated is addressed in the "shall offer" provision, which was added in 2010 in the Affordable Care Act. The "shall offer" provision requires that drug manufacturers "offer"— that is, "present for acceptance or rejection," [34]— covered drugs at or below the ceiling price. The "ceiling price" is "the maximum price that covered entities may permissibly be required to pay for the drug." 42 U.S.C. § 256b(a)(1). Drug manufacturers may not require covered entities to "pay" — "to give money to in return for goods or services rendered"[35]— more than this maximum price when it "offer[s] each covered entity

---

[34]    *Offer*, American Heritage Dictionary, https://bit.ly/4jZThmZ (last accessed Feb. 17, 2025); *Offer*, Merriam-Webster, https://bit.ly/42V6kA3 (last accessed Feb. 17, 2025).

[35]    *Pay*, American Heritage Dictionary, https://bit.ly/3X0YIZ6 (last accessed Feb. 17, 2025).

covered outpatient drugs for purchase." In other words, the "shall offer" provision means that manufacturers must provide up-front price reductions that keep covered drugs under the ceiling price when those drugs are initially purchased by 340B Providers.

Because manufacturers must offer to sell covered drugs at this maximum ceiling price, any attempt to sell covered drugs to 340B Providers above this price in the first instance would, by definition, run afoul of the statutory language. The drugs would be *offered* for sale *above* the ceiling price. Even if manufacturers remitted some amount of payment later, the clear mechanics of the "shall offer" provision would be thwarted. This ultimately matters because 340B Providers often operate on tight margins and need the immediate cashflow provided by up-front price reductions. *See supra* at p. 7.

Like any transaction, then, the 340B statute spells out the "what"—covered drugs in exchange for a statutorily defined amount—and the "how"—manufacturers offering the drugs for sale to covered entities at an up-front reduced price. As in any transaction, both of these pieces of information are necessary ingredients to effectuate the ultimate sale of goods. Beyond simply comporting with common sense and laying out the two fundamental components of the transaction, this reading of the statute gives effect to all of the words in the statute. *See Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 89 (2020) (relying on the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute" (quoting *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019))); *Donnelly v. F.A.A.*, 411 F.3d 267, 272 (D.C. Cir. 2005) (eschewing a reading that "fails to give meaning to every word of the statute"). This is especially important here, given that Congress added the "shall offer" provision nearly 20 years after 340B's initial enactment.

Consistent with this statutory language, courts have time and time again recognized that the statute requires an up-front price reduction rather than a post-transaction refund. The Supreme Court has explained that "Section 340B of the Public Health Services Act imposes *ceilings* on prices drug manufacturers *may charge* for medications sold to specified health-care facilities." *Astra*, 563 U.S. at 113 (emphases added). Likewise, courts have highlighted that the "shall offer" provision requires of manufacturers what its plain language demands: that "[i]f drug makers make drugs available to anyone at any price, they must '*offer*' those drugs to 'covered entities' *at a discount*." *Sanofi*, 58 F.4th at 703 (emphases added); *see also Novartis*, 102 F.4th at 460 (interpreting the "shall offer" provision to require "manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount").

Though this plain reading shows that up-front price reductions are required by statute, contrasting this reading with Plaintiffs' proffered interpretation bolsters the point. Under Plaintiffs' understanding of the statute, the "purchased by" provision, standing alone, accomplishes all of the work. That provision, according to Plaintiffs, spells out the what and the how of the 340B transaction, because the purchased by provision contains both a statutory price (the "what") and provides for the means to effectuate the transaction through either a rebate or a discount (the "how"). This cannot be correct. Under this reading, fully half of 42 U.S.C. § 256b(a)(1) is superfluous. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." (quoting *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988))).

What is more, Plaintiffs' reading renders a core section of 42 U.S.C. § 256b(a)(1) that was enacted later in time surplusage, a double strike against its interpretation. *Food & Drug Admin. v.*

*Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." (internal quotation marks and citations omitted)). Plaintiffs have offered no interpretation of the statute that does not render the "shall offer" provision entirely redundant, despite Congress's decision that the addition of that provision was necessary nearly 20 years after 340B's initial enactment. In fact, Plaintiffs barely even discuss this provision. And it would be especially strange for a phrase found in a parenthetical to have the force that Plaintiffs believe it has, when the "shall offer" provision spells out how manufacturers must offer drugs for purchase at the ceiling price. *See Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 206 (2022) (noting that a phrase "found in a parenthetical . . . is typically used to convey an 'aside' or 'afterthought'") (quoting B. Garner, Modern English Usage 1020 (4th ed. 2016))); *see also Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001) ("The use of parentheses emphasizes the fact that that which is within is meant simply to be illustrative, hence redundant.").

Contrary to Plaintiffs' evident views, giving the later-enacted "shall offer" provision its natural force—requiring an up-front price reduction—does not render the parenthetical language of the "purchased by" provision meaningless. Nor does the "shall offer" provision implicitly overrule the "provided by" language. As discussed, the two provisions, which are directly next to each other in the statutory text, work together in harmony to spell out the specifics of the 340B transaction.

Beyond being the only sensible reading of *both* sentences of § 256b(a)(1), this understanding of the statute comports with its broader language. It is black-letter law that statutory interpretations must take into account the statutory context in a way that makes sense of the statute

as a whole. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ("Statutory language, however, 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989))); *King v. Burwell*, 576 U.S. 473, 486 (2015) ("Our duty, after all, is to construe statutes, not isolated provisions." (internal quotation marks omitted)). Doing so makes clear that the "any rebate or discount" language goes to the calculation of the 340B price, not how the manufacturers must effectuate that price. For example, § 256b(a)(1) notes that the "amount required to be paid" is reduced by a "rebate percentage" which is determined based on the "average total rebate" required by section 1927(c) of the Social Security Act. 42 U.S.C. § 256b(a)(2)(A). In other words, the rebate referenced in the statutory text goes into calculating the 340B price, *not* spelling out how that price is actually made available to covered entities.

### B. Rebates are Inconsistent with the Structure of the 340B Statute as a Whole.

If the plain language in subsection (a)(1) were not enough, the structure of the entire 340B statute also makes clear that Plaintiffs' rebate models are not permitted. Take, for example, the audit and sanction provisions of the statute. With respect to audits, the 340B statute provides that:

> AUDITING—A covered entity **shall permit the Secretary and the manufacturer** of a covered outpatient drug that is subject to an agreement under this subsection with the entity . . . to audit at the Secretary's or the manufacturer's expense **the records of the entity that directly pertain to the entity's compliance** with the requirements [prohibiting duplicate discounts and diversion to non-340B patients].

42 U.S.C. § 256b(a)(5)(C) (bolding added). Similarly, the statute states that:

> If the Secretary finds, after audit . . . and after notice and hearing, that **a covered entity is in violation of a requirement** [prohibiting duplicate discounts and diversion], **the covered entity shall be liable to the manufacturer** of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the

24

> price of the drug . . . under the agreement between the entity and the
> manufacturer under this paragraph.

*Id.* § 256b(a)(5)(D) (bolding added). Plaintiffs' rebate models, which are an end-run around these provisions, are entirely at odds with the statutory structure for several reasons.

First, only the Secretary and manufacturers are provided with statutory audit rights. Only the Secretary and manufacturers have this right to access "the records of the entity that directly pertain to the entity's compliance with the" prohibitions on duplicate discounts or rebates and diversion of covered drugs. This makes sense only when discounts are provided up front. Because manufacturers must make 340B drugs available to 340B Providers at the ceiling price, the *only* way that manufacturers (or the Secretary) can ensure compliance with the statute's prohibitions is through auditing 340B Providers after those Providers purchase covered drugs at reduced prices. This is why manufacturers and the Secretary are afforded the ability to audit, whereas 340B Providers have no such statutory right. Had Congress intended that a post-purchase refund would be allowed, Congress would have given 340B Providers the ability to audit manufacturers' rebate models and how those models process refund requests. Congress clearly did not do so, and so Plaintiffs' proposals would leave 340B Providers helpless to determine whether the drug manufacturers are complying with the law.

Plaintiffs' rebate models render entirely meaningless the audit provision. Plaintiffs insist that the claims-data requirements in their rebate models are necessary to give teeth to the audit provision because they need the data to demonstrate that there is cause to audit, but this understates what a rebate model accomplishes. Through rebate models, drug manufacturers like Plaintiffs will force 340B Providers to turn over all claim-level data necessary to validate 340B claims. Yet this type of information is exactly the same information the audit provision contemplates. Congress gave manufacturers an explicit mechanism to seek this information and to ensure compliance with

the statute. Plaintiffs' interpretation thus renders nugatory the audit provision and is an end-run around the proper procedure. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) (explaining, under prior *Chevron* framework, that "an agency interpretation that is inconsistent with the design and structure of the statute as a whole does not merit deference" (internal quotation marks and citation omitted, and alteration adopted)); *see also, e.g.*, *Moss by Mutakabbir v. Smith*, 794 F. Supp. 11, 13 (D.D.C. 1992) (declining to bless a course of action that "would be a complete end-run around the procedures established by the statute"); *Mapes v. Reed*, 487 F. Supp. 3d 20, 25 (D.D.C. 2020) (a litigant "is not permitted to 'end-run'" statutory procedures when those procedures provide the proper recourse). At best, the audit provision, like the "shall offer" provision, is superfluous under Plaintiffs' incorrect reading of the 340B statute.

Second, the statutory scheme exhibits a preference against vigilantism and in favor of empowering the Secretary to conduct audits or to authorize manufacturers to do so. But Plaintiffs' rebate models, which are precluded by the text and structure of the 340B statute, defeat these goals. In *Astra*, the Supreme Court rejected an attempt by covered entities to sue directly under PPAs for alleged overcharges. 563 U.S. at 116. The Court reasoned that "Congress placed the Secretary (acting through her designate, HRSA) in control of § 340B's drug-price prescriptions" and that allowing 340B Providers to take matters into their own hands would frustrate the statutory scheme. *Id.* at 114; *see also, id.* ("That control could not be maintained were potentially thousands of covered entities permitted to bring suits alleging errors in manufacturers' price calculations."). Because HRSA is best suited to oversee all aspects of the 340B program and to take appropriate compliance actions when necessary, Congress "assigned no auxiliary enforcement role to covered entities." *Id.* at 117.

That logic applies with equal force here. Congress enacted a statutory scheme through which manufacturers must offer up-front price reductions on covered drugs to 340B Providers. When 340B Providers dispute that the proper price was offered to them, they may seek recourse through the procedures available under the 340B statute. Likewise, when manufacturers believe that 340B Providers have violated the statute's prohibition on duplicate discounts or diversion, manufacturers may audit Providers and seek sanctions through the Secretary. Through the rebate model, Plaintiffs seek to short-circuit these processes and take matters into their own hands, imposing *their* view of compliance. This is plainly at odds with the text and structure of 340B.

### C.    Plaintiffs' Reading Blesses Absurd Results That Threaten to Undermine the 340B Statute Altogether.

"[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Yet hiding in plain sight of Plaintiffs' interpretation of the statute are a host of absurdities that would follow and would essentially upend the 340B program. These consequences further demonstrate that the statute does not contemplate a rebate model and instead requires up-front price reductions.

As is clear from Plaintiffs' pleadings and briefings, the form of the rebate models that Plaintiffs claim is allowed by the 340B statute is entirely decided by Plaintiffs. Most obviously, Plaintiffs, not HRSA, nor the Secretary, nor Congress, decide *when* 340B Providers are in fact given post-purchase refunds following those entities' submission of whatever information and data Plaintiffs demand. Plaintiffs, like all other manufacturers seeking to flip the 340B program on its head, claim that 340B Providers will receive post-purchase refunds promptly, perhaps not more than a few days after submission of whatever information Plaintiffs require. But nothing guarantees that this is the case, other than Plaintiffs' word. On Plaintiffs' reading of the statute,

they could evidently give post-purchase refunds a week, or two weeks, or even months after 340B Providers purchase 340B drugs. What is to stop Plaintiffs from giving post-purchase refunds six months after 340B Providers make a 340B purchase? Or even years later? Certainly nothing in the 340B statute, as Plaintiffs interpret it, constrains these results. And there is no mechanism in the 340B statute that would allow 340B Providers to demand faster payment of the refunds, because the statute does not contemplate such post-purchase rebates in the first place. The reason why is clear: the statute—through the "shall offer" provision—requires up-front discounts at the time of purchase.

This statutory silence related to the proposed rebate model is striking in two respects. First, it contrasts with the statutory evidence that up-front discounts are required by the 340B statute. This evidence, as discussed, includes the plain text of the "shall offer" provision as well as the fact that up-front discounts are consistent with the overall statutory structure, and the rebate model is not. Second, it contrasts with other public health statutes that *do* in fact allow post-purchase refunds and rebates. For example, the Medicaid rebate law, which is cross-referenced in 340B, 42 U.S.C. § 1396r-8, lays out a multitude of specifics related to the Medicaid Drug Rebate Program. Unlike the 340B statute, the Medicaid Drug Rebate Program is specific and exacting in how these rebates must be provided, what information must be exchanged among parties, and myriad other details for the program to function. Notably, an entire subsection of the statute pertains to "Terms of rebate agreement[s]," 42 U.S.C. § 1396r-8(b), including that "[s]uch rebate[s] shall be paid by the manufacturer *not later than 30 days after* the receipt of the information" required of the state seeking the rebate. *Id.* § 1396r-8(b)(1)(A) (emphasis added). If the 340B statute allowed such post-purchase refunds or rebates, it would include the same information and requirements precisely to avoid the absurdity that Plaintiffs' interpretation portends.

The lack of any statutorily prescribed guidance related to Plaintiffs' rebate models also breeds other absurdities. Given that Plaintiffs would evidently be allowed to give the post-purchase refunds whenever they want, the enforcement and compliance provisions of the 340B statute lose all meaning. For example, a 340B Provider cannot feasibly complain that it has not received the 340B price because Plaintiffs, and all other manufacturers, can simply say that they have not yet given the post-purchase refund. Or a manufacturer can simply declare that it is still parsing the information that it has demanded from 340B Providers to determine whether the entity is in fact entitled to the ceiling price. How long this process could last—with absolutely no recourse available to 340B Providers—is not spelled out by the 340B statute.

Finally, nothing other than Plaintiffs' good faith prevent them from demanding all manner of conditions, information, and data before they provide a post-purchase refund under their rebate models. Again, a rebate model, unlike a pre-purchase reduction in price, is not in any way constrained or guided by the statutory text, because it is not contemplated by the text. Even if it were so contemplated by the text, drug manufacturers time and time again (including in this litigation) have argued—and courts have found—that HRSA and HHS lack rulemaking authority under 340B. *See, e.g.*, *Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 42–43 (D.D.C. 2014). Not only is the rebate model not contemplated, guided, or constrained by the text, then, but also the very agencies that oversee the 340B Program lack any means to impose restrictions on its implementation and execution. A model that relies on good faith to function will just as easily be subject to the arbitrariness and whims of pharmaceutical manufacturers. This is fundamentally at odds with the 340B Program and the purpose that Congress intended. *See Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 730–31

(2022) (noting that "Congress . . . actually intended for the 340B program's drug reimbursements to subsidize other services provided by 340B hospitals").

The 340B statute plainly does not condone these hostage-taking results. Through the non-statutory rebate model, manufacturers can, and Intervenor Defendants believe likely will, abuse the 340B Program, which is designed to provide drug discounts to 340B Providers so that the entities may continue to provide necessary care to vulnerable patient populations. Not only is this approach misguided as a policy matter: it is barred by the statutory text and structure of 340B.

**D.    Plaintiffs' Attempts to Obfuscate the Statutory Text Fail.**

Plaintiffs' resort to mistaken policy arguments, as well as outdated legislative history and agency guidance, to support its interpretation and to override the plain language of the 340B statute is unavailing.

First, just as Plaintiffs evidently overlook the "shall offer" provision in its flawed statutory interpretation, Plaintiffs rely on legislative history and agency guidance that *pre-date* the 2010 ACA amendment to the 340B statute that added the very provision that controls the outcome of this case. Though resorting to legislative history and prior agency guidance would be inappropriate under any circumstance, here, where the plain text of the 340B statute forecloses Plaintiffs' argument, outdated, pre-amendment legislative history can have no bearing on this case. *See, e.g.*, *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 339 (D.C. Cir. 2020) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").

Second, in a further effort to distract from the statutory text, Plaintiffs turn to ADAP rebates, which are not before this Court. As discussed *supra* at p. 4, ADAPs face unique challenges that may justify their accessing the benefits of 340B through a rebate, rather than through an up-front discount. Setting that to the side, HRSA's guidance related to ADAPs precedes the 2010

addition of the "shall offer" provision to the 340B statute, so HRSA's practices related to ADAPs, like outdated legislative history, offers no insight into the present meaning of the statute.

Third, Plaintiffs state that the replenishment model is analogous to a rebate mechanism because both models work after the fact to reconcile transactions made initially at a commercial price to the 340B discount. But that statement overlooks an essential fact: the price of the drug at the point of purchase. As described above, under the contract pharmacy replenishment model, 340B Providers are never asked to pay the full price of a drug upfront: they *only pay the statutorily imposed discount price*. Testoni Dec. ¶ 10. Under the in-house replenishment model, the 340B Provider pays market price for a drug one time. *Id.* ¶ 9. Under Plaintiffs' proposed rebate models, 340B Providers will *always* pay full price and then at a later time receive a rebate. Likewise, under the replenishment model, 340B Providers are not required to provide Plaintiffs with patient data, essentially giving Plaintiffs the power to conduct front-end audits of 340B Hospitals, without permission from HRSA and contrary to the statute.

Fourth, at times, Plaintiffs suggests that *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024) and *Sanofi Aventis U.S. LLC v. United States Department of Health & Human Services*, 58 F.4th 696 (3d Cir. 2023) allow drug manufacturers to impose whatever conditions they wish on the sale of covered drugs. Not so. These cases, which principally concern delivery conditions related to covered drugs for contract pharmacies, merely explain that manufacturers may place *certain* conditions on the distribution of drugs when the 340B statute is otherwise silent as to those conditions. *Novartis*, 102 F.4th at 460, 464.

Indeed, the D.C. Circuit explicitly noted just how limited its decision was. *Id.* at 459 ("For their part, the manufacturers assert a nearly unfettered ability to impose conditions . . . Fortunately, we need only consider the *specific conditions* addressed in the enforcement letters under review."

(emphasis added)). The D.C. Circuit reasoned that because "Section 340B is . . . silent about delivery conditions," the statute "preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions" related to contract pharmacies. *Id.* at 460. Importantly, the D.C. Circuit explicitly recognized that the 340B statute *is not* silent with respect to the issue here; when construing the "shall offer" provision, it explained that "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount." *Id.*; *see also Sanofi*, 58 F.4th at 703 (stating that the "shall offer" provision requires that "[i]f drug makers make drugs available to anyone at any price, they must 'offer' those drugs to [340B Providers] at a discount"). If anything, *Novartis* and *Sanofi*, through recognizing the force of the "shall offer" provision, directly support Intervenor Defendants' arguments.

Fifth, and perhaps most obviously, Plaintiffs' briefing betrays the fact that this litigation is nothing more than a full-frontal attack on the 340B program. These policy-driven points are disingenuous; indeed, as discussed, the 340B program is meant to stretch scarce healthcare dollars and subsidize covered entities working with and treating vulnerable populations. To the extent that Plaintiffs or other drug manufacturers believe that the 340B program fails to achieve this venerable purpose—which it clearly does not—Plaintiffs' concerns should be addressed to Congress. Congress made decisions about the 340B Program through the 340B statute itself—including the 2010 amendment—and Congress alone is responsible for addressing whether the statute is achieving its goals. Regardless, Plaintiffs' invocation of a false parade of horribles has nothing to do whatsoever with the very simple question at the heart of this case: whether the 340B statute requires up-front price reductions. As discussed above, the answer to that question is unambiguously yes. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016) ("[P]olicy arguments cannot supersede the clear statutory text.").

### E.    Plaintiffs' Justification for Rebate Models Is Without Merit.

Plaintiffs' stated reason for proposing rebate models is to address what they describe as widespread abuses in the 340B Program and because rebate models are necessary to comply with the Inflation Reduction Act. Neither reason withstands scrutiny.

Plaintiffs' cherry-picked statistics regarding HRSA's audit findings are nothing more than a misleading attempt to paint a picture of abuse in a program that has successfully operated for more than thirty years. For example, Plaintiffs claim that HRSA found that from 2012 to 2019, HRSA audits revealed over 429 instances of duplicate discounts with the Medicaid Drug Rebate Program. *See e.g.,* Lilly Mot. for Summ. J. 16, *Eli Lilly v. Kennedy,* No. 24-cv-3220 (DLF) (D.D.C. Feb. 3, 2025), Dkt. No. 15-1. But that statistic does not provide evidence of the widespread abuse that Plaintiffs claim.

The claimed duplicate discount findings are not evidence that a state tried to collect a Medicaid rebate on a 340B drug, nor that a manufacturer actually paid a Medicaid rebate on a 340B drug. The 340B statute prohibits covered entities from billing Medicaid for 340B discounted drugs that are subject to a rebate under the Medicaid Rebate Act. 42 U.S.C. § 256b(a)(5)(A)(i). The 340B statute also requires the Secretary to establish a mechanism to ensure that covered entities comply that prohibition. 42 U.S.C. § 256b(a)(5)(A)(ii). These two provisions are intended to prevent manufacturers from providing the same reduction twice – once when selling the drug at the 340B discount and again at a later time when invoiced by Medicaid for a rebate on that same drug. Per that directive, HRSA requires that at registration, 340B Providers state whether they plan to use 340B drugs for Medicaid Fee-for-Service (FFS) patients[36] and, if so, to provide their

---

[36]   As discussed below, the process for preventing duplicate discounts on 340B drugs used for Medicaid managed care organization (MCO) patients is different.

Medicaid billing number(s) to be included on the HRSA 340B Medicaid Exclusion File (MEF) so that states and manufacturers will know that Providers' drugs are not eligible for a Medicaid rebate.[37] Failure to have the correct numbers on the MEF will be identified as a "duplicate discount" finding in a HRSA audit.[38] HRSA does not contact the State Medicaid agency to verify whether a manufacturer actually paid a rebate on a 340B drug, or whether the state Medicaid agency even requested a rebate on that drug.[39] If a 340B Provider is able to obtain confirmation from its state Medicaid agency that the agency had not sought rebates from manufacturers for the 340B Providers' 340B claims, HRSA will downgrade the audit finding from "duplicate discount" to "Medicaid Exclusion File Error," indicating that no manufacturer actually paid a rebate as a result of the informational error on the MEF, and no repayment is due to manufacturers. Testoni Decl. ¶ 15.

In fiscal year 2022, nearly two-thirds of all duplicate discount findings were later confirmed not to have resulted in duplicate discounts.[40] That is likely an underestimate, as many state Medicaid agencies do not respond to hospital requests on this issue, or do not provide a timely response. Testoni Decl. ¶ 15. It is not surprising that most MEF information errors do not actually result in states seeking rebates on 340B drugs, as more than 20 states do not use HRSA's MEF and have instead adopted their own policies to identify and remove 340B drugs from their rebate

---

[37] *See Clarification on the Use of Medicaid Exclusion File*, HRSA (Dec. 12, 2014), https://tinyurl.com/ycvupudr.

[38] *Id.*

[39] *Id.*

[40] *See HRSA Program Integrity, FY 22 Audit Results*, HRSA (Oct. 28, 2024), https://www.hrsa.gov/opa/program-integrity/fy-22-audit-results.

requests prior to submitting them to manufacturers.[41] Plaintiffs' citations to HRSA audit findings provide no evidence that Plaintiffs have been asked to pay a Medicaid rebate for a 340B discounted drug, nor that they have paid such a rebate to a state Medicaid agency.

Plaintiffs also argue that rebate models would assist manufacturers in preventing duplicate discounts on 340B drugs used for Medicaid managed care organization (MCO) patients (340B MCO claims), an area that Plaintiffs correctly assert is not policed by HRSA when it audits 340B Providers. That is because under federal law, 340B Providers have no role in preventing Medicaid MCOs from improperly claiming rebates on 340B MCO claims. Instead, pursuant to the Medicaid statute, the Centers for Medicare & Medicaid Services (CMS) obligates states to exclude 340B MCO claims from their rebate requests. 42 U.S.C § 1396r-8(j)(1)(A); 42 C.F.R. § 438.3(s)(3). Though Plaintiffs have not provided any evidence that they have been wrongly invoiced by a state Medicaid agency for Medicaid rebates relating to 340B MCO claims, their recourse would be to dispute the rebate with the state Medicaid agency, and they have multiple avenues to do so. For example, the Medicaid Drug Rebate statute and the Medicaid Drug Rebate Agreement specifically allow manufacturers to audit and dispute state rebate requests that they believe incorrectly include 340B claims.[42] Despite the options available to them under the federal Medicaid law, Plaintiffs

---

[41]   U.S. Gov't Accountability Off., GAO-20-212, *340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* (Jan. 27, 2020), Appendix III, https://bit.ly/3ZG0ctH.

[42]   *See* 42 U.S.C. § 1396r-8(b)(2)(B) (providing that manufacturers may audit state Medicaid data in connection with rebate requests and mandating adjustments if there are discrepancies regarding utilization amounts). *See also,* Centers for Medicare and Medicaid Services, Medicaid Drug Rebate Notice for Participating Drug Manufacturers, (June 29, 2017), https://tinyurl.com/263rs89c (describing the process for disputing state rebates under the Medicaid National Drug Rebate Agreement) and https://tinyurl.com/2ma24fh6 (last updated Feb. 24, 2025) (describing the Medicaid Drug Rebate Dispute Resolution Program).

would prefer to impose an unlawful 340B rebate model and additional costs on 340B Providers to help prevent MCO duplicate discounts for which 340B Providers have no responsibility.

Plaintiffs Lilly, BMS, and Novartis also justified their decisions to adopt a rebate model based on changes in pharmaceutical pricing made by the Inflation Reduction Act (IRA) that Congress enacted in 2022 to lower the drug prices paid by Medicare.[43] Beginning in 2026 for Medicare patients, under the IRA Plaintiffs will have to provide the lower of the 340B price or the maximum fair price (MFP) that they and CMS have negotiated for some of their most expensive drugs. Even though Plaintiffs would not be required to charge the MFP until 2026, Plaintiffs justify their rebate plans by claiming that, without the rebate models, Plaintiffs will be unable able to comply with the non-duplication provision in the IRA, which protects manufacturers from providing both the 340B price and the MFP refund on the same drug claim.[44]

However, a rebate model is not the only way to implement the IRA's non-duplication provision; there are other options. As just one example, manufacturers could work with 340B Providers on limited data sharing arrangements for 340B drugs that are dispensed to Medicare beneficiaries to ensure that providers will receive either the 340B discount or the MFP if it is lower, as required by the IRA. This could be done either in advance of or after the MFP refund has been paid, potentially involving a neutral third party. This and other options have been presented to

---

[43]  *See e.g.,* Lilly Complaint ¶ 12, *Eli Lilly v. Kennedy,* No. 24-cv-3220 (DLF) (D.D.C. Nov. 14, 2024), Dkt. No. 1; Novartis Complaint ¶ 75, *Novartis v. Kennedy,* No. 25-cv-117 (DLF) (D.D.C. Jan. 15, 2025), Dkt. No. 1; BMS Complaint ¶¶ 53–62, *Bristol Myers Squibb v. Kennedy,* No. 24-cv-3337 (DLF) (D.D.C. Nov. 26, 2024), Dkt. No. 1).

[44]  *See id.*

36

CMS by Intervenor Defendant 340B Health.[45] Of course, until this action is resolved, Plaintiffs

have no incentive to work with 340B Providers to address this issue.

Finally, CMS's Final Guidance stated that CMS is still considering collecting more data to

address any non-duplication concerns. The final CMS Guidance states

> CMS will not, at this time, assume responsibility for nonduplication
> of discounts. . . . As described above CMS intends to provide Primary
> Manufacturers a process to identify applicable 340B-eligible claims
> through the reporting of claim-level payment elements to the MTF. . .
> . CMS will rely on such indications when determining the extent to
> which the obligation to provide access to MFP has been discharged. .
> . . CMS is exploring the feasibility of incorporating 340B-related
> transactional data from 340B covered entities or their [third party
> administrators] identifying claims eligible [for non duplication].[46]

Because CMS may still decide to implement a process to gather the information Plaintiffs seek

through their rebate models, Plaintiffs' overblown complaints about the need for data to avoid

duplicate discounts are premature.

Sanofi additionally argues that the provision of the 340B statute which authorizes HHS to

develop a mechanism by which "appropriate credits and refunds" are issued to covered entities to

ensure conformity to the applicable ceiling price, 42 U.S.C. § 256b(d)(1)(B)(iv)(II), indicates that

Congress contemplated the use of credits to effectuate the 340B price. That is wrong. This

provision, which was added by the ACA in 2010, appears in the Program Integrity subsection of

---

[45]  340B Health Comment Letter to CMS relating to Medicare Drug Price Negotiation Program
(MDPNP) Draft Guidance, July 2, 2024, https://www.340bhealth.org/files/340B-Health-
Comments-on-5.3.24-IRA-Draft-Guidance-7_.2.24.pdf

[46]  Medicare Drug Price Negotiation Program: Draft Guidance, Implementation of Sections 1191
– 1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer
Effectuation of the Maximum Fair Price (MFP) in 2026 and 2027 (May 3, 2024),
https://tinyurl.com/bnv552ad.

the statute under "Manufacturer Compliance" and relates to the development of a mechanism to ensure that appropriate credits and refunds are issued to covered entities if rebates and other discounts provided by manufacturers to other purchasers subsequent to the sale of covered outpatient drugs to covered entities have the effect of lowering the applicable ceiling price for the relevant quarter for the drugs involved. 42 U.S.C. § 256b(d)(1)(B)(iv). This provision, like other provisions in this subsection, was intended to allow manufacturers to provide credits or refunds to covered entities in the event that the manufacturer overcharged a covered entity for the 340B drug, and this provision therefore provides no support for the proposition that the 340B statute permits a rebate model. [47]

## II. REQUIRING MANUFACTURERS TO OFFER PRE-PURCHASE PRICE REDUCTIONS AS MANDATED BY THE 340B STATUTE DOES NOT VIOLATE THE APA.

### A. Plaintiffs' APA Arguments Fail with its Incorrect Reading of the 340B Statute.

Plaintiffs' APA arguments necessarily fail because Plaintiffs' reading of the 340B statute is incorrect. As discussed above, the 340B statute leaves no discretion to HRSA or the Secretary with respect to how the 340B price must be effectuated. The "shall offer" provision requires that manufacturers offer covered drugs to covered entities prior to the drugs' sale at a reduced price. Because of this statutory command, HRSA and HHS merely followed the plain language of the statute when they denied Plaintiffs' request to implement their rebate models. HRSA and HHS exercised no discretion or decision-making because the statute forbids it. A claim under the APA

---

[47] This interpretation is supported by the legislative history accompanying the bill that was ultimately included in the ACA. *Oversight and Administration of the 340B Drug Discount Program: Improving Efficiency and Transparency*: *Hearing before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce,* 109th Cong. 47–48 (Dec. 15, 2005), https://www.congress.gov/109/chrg/CHRG-109hhrg30139/CHRG-109hhrg30139.pdf.

fails at the outset when the agency acted in a manner required by statute. *Rancho Vista del Mar v. United States*, 640 F. Supp. 3d 112, 122 (D.D.C. 2022). When an agency "follow[s] an unambiguous statutory . . . command, . . . its actions cannot be considered arbitrary or capricious" because it lacks any decision-making ability. *Id.*

That is the case here. Plaintiffs necessarily ask for HRSA to act *ultra vires* and to allow a rebate model that it has no discretion to sanction. Because HRSA followed a statutory command when it denied Plaintiffs' requests to implement a rebate model, that ends this case. *Cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 534 (2007). This Court need not and should not examine HRSA's decision-making process precisely because there was no decision to be made: Congress, through the 340B statute and specifically through the "shall offer" provision, mandated that up-front price reductions, not post-purchase refunds, be the manner through which 340B prices are effectuated.

### B. Even if a Rebate Model were Permissible, HRSA's Actions were not Arbitrary or Capricious.

Assuming that the 340B statute allows HRSA to choose, in its discretion, how 340B prices are offered to 340B Providers, HRSA exercised its discretion soundly in rejecting Plaintiffs' attempts to implement their flawed rebate models.

Under arbitrary-and-capricious review—a "narrow standard"—a court does not "substitute its judgment for that of the agency" and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009). In line with this deferential standard, "a court presumes that the agency's action is valid." *McDonough v. Mabus*, 907 F. Supp. 2d 33, 43 (D.D.C. 2012). "An agency need only articulate a rational connection between the facts found and the choice made, and the court will not intervene unless the [agency] failed to consider relevant factors or made a manifest error in

judgment." *United W. Bank v. Off. of Comptroller of Currency*, 928 F. Supp. 2d 70, 83 (D.D.C. 2013) (quoting *Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 233 (D.C. Cir. 2008)).

Applying this "highly deferential" standard, *id.*, HRSA's explanation for requiring up-front price reductions over post-purchase refunds reflects reasoned decision-making.[48] As discussed throughout this brief, HRSA understood that the only manner through which the 340B statute can fulfill its laudable goals of furthering care for vulnerable patient populations is through up-front price reductions, not post-purchase refunds. HRSA explained to Plaintiffs that a shift to a rebate model would disrupt over 30 years of practice under which manufactures have provided up-front discounts, and fundamentally undermine the 340B program because 340B Providers would be forced to pay higher prices for covered drugs, and asked manufacturers, such as Lilly, to provide responses to over twenty questions about their proposed rebate models. *See supra* at p. 12.

As HRSA recognized, a rebate model improperly empowers drug manufacturers to engage in self-help and vigilantism, and it prevents 340B Providers from realizing the benefits of the 340B program—namely, accessing covered drugs at reduced up-front prices.[49] These communications more than reflect a "path [that] may reasonably be discerned," *Fox Television*, 556 U.S. at 513-14, especially in light of the repeated litigation of all aspects of the 340B statute and CMS guidance pertaining to the interaction between 340B and the IRA. Plaintiffs evidently fault HRSA for not providing detailed rebuttals to each one of their policy arguments, including, for example, the

---

[48]    It appears that Plaintiffs met with HRSA about their proposed rebate models, where HRSA may have provided additional justifications for its decision. Intervenor Defendants have no insight into what was said or discussed at those meetings.

[49]    *See* Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs to Paul Hudson, Chief Executive Officer, Sanofi-Aventis U.S. LLC (Dec. 13, 2024), *Sanofi v. Kennedy,* No. 24-cv-3496 (DLF) (D.D.C. Dec. 16, 2024), Dkt. No. 1-7.

decision to allow ADAPs to access the benefits of the 340B program through rebates. But HRSA has explained why ADAPs are uniquely situated vis-à-vis other covered entities. *See supra* at p. 4.

No doubt, HRSA's explanations for why it requires pre-purchase price reductions rather than rebates were brief. But the APA does not require HRSA to respond to every tangential point raised by Plaintiffs, especially when the agency and other HHS entities have already addressed any potential issues. That is especially true when these issues do not reflect factors that the agency is required to consider and when the issues raised in fact distort the 340B program. What the APA requires is "that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That Plaintiffs attempt to drum up tangential issues did not draw an explicit response from HRSA does not mean that HRSA acted in a manner that is arbitrary and capricious.

C.    **If the Court Determines that HRSA Acted in an Arbitrary and Capricious Manner, the Proper Remedy is to Send the Issue Back to HRSA Without Vacating HRSA's Policy Letters.**

Plaintiffs request wide-ranging relief, including that this Court agree with their statutory interpretation, allow Plaintiffs to proceed with their rebate models, and that the Court essentially prevent HRSA from pursuing any enforcement actions or litigation against Plaintiffs in connection with their rebate models. But Plaintiffs are not entitled to such sweeping relief. Instead, should this Court determine that HRSA's decision-making was arbitrary and capricious, all that Plaintiffs are entitled to is a setting aside of the policy letters and a remand to HRSA to reconsider Plaintiffs' requests and further explain itself. 5 U.S.C. § 706(2) (empowering a reviewing court to "set aside agency action, findings, and conclusions"); *see also, e.g.*, *St. Lawrence Seaway Pilots Ass'n, Inc. v. United States Coast Guard*, 85 F. Supp. 3d 197, 208 (D.D.C. 2015) (vacating a rule promulgated in a fashion that was arbitrary and capricious is the "typical remedy"). Any other relief sought by

Plaintiffs necessarily requires that this Court to adopt an interpretation of the 340B statute that affirmatively *requires* HRSA to permit rebate models, which has no basis in the text.

Moreover, because, as discussed (1) a myriad of reasons support HRSA's decision to require up-front price reductions as opposed to post-purchase refunds; and (2) allowing Plaintiffs to disrupt the 30-years of effectuating the 340B price through discounts will cause immediate harm and disruption, this Court should leave HRSA's letters in effect while giving HRSA an opportunity to further explain its decision-making if it finds that HRSA acted in an unlawful manner. *See, e.g.*, *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) ("The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."); *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005).

## III. HRSA DID NOT VIOLATE THE CONSTITUTIONAL RIGHTS OF NOVARTIS AND BMS

In a last-ditch effort, Plaintiffs Novartis and BMS argue that HRSA's failure to permit Novartis and BMS to implement their proposed rebate models is so irrational and outrageous that it shocks the conscience, comprising a substantive due-process violation, in light of requirements BMS and Novartis must comply with under the IRA. However, their attempts to refashion their arbitrary and capricious claim into a constitutional violation completely miss the mark.[50]  As

---

[50]  Though BMS attempts to transmogrify its APA challenge into a constitutional one, it effectively ignores that due process prohibits a much narrower type of government behavior. *See, e.g.*, *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 829 n.7 (4th Cir. 1995) ("[T]o conclude that every agency decision reversed as 'arbitrary and capricious' under state or federal administrative law rises to the level of a constitutional claim would distort the substantive due process doctrine. As the courts have consistently recognized, the inquiry into 'arbitrariness' under the Due Process Clause is completely distinct from and far narrower than the inquiry into 'arbitrariness' under state or federal administrative law.").

discussed at length, HRSA has no authority to permit a rebate model, and therefore its actions are not arbitrary and capricious. Regardless, for all of the reasons discussed throughout this brief, HRSA's actions certainly do not rise to the level of "egregious official conduct" that is "arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).[51] One need only review in cursory fashion the class of cases cited by the Supreme Court in *Lewis* to understand that the "shock the conscience" standard is, as one might expect, a high threshold to clear. *Id.* at 846–47 (analyzing cases involving forced pumping of detainee's stomach, among other facts). HRSA's conduct here does not remotely approach this threshold for all of the reasons discussed in this brief, let alone represent the sort of "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 849.[52]

In any event, Novartis and BMS lack standing to bring this constitutional challenge and their challenge is not yet ripe. Participation in the IRA negotiated-price program has not yet begun, and, as discussed *supra* at p. 38, final CMS Guidance stated that that it is still considering collecting more data to address any deduplication concerns.[53] Therefore, the Court should decline to review this hypothetical bind until "the agency's policies have crystallized through the application of the policy to particular facts." *Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003).

---

[51]    As with Plaintiffs' APA challenges, the only relief Novartis and BMS would be entitled to with respect to their constitutional arguments would be vacatur. But that alone reveals the weakness of the constitutional challenge. Indeed, if accepted, Novartis and BMS's arguments would *require* the use of a rebate model under 340B, which is plainly incorrect.

[52]    Put simply, Novartis and BMS's cited authority—which stand for nothing more than that the government may not act in an intentionally malicious or entirely arbitrary fashion—only undermines their due-process theory, which would elevate any APA challenge to a constitutional dimension.

[53]    Medicare Drug Price Negotiation Program: Draft Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price (MFP) in 2026 and 2027, (May 3, 2024) https://tinyurl.com/bnv552ad.

Furthermore, "respect for the separation of powers counsels restraint" when a litigant challenges an alleged conflict between two statutory schemes. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018) ("Respect for Congress as drafter counsels against too easily finding irreconcilable conflicts in its work."); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24, (2021) ("Under Article III, federal courts do not adjudicate hypothetical or abstract disputes.").

Novartis also argues that HRSA has violated its procedural due process rights under *Mathews v. Eldridge,* 424 U.S. 319 (1976), which examined whether an individual was entitled to an evidentiary hearing before their social security benefits were terminated, because Novartis will now have to comply with both the IRA's Drug Price Negotiation Program and the 340B Program. However, Novartis' drugs are subject to the IRA and the 340B Program because of actions taken by Congress, not HRSA. Assuming Novartis has even raised a property interest, Novartis's procedural due process claim fails for the simple reason that the 340B statute and the IRA, as described throughout this brief, provide various statutory safeguards and processes that permit manufacturers to seek recourse should they believe their rights have been violated under the statute. Finally, contrary to Novartis's assertions and for all of the reasons described *supra*, the public interest is best served by HRSA's denial of the proposed rebate model, as Novartis's proposed rebate model would cause harm to 340B Hospitals, including UMass and Genesis, that are providing invaluable resources to vulnerable patients and communities across the country.

In any event, the remedy for a procedural due process claim is just what it sounds like: the provision of *process*. Yet Novartis appears to request vacatur of HRSA's actions, which does not match any potential (and indeed, hypothetical) violation of procedural due process. Novartis's procedural due process argument, like its substantive due process argument, amounts to little more than a disagreement with Congress's decision to impose price concessions on major drug

manufacturers. Novartis's kitchen-sink approach merely reflects the same repeated arguments in different clothing, and this Court should reject these constitutional challenges for all of the reasons discussed throughout this brief.

## **CONCLUSION**

For the foregoing reasons, Intervenor Defendants respectfully request that this Court grant Intervenor Defendants' Cross Motion for Summary Judgment and deny Plaintiffs' Motions for Summary Judgment.

Dated: March 18, 2025

William B. Schultz (D.C. Bar No. 218990)
Margaret M. Dotzel (D.C. Bar No. 425431)
**ZUCKERMAN SPAEDER LLP**
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8106
wschultz@zuckerman.com
mdotzel@zuckerman.com

*Attorneys for Intervenor Defendants*

**CERTIFICATE OF SERVICE**

I certify that on March 18, 2025, I filed the foregoing with the Clerk of the Court using the

ECF System, which will send notification of such filing to the registered participants identified on

the Notice of Electronic Filing.

William B. Schultz
_____
William B. Schultz