## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELI LILLY AND COMPANY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ROBERT F. KENNEDY JR., *et al.*, <br><br> *Defendants*. | Case No. 24-CV-3220 (DLF) |
| BRISTOL MYERS SQUIBB COMPANY, <br><br> *Plaintiff*, <br><br> v. <br><br> ROBERT F. KENNEDY JR., *et al.*, <br><br> *Defendants*. | Case No. 24-CV-3337 (DLF) |
| SANOFI-AVENTIS U.S. LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> *Defendants*. | Case No. 24-CV-3496 (DLF) |
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> *Plaintiff*, <br><br> v. <br><br> ROBERT F. KENNEDY JR., *et al.*, <br><br> *Defendants*. | Case No. 25-CV-0117 (DLF) |

**PLAINTIFFS' JOINT BRIEF IN OPPOSITION TO INTERVENOR-DEFENDANTS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY**
**IN SUPPORT OF SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 3

    I.      SECTION 340B'S TEXT FORECLOSES INTERVENORS'
           "DISCOUNT ONLY" INTERPRETATION, WHICH EVEN HRSA
           DOES NOT EMBRACE ....................................................................................... 3

    II.     INTERVENORS DO NOT PROVIDE A NON-ARBITRARY
           RATIONALE FOR HRSA'S REFUSAL TO APPROVE
           PLAINTIFFS' MODELS ................................................................................... 18

          A.    HRSA Irrationally Distinguished Between Plaintiffs' Models And
               The ADAP Cash-Rebate Model ............................................................... 19

          B.    HRSA Irrationally Distinguished Between Plaintiffs' Models And
               The Product-Replenishment Model ......................................................... 21

          C.    HRSA's Policy Impedes Statutory Objectives ........................................ 23

          D.    The Agency's Policy Precludes Manufacturers From Implementing
               MFP-340B Nonduplication ...................................................................... 25

          E.    HRSA Has No Solution For The Program-Integrity Problems Of
               The Current System And No Answer For The Benefits Of
               Plaintiffs' Models .................................................................................... 27

    III.    HRSA'S REFUSAL TO APPROVE BMS'S AND NOVARTIS'S
           MODELS DENIES THEM DUE PROCESS OF LAW ............................................ 28

          A.    HHS's Position Is Irrational And Gravely Unfair .................................... 29

          B.    Novartis Has No Meaningful Opportunity To Be Heard Regarding
               Improper 340B Pricing ............................................................................ 32

    IV.    VACATUR OF THE AGENCY'S UNLAWFUL ACTIONS IS THE
           NORMAL—AND PROPER—REMEDY ............................................................. 34

CONCLUSION ...................................................................................................................... 36

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993)...............................................................34, 35

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014)..............................................................34, 35

*Attias v. Carefirst, Inc.*,
  865 F.3d 620 (D.C. Cir. 2017)......................................................................31

*Azar v. Allina Health Servs.*,
  587 U.S. 566 (2019) .......................................................................................7

*Barrick Goldstrike Mines Inc. v. Browner*,
  215 F.3d 45 (D.C. Cir. 2000).......................................................................27

*Bennett v. Spear*,
  520 U.S. 154 (1997) ......................................................................................26

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
  972 F.3d 83 (D.C. Cir. 2020).........................................................................4

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
  799 F.3d 202 (2d Cir. 2015) .........................................................................10

*Camp v. Pitts*,
  411 U.S. 138 (1973) ..................................................................................4, 18

*Eagle Pharms., Inc. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020).......................................................................5

*Center for Auto Safety v. National Highway Traffic Safety Admin.*,
  452 F.3d 798 (D.C. Cir. 2006)......................................................................26

*Ciba-Geigy Corp. v. EPA*,
  801 F.2d 430 (D.C. Cir. 1986)......................................................................26

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985) ......................................................................................32

*Committee of U.S. Citizens Living in Nicar. v. Reagan*,
  859 F.2d 929 (D.C. Cir. 1988), *abrogation on other grounds recognized*,
  *Schieber v. United States*, 77 F.4th 806 (D.C. Cir. 2023) .................................30

*Authorities upon which we chiefly rely are marked with an asterisk.

**TABLE OF AUTHORITIES–CONTINUED**

Page(s)

*County of Los Angeles v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999).................................................................20

*CSI Aviation Servs., Inc. v. Department of Transp.,*
    637 F.3d 408 (D.C. Cir. 2011)..................................................................27

*Da'Vage v. D.C. Hous. Auth.,*
    583 F. Supp. 3d 226 (D.D.C. 2022)...........................................................33

*Esparraguera v. Department of the Army,*
    101 F.4th 28 (D.C. Cir. 2024)...................................................................34

*FTC v. Cardinal Health, Inc.,*
    12 F. Supp. 2d 34 (D.D.C. 1998)..............................................................10

*Forest Cnty. Potawatomi Cmty. v. United States,*
    317 F.R.D. 6 (D.D.C. 2016) .......................................................................5

*Henson v. Santander Consumer USA Inc.,*
    582 U.S. 79 (2017)..................................................................................17

*Independent Petroleum Association of America v. Babbitt,*
    92 F.3d 1248 (D.C. Cir. 1996)..................................................................22

*Independent U.S. Tanker Owners Comm. v. Dole,*
    809 F.2d 847 (D.C. Cir. 1987)..................................................................23

*In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency,*
    156 F.3d 1279 (D.C. Cir. 1998).................................................................19

*Jackson v. Modly,*
    949 F.3d 763 (D.C. Cir. 2020)....................................................................8

*Jones v. United States,*
    527 U.S. 373 (1999) .................................................................................7

*Landstar Express Am., Inc. v. Fed. Mar. Comm'n,*
    569 F.3d 493 (D.C. Cir. 2009)....................................................................5

*Luna Perez v. Sturgis Pub. Schs.,*
    598 U.S. 142 (2023) ...............................................................................17

*Mercy Hosp., Inc. v. Azar,*
    891 F.3d 1062 (D.C. Cir. 2018)..................................................................5

*National Mining Association v. Fowler,*
    324 F.3d 752 (D.C. Cir. 2003)..................................................................30

# TABLE OF AUTHORITIES–CONTINUED

Page(s)

*National Park Hospitality Ass'n v. Department of Interior*,
538 U.S. 803 (2003) ...................................................................................27

*New England Power Generators Ass'n, Inc. v. FERC*,
881 F.3d 202 (D.C. Cir. 2018) ...................................................................28

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024)................................................11, 12, 13, 17

*Pharmaceutical Rsch. & Mfrs. of Am. v. David*,
510 F. Supp. 3d 891 (E.D. Cal. 2021) .......................................................10

*Pharmaceutical Rsch. & Mfrs. of Am. v. HHS*,
138 F. Supp. 3d 31 (D.D.C. 2015)........................................................26, 27

*Propert v. District of Columbia*,
948 F.2d 1327 (D.C. Cir. 1991) .................................................................33

*Russello v. United States*,
464 U.S. 16 (1983) .......................................................................................4

*Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*,
25 F.4th 12 (D.C. Cir. 2022)......................................................................18

*Sebelius v. Cloer*,
569 U.S. 369 (2013) ...................................................................................10

*SEC v. Chenery*,
332 U.S. 194 (1947) ...........................................................................2, 5, 19

*Silverman v. Barry*,
845 F.2d 1072 (D.C. Cir. 1988)..................................................................32

*Simms v. District of Columbia*,
872 F. Supp. 2d 90 (D.D.C. 2012)........................................................33, 34

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) .................................................................35

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002)......................................................................35

*Thompson v. District of Columbia*,
832 F.3d 339 (D.C. Cir. 2016)....................................................................33

*Westar Energy, Inc. v. FERC*,
473 F.3d 1239 (D.C. Cir. 2007)..................................................................22

# TABLE OF AUTHORITIES–Continued

Page(s)

*Wildearth Guardians v. Salazar,*
    272 F.R.D. 4 (D.D.C. 2010) ............................................................5

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n,*
    82 F.4th 1273 (D.C. Cir. 2023).......................................................29

**Regulations:**

42 C.F.R. § 423.100..........................................................................11

42 C.F.R. § 447.505(b) ......................................................................10

61 Fed. Reg. 65,406 (Dec. 12, 1996)..........................................13, 33

62 Fed. Reg. 45,823 (Aug. 29, 1997) ................................................8

*63 Fed. Reg. 35,239 (June 29, 1998) ...................7, 8, 19, 20, 34

89 Fed. Reg. 28,634 (Apr. 19, 2024) ................................................14

**Statutes:**

*42 U.S.C. § 256b(a)(1)..............................1, 4, 5, 6, 9, 11, 28

42 U.S.C. § 256b(a)(2) ...........................................................4, 6, 7

42 U.S.C. § 256b(a)(5)(A) ................................................................4

42 U.S.C. § 256b(a)(5)(A)(i) ..........................................................16

42 U.S.C. § 256b(d)(1)(B)(iv) .....................................................4, 7

42 U.S.C. § 256b(d)(2)(A) ..............................................................28

42 U.S.C. § 256b(d)(2)(B)(iv) ........................................................16

42 U.S.C. § 256b(d)(3)(A) ..............................................................13

42 U.S.C. § 1320f(a) ........................................................................28

42 U.S.C. § 1320f(a)(2) ..............................................................27, 28

42 U.S.C. § 1320f-2(d) ...............................................................27, 28

42 U.S.C. § 1395w-102(d)(1)(B) .....................................................11

42 U.S.C. § 1396r-8(c)(1)(C)(ii)(I) .................................................10

**TABLE OF AUTHORITIES–CONTINUED**

Page(s)

**OTHER AUTHORITIES:**

340B Health, *Preliminary Results of 340B Health Survey: Impact of Rebates on
340B Hospitals* (Mar. 18, 2025) ....................................................................... 34

CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementa-
tion of Section 1191-1198 of the Social Security Act for Initial Price Ap-
plicability Year 2027 and Manufacturer Effectuation of the Maximum Fair
Price in 2026 and 2027* (Oct. 2, 2024) ...................................... 25, 26, 29, 30, 31

CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial
Price Applicability Year 2026* (Aug. 2024) .................................................. 26, 31

Letter from 340B Health to Dr. Meena Seshamani, M.D., Ph.D., CMS
(July 2, 2024) ....................................................................................................... 30

Lindsay Bealor Greenleaf, *Analysis of FY 2021 HRSA 340B Covered Entity
Audits* (Feb. 23, 2023) ........................................................................................ 24

GAO, *GAO-18-480, Drug Discount Program: Federal Oversight of Compliance
at 340B Contract Pharmacies Needs Improvement* (June 2018) ....................... 15

GAO, *GAO-20-212, 340B Drug Discount Program: Oversight of the Intersection
with the Medicaid Drug Rebate Program Needs Improvement* (Jan. 2020) ............. 14, 15

GAO, *GAO-21-107, Drug Pricing Program: HHS Uses Multiple Mechanisms to
Help Ensure Compliance with 340B Requirements* (Dec. 2020) ....................... 24

HIV/AIDS Bureau, *AIDS Drug Assistance Program (ADAP) Manual* (June 2023) ................... 8

House Energy & Commerce Comm., *Review of the 340B Drug Pricing
Program* (Jan. 10, 2018) ...................................................................................... 24

HRSA, Program Integrity: FY24 Audit Results (last updated Mar. 26, 2025) ............................ 16

Kalderos, *2022 Annual Report: Conquering the "Great Unknown"* (2022) ................................ 24

Cathy Kelly, *CMS May Engage in Medicare, 340B Discount Deduplication
'Eventually,' Ex-CMS Official Says*, Citeline Regulatory (Mar. 13, 2025) ............... 15, 31

Michigan Dep't of Health and Human Servs., *Enhanced 340B Reporting Require-
ments* (Mar. 1, 2017) ........................................................................................... 16

Ashwin Mundra, Drug Channels, *The 340B Noncompliance Data Gap Leaves
Drug Manufacturers in the Dark* (Mar. 18, 2022) ...................................... 15, 24

*Price*, Black's Law Dictionary (12th ed. 2024) ......................................................................... 9

**TABLE OF AUTHORITIES–Continued**

Page(s)

Antonin Scalia & Bryan J. Garner, *Reading Law: The Interpretation of
Legal Texts* (2012) ................................................................................................. 5

## INTRODUCTION

This is a straightforward case of statutory interpretation about the methods Plaintiffs may use to effectuate the 340B price. But there is nothing straightforward about Intervenors' reading, which bobs and weaves around the plain text to construct a new meaning that better suits Intervenors' policy preferences.

The 340B statute requires the Secretary of Health and Human Services (HHS) to "enter into an agreement" with manufacturers—a Pharmaceutical Pricing Agreement (PPA)—that requires manufacturers to drastically lower the prices of their medicines for certain healthcare providers called covered entities. 42 U.S.C. § 256b(a)(1). The statute identifies two possible methods for making these reduced prices available: an up-front "discount," or a back-end "rebate." *Id.* And when the Secretary enters into PPAs with manufacturers, the statute allows him to "provide[ ]" for a pricing methodology. No one—not Intervenors and not the Government—contends that Plaintiffs' PPAs mandate the use of the prevailing-replenishment model or prohibit cash rebates. That should end the analysis.

Plaintiffs' interpretation ensures every word in the 340B statute retains meaning. And Plaintiffs' statutorily authorized cash-rebate or cash-replenishment models address the rights and obligations of *both* manufacturers and covered entities, and are consistent with program precedents and standard business practices. Critically, Plaintiffs' models also provide a mechanism for addressing both the longstanding program-integrity concerns that virtually every relevant government watchdog has found to be commonplace and new statutory provisions for which the Government has made no allowances. Intervenors' position, by contrast, would not only leave the worst parts of the status quo in place, but also enshrine it as law.

Intervenors contend the statute's phrase "any rebate or discount" has nothing at all to do with pricing methods, while a different statutory phrase—added nearly 20 years after the Program's

1

creation, and long after the Health Resources and Services Administration (HRSA) had already recognized a rebate model for certain covered entities—forecloses rebates entirely by requiring that manufacturers "shall . . . offer" medicines to covered entities at or below ceiling prices.  HRSA did not adopt that interpretation, so the Court must ignore it, along with all of the extra-record evidence Intervenors put forward.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  On this basis alone, the Court can largely reject Intervenors' arguments.  But in any event, Intervenors' interpretation is as wrong as it sounds.  Intervenors cannot explain away the statute's multiple uses of the word "rebate," and their position relies on a misunderstanding of what it means to make an "offer" at a particular price.  It also would render two longstanding methods of effectuating the 340B price unlawful—including the one Intervenors themselves prefer.

Even apart from the statutory text, Intervenors fail to make sense of HRSA's refusal to approve Plaintiffs' models.  Intervenors' sole answer to the cash-rebate model's decades-long use by AIDS Drug Assistance Programs (ADAPs), a type of covered entity, is that they are somehow unique.  But Intervenors have not explained how ADAPs' particular attributes *today* are relevant to the question whether a rebate model for other covered-entity types is permissible, and it is telling that Intervenors have not identified any instance in which the ADAP rebate model has led to the parade of horribles they fret about, much less HRSA doing so in the administrative record.  And Intervenors do not dispute that the extant product-replenishment model relies on post-purchase true-ups—at least for the covered entity's first purchase of a drug—to effectuate the 340B price.  That makes it a rebate model, just like Plaintiffs' proposed models.  These structural similarities leave no room for singling out Plaintiffs' models for harsher scrutiny.

Intervenors also fail to justify HRSA's distinctions, which have no legitimate regulatory basis.  HRSA views up-front discounts as the preferred way of implementing 340B pricing, even though the statute treats rebates and discounts as peers, and even though *no* widely used 340B

2

pricing method is an up-front discount. And HRSA privileges covered entities' preferences over program integrity. Absent Congressional authorization, agencies do not get to pick winners and losers. Congress tells agencies what factors they may consider when making decisions. Covered entities get no special preferences beyond that—no matter if some would prefer that manufacturers not strive to prevent program-integrity violations in the absence of HRSA enforcement.

Perhaps worst of all, Intervenors have no answer for the Inflation Reduction Act (IRA)-related harms HRSA's policy will soon unleash. At most, Intervenors hint at "limited data sharing arrangements" they could supposedly "work with 340B Providers on." Intervenors Br. 36. But covered entities have no incentive to voluntarily share their data with manufacturers—some have even refused to provide information sought by HRSA-approved audits or sued to block those audits—and Intervenors do not suggest that covered entities will share data out of the goodness of their hearts. Plaintiffs' models create that incentive by conditioning receipt of the 340B price on covered entities sharing data they keep in the ordinary course of their businesses—something the D.C. Circuit and Third Circuit have held that manufacturers have the right to do.

For all these reasons, Intervenors' arguments should be rejected, and HRSA's refusal to approve Plaintiffs' rebate models and its general policy forbidding rebate models absent HRSA preapproval should be vacated and set aside. That is the ordinary remedy for arbitrary and capricious agency action, and Intervenors have given no good reason for the Court to believe that HRSA can salvage its refusal to approve Plaintiffs' rebate models on remand.

## ARGUMENT

## I.    SECTION 340B'S TEXT FORECLOSES INTERVENORS' "DISCOUNT ONLY" INTERPRETATION, WHICH EVEN HRSA DOES NOT EMBRACE.

As Plaintiffs have explained, the 340B statute does not discriminate or express a preference between rebates and discounts. Lilly Opening Br. 26–27; BMS Opening Br. 24; Novartis Opening

Br. 20; Sanofi Opening Br. 17.  The statute merely provides that manufacturers enter into an agreement where "the amount required to be paid" accounts for "any rebate or discount, as provided by the Secretary."  42 U.S.C. § 256b(a)(1).  Post-purchase rebates and point-of-sale discounts are both authorized, so long as the price is at or below the 340B ceiling price.  Novartis Opening Br. 20; *see also* Lilly Opening Br. 27; BMS Opening Br. 24–25; Sanofi Opening Br. 18.

That statutory indifference to discounts and rebates continues throughout section 340B's text.  The very next paragraph, for example, defines the statutory ceiling price, which is achieved by reducing the "average manufacturer price."  *See* 42 U.S.C. § 256b(a)(2).  That reduction is called the "rebate percentage."  *Id.*  Later, in the statute's duplication prohibition, it again describes "discounts or rebates."  *Id.* § 256b(a)(5)(A).  And when Congress amended the 340B statute to try to improve its functionality, one of the targeted changes was a "mechanism" for reporting "rebates and other discounts" and ensuring that "such discounts or rebates" resulted in the appropriate ceiling price.  *Id.* § 256b(d)(1)(B)(iv).  That persistent textual parity between rebates and discounts belies any suggestion that the statute disfavors rebates—much less prefers product replenishment.  "Had  Congress intended to" mandate the use of point-of-sale discounts, "it presumably would have done so expressly."  *Russello v. United States*, 464 U.S. 16, 23 (1983).

**1.**  Intervenors take a position not even the Government accepts: that despite the clear statutory language, rebate models are flatly prohibited under the 340B statute.  Intervenors' Br. 18–32.  This argument fails at the threshold for two distinct reasons.

*First,* where HRSA did not embrace Intervenors' discount-only reading of the statute in the administrative record, Intervenors cannot deploy it as a *post hoc* rationale in this Court.  *See Bhd. of Locomotive Eng'rs & Trainmen v. Federal R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020) (parties cannot rely on arguments not presented by agency below).  Review here is limited to the record as the agency marshaled it, *Camp v. Pitts*, 411 U.S. 138, 142 (1973), and is confined to the agency's

rationale as HRSA articulated it, *Chenery*, 332 U.S. at 196.  The Court may reject Intervenors' novel arguments on that ground alone.

*Second*, and relatedly, Intervenors cannot inject new issues into the case that the parties have not raised.  *See Forest Cnty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 15 (D.D.C. 2016) ("In the past, courts have barred intervenors from injecting collateral issues into the litigation."); *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 20 (D.D.C. 2010) (same).  This Court should not wade into Intervenors' discount-model-only theory when even HRSA does not defend it.

**2.**  Intervenors' argument fails on its own terms, anyway.  Intervenors contend that any cash-rebate or cash-replenishment model would "thwart[ ]" the statute's "shall offer" provision, because "manufacturers must offer to sell covered drugs at th[e] maximum ceiling price . . . in the first instance."  Intervenors' Br. 21.  Even the Government does not embrace that maximalist reading of the statute, and for good reason; Intervenors' position is wrong in three different respects.

*First*, Intervenors cannot make sense of the statute's reference to "any *rebate* or discount." 42 U.S.C. § 256b(a)(1) (emphasis added).  Intervenors read out the word "rebate" entirely.  *See, e.g.*, *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) ("We presume that Congress did not 'include words that have no effect.'") (quoting Antonin Scalia & Bryan J. Garner, *Reading Law: The Interpretation of Legal Texts* 176–177 (2012)).  If Congress had intended to revoke its authorization of rebate models when it added the "shall offer" provision in 2010—the assumption apparently underlying Intervenors' claim—it would have done so by amending the provision expressly providing for a rebate mechanism.  Yet that language remained unchanged.  Intervenors cannot "rewrite a statute's plain text" to make it correspond with their policy preference.  *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 335 (D.C. Cir. 2020) (quoting *Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009) (Kavanaugh, J.)).

Intervenors try to paper over this problem by carving out a miniscule role for the "any rebate or discount" language.  They contend it merely gives the Secretary the power to "make . . . adjustments" to the ceiling price in certain edge cases, such as new medicines without sufficient Medicaid data, or "operational challenges" that would lead to 340B prices below a penny per unit.  Intervenors' Br. 18–21.  For starters, Intervenors' whole line of analysis assumes that "340B is an upfront discount," which is the conclusion Intervenors are trying to prove.  Intervenors' Br. 19.  Circularity aside, Intervenors refer to these *ad hoc* adjustments to 340B prices as "rebate and discount authority" without justification—they never explain why the actions they describe qualify under any definition of either term, let alone which one.  Adjusting the price *upward* to avoid a negative 340B price can hardly be described as a "rebate or discount."  *Contra* Intervenors Br. 20.  And rebates and discounts differ primarily in their timing; the former effectuates a net price after an initial transaction, while the latter does so at the time of the initial transaction.  Lilly Opening Br. 32–33; BMS Opening Br. 33; Novartis Opening Br. 29–30; Sanofi Opening Br. 23–24.  None of the "examples" Intervenors offer involve HRSA setting prices retroactively.  Rather, Intervenors seem to insist that this can never occur "because 340B is an up-front discount."  Intervenors' Br. 19.  So even on their own terms, Intervenors cannot explain why Congress included the term "rebate" in the 340B statute.  That is textbook surplusage.

Intervenors' theory also implies that Congress carelessly cross-contaminated topics when crafting the 340B statute.  Intervenors assert that the "any rebate or discount" phrase is all about calculating ceiling prices.  Intervenors' Br. at 20 ("[I]t simply describes how much the manufacturer may charge.").  But Congress left that phrase in subsection (a)(1), which addresses the obligations that manufacturers' PPAs must impose.  42 U.S.C. § 256b(a)(1).  If Intervenors' theory were correct, the more natural place to put the language would have been in subsection (a)(2), which contains instructions for calculating ceiling prices by defining the "rebate percentage."  *Id.*

§ 256b(a)(2).  A statutory "phrase gathers meaning from the words around it."  *Jones v. United States*, 527 U.S. 373, 389 (1999) (citation omitted).  The context surrounding "any rebate or discount" supports Plaintiffs' reading:  It is part of a set of instructions for *effectuating* 340B pricing.

That conclusion is bolstered by Congress's use of the phrase "rebates and other discounts" to refer to a method of effectuating a net price at exactly the same time it added the "shall offer" provision on which Intervenors rely.  In the same amendment, Congress required reporting of these pricing mechanisms in the private market and provided for a "mechanism" for lowering prices to covered entities in response "if such discounts or rebates have the effect of lowering the applicable ceiling price."  Pub. L. No. 111-148, §§ 2501, 7102(a), 124 Stat. 119, 309, 824 (2010) (codified at 42 U.S.C. § 256b(d)(1)(B)(iv)).  That is both an implicit recognition that a post-purchase rebate is part of a good's net price, *contra* Intervenors' Br. 20–21, and a use of the term "rebate" in its ordinary sense: a way of effectuating a net price.  It would be odd indeed if Congress, in the same breath, referred to "rebates and other discounts" as a pricing mechanism, but left the phrase "any rebate or discount" in the statute if its specific intention were to forbid the use of rebates as a pricing mechanism.  *Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes.").

*Second*, Intervenors' reading conflicts with HRSA's rebate guidance for ADAPs.  *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35,239, 35,240 (June 29, 1998).  Intervenors' primary response is that ADAPs "face unique challenges."  Intervenors' Br. 30.  Yet Intervenors never explain what makes ADAPs "unique," nor why the 340B statute supposedly (and silently) treats them differently:  If Intervenors' reading pre-

vails, the rebate model used for ADAPs—which has seen decades of success—would become unlawful.[1]  And although "HRSA's guidance related to ADAPs precedes the 2010 addition of the 'shall offer' provision to the 340B statute," Intervenors' Br. 30, that guidance remains in effect today.  As HRSA's current guidance manual for ADAPs recognizes, ADAPs "submit claims to drug manufacturers for rebates on medications that were purchased through a retail pharmacy network at a price higher than the 340B price."  HIV/AIDS Bureau, *AIDS Drug Assistance Program (ADAP) Manual* 42 (June 2023), https://tinyurl.com/2pcx49t4.  And HRSA has conceded that cash rebates for ADAPs are "consistent with the section 340B rebate program."  63 Fed. Reg. at 35,240. That's because "Section 340B has no explicit language as to whether the required reduction in price should be obtained by an initial reduction in the purchase price (i.e., a discount mechanism) or received as a required reduction in cost rebated after purchase, dispensing, and payment are completed (i.e., a rebate option)."  Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997).

All these things were true in 2010 when Congress added the "shall offer" provision.  This highlights a revealing gap in Intervenors' reasoning:  If, as Intervenors claim (at 23), Congress's intention was to "requir[e] an up-front price reduction," why did Congress say nothing at all about a prominent, longstanding example of a back-end price reduction—the precise thing it was supposedly trying to quash?  Congress was presumably aware of the way HRSA had interpreted the statute's "any rebate or discount" language.  *See Jackson v. Modly*, 949 F.3d 763, 773 (D.C. Cir. 2020). Yet Intervenors have not produced a shred of evidence—not text, not drafting history, not public statements, nothing—that Congress had ADAPs in mind in 2010.  That Congress did not

---

[1]  Notably, the only ADAPs that have expressed their views in this case strongly *support* the use of Plaintiffs' models.  No. 24-CV-3337, ECF No. 26 at 15–16 (noting that Plaintiffs' models would "give covered entities transparency into manufacturer concessions").

acknowledge what Intervenors take to be the primary concrete consequence of its amendment is powerful evidence that Intervenors are mistaken.

*Third*, under Intervenors' reading of section 340B, the product-replenishment model, which Intervenors tout as an unassailable regime, would *itself* violate the statute. As Intervenors concede, covered entities that dispense medicines in-house still must "pay[ ] market price for a drug one time." Intervenors' Br. 31. But according to Intervenors' discount-only reading of the statute, even "one time" is too many.[2] As Intervenors explain their theory, "any attempt to sell drugs to 340B providers above [the ceiling price] in the first instance would, by definition, run afoul of the statutory language." Intervenors' Br. 21. Even "some amount of payment later," Intervenors say, would "thwart[ ]" the "clear mechanics of the 'shall offer' provision." *Id.* But if a sale at the wholesale price violates the 340B statute, that would make the first step in the product-replenishment model— the one-time wholesale-price purchase—unlawful. Intervenors never explain the contradiction.

**2.** Intervenors contend that their reading must be correct because Plaintiffs' reading "render[s] the 'shall offer' provision entirely redundant." Intervenors' Br. 23. To the contrary, Plaintiffs' interpretation of the "shall offer" provision gives effect to its ordinary meaning in multiple different ways. The statute provides that the PPA "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling *price*." 42 U.S.C. § 256b(a)(1) (emphasis added). "Price" means "[t]he cost of acquiring or producing something." *Price*, Black's Law Dictionary (12th ed. 2024). Nothing requires that cost to be provided

---

[2] It is also not the case that covered entities pay the market price only once under the product-replenishment model. As the state and regional hospital association *amici* observe, covered entities keep "separate drug purchasing accounts based on different types of pricing available" and then keep "products purchased through all different accounts mixed in one physical inventory." No. 24-CV-3220, ECF No. 39-1 at 8. Under the routine operation of the product-replenishment model, then, a covered entity may pay the commercial price for a unit under a non-340B purchasing account, dispense that unit to an ostensibly 340B-eligible patient, and then claim a "replenishment" unit as a result. Every instance would be illegal under Intervenors' view.

up-front.  A consumer that receives a rebate for a product has acquired the product at the post-rebate price.

Common understanding bears that out.  *See Sebelius v. Cloer*, 569 U.S. 369, 370 (2013) (defining a word as it "is commonly understood").  Suppose Best Buy offers a laptop for $1,000 with a $200 mail-in rebate for students paid 14 days after the student submits a copy of her receipt and student ID.  For what price is Best Buy offering the laptop to students?  $800, of course, which is why mail-in rebates are a successful way to drive sales.  *See* Sanofi Opening Br. 23–24.

The same goes for prescription medicines.  "The transaction price of a prescription drug . . . includes discounts and rebates."  *Pharmaceutical Rsch. & Mfrs. of Am. v. David*, 510 F. Supp. 3d 891, 898 (E.D. Cal. 2021).  And manufacturers routinely "*offer*[ ] lower *prices* . . . through *rebates* or discounts."  *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 206 (2d Cir. 2015) (emphasis added); *see also, e.g.*, *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 41 (D.D.C. 1998) (explaining that manufacturers may offer "cash rebates" to wholesalers that result in a wholesaler "acquir[ing] the drugs for *prices* less than the listed [wholesale acquisition cost]") (emphasis added).  An offer to purchase medicine and then receive a rebate is an offer to purchase the medicine at the price after the rebate.  Plaintiffs' 340B models therefore do not result in covered entities paying more than the ceiling price.

Parallel provisions and regulations likewise reinforce that the 340B statute's "shall offer" provision by its plain terms is satisfied when a covered entity receives a rebate that reduces the price for an eligible purchase to the ceiling price.  Under the Medicaid Drug Rebate Program (MDRP), the "best price" for a medicine "shall be inclusive of cash discounts, . . . volume discounts, and rebates."  *See, e.g.*, 42 U.S.C. § 1396r-8(c)(1)(C)(ii)(I).  Medicaid regulations similarly define "[b]est price" to include "applicable discounts, rebates, or other transactions that adjust prices either directly or indirectly."  42 C.F.R. § 447.505(b).  The Medicare Part D statute provides

that "negotiated prices . . . shall take into account negotiated price concessions, such as discounts, direct or indirect subsidies, rebates, and direct or indirect remunerations, for covered part D drugs." 42 U.S.C. § 1395w-102(d)(1)(B).  And regulations define "[p]rice concession" for Part D as "any form of discount, direct or indirect subsidy, or rebate received by the Part D [plan] sponsor . . . that serves to decrease the costs incurred under the Part D plan."  42 C.F.R. § 423.100; *see also* 24-CV-3220, ECF No. 21-1 at 8–10 (collecting examples of the use of rebates in federal programs).

The "shall offer" provision instead imposes distinct and important restrictions on manufacturers.  By itself, the first sentence of the 340B statute requires a manufacturer only to "enter into an agreement" that establishes "the amount required to be paid."  42 U.S.C. § 256b(a)(1).  It says nothing about how—or whether—a covered entity will actually receive 340B-priced medicines.  The "shall offer" provision fills that gap by requiring a manufacturer to actually "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price."  *Id.*  Put differently, the "shall offer" provision prevents a manufacturer from simply declining to make its products available to covered entities to avoid the lost revenue that results from selling medicines at or below the ceiling price.

The "shall offer" provision also regulates the conditions manufacturers can attach to 340B pricing because offers must be "bona fide."  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 462 (D.C. Cir. 2024).  A manufacturer that conditions the 340B price on medicine being delivered at its own facilities or that "requires that a covered entity pick up its orders one pill at a time" violates the statute even if the price charged—taking into account any rebate or discount—is at or below the 340B ceiling price.  *Id.*  Similarly, "some conditions may be onerous enough to effectively increase the contract 'price,' thus perhaps nudging it above the statutory ceiling."  *Id.*  But Plaintiffs' models include nothing of the sort, as they merely request claims data—which *Novartis* approved—and provide for prompt rebates, avoiding the scenarios about which Intervenors (at 28)

11

fret. *See* AR 272, 330, 409–410, 435. And even if there may be difficult corner cases, the D.C. Circuit has expressed "confiden[ce] that the courts can sensibly adjudicate [such] questions . . . if they should arise." *Novartis*, 102 F.4th at 462–463. "For now," the Court need only hold that Intervenors' "concern about unreasonable conditions fails to justify [their] atextual and ahistorical position that manufacturers may impose no [rebate models] at all." *Id.* at 463.

**3.** Intervenors' statutory-structure arguments are even less compelling. Intervenors point to the fact that "only the Secretary and manufacturers" have "statutory audit rights" as proof that manufacturers must "provide[ ] up front" discounts. Intervenors' Br. 25. But Plaintiffs' models do not render manufacturers' statutory audit rights superfluous. Except for certain covered entities under Sanofi's model, Plaintiffs' models do not attempt to stop diversion, a common source of 340B statutory violations by covered entities. *See* Lilly Opening Br. 9; BMS Opening Br. 8; Novartis Opening Br. 11; Sanofi Opening Br. 13–14.[3] Even to the extent Sanofi attempts to prevent diversion, that will not erase the need for audits to detect diversion that slips through—or duplicate discounting, for that matter. No one has claimed Plaintiffs' models will be airtight in preventing statutory violations, and manufacturers routinely rely on audit rights under commercial agreements regardless of the level of validation used before extending a price reduction. That is because any

---

[3] Intervenors also misrepresent the patient-eligibility condition applied by Sanofi's model to hospital covered entities. *See* Intervenors' Br. 15–17. For example, Intervenors claim that Sanofi's patient definition "differ[s] significantly from HRSA's 1996 Patient Definition Guidelines," Intervenors' Br. 15, but HRSA *did not object* to how Sanofi defines and applies the term "patient," presumably because it recognized that Sanofi adopted and operationalized the agency's own definition. *See* AR 424–425. Nor did the agency express any concerns about hypothetical patients in rural areas. *Id.* Here, too, Intervenors' concerns are misguided. In their cancer hypothetical, for example, the 340B rebate would apply because the prescription (chemotherapy) relates to the care (chemotherapy) provided by the covered entity. *See* AR 389. And Intervenors' purported concerns about how Sanofi will apply its policy are entirely speculative—as is their insinuation that Sanofi will act in bad faith. In all events, none of these points were raised by the agency, so the Court should not consider them now. *See supra* p.5 (Intervenors cannot supply *post hoc* rationale or inject new issues into the case).

number of concerns may be identified after the fact that would justify an audit.  In any event, nothing about Plaintiffs' interpretation would *require* manufacturers to use cash-rebate or cash-replenishment models, and so it is irrelevant that the use of those models may make audits less necessary.  Statutory language is not surplusage simply because it need not be invoked in all circumstances.

Moreover, contrary to Intervenors' arguments, the claims-data requirements in Plaintiffs' 340B models "*are* necessary to give teeth to the audit provision because [Plaintiffs] need the data to demonstrate that there is cause to audit," and in turn access ADR proceedings.  Intervenors' Br. 25 (emphasis added).  Without that data—which only the covered entities possess and which they keep in their ordinary course of business, AR 435—Plaintiffs will unknowingly offer duplicate 340B and MDRP price concessions.  *See* Lilly Opening Br. 38–39; Novartis Opening Br. 17–18; BMS Opening Br. 34–35.  Even worse, the IRA does not provide manufacturers the right to audit covered entities to ensure they are not creating illegal MFP-340B duplicates.  BMS Opening Br. 15–18; Novartis Opening Br. 34–38.  So Intervenors' reading—not Plaintiffs'—has the effect of "render[ing] nugatory the audit provision."  Intervenors' Br. 26.  By confining Plaintiffs to the product-replenishment model, Intervenors' reading limits Plaintiffs' access to the information they need to effectuate the audit and ADR provisions of the statute.  *See* Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996) (requiring manufacturers to establish "reasonable cause" for an audit); 42 U.S.C. § 256b(d)(3)(A) (no ADR claim without an audit).

Intervenors further argue that "HRSA is best suited to oversee all aspects of the 340B program and to take appropriate compliance actions when necessary."  Intervenors' Br. 26.  But that policy position has no basis in the statutory text, which the D.C. Circuit has already held permits manufacturers to police covered-entity abuses by imposing reasonable conditions on extending the 340B price.  *See Novartis*, 102 F.4th at 464.  And Intervenors are wrong to suggest that HRSA is

the Program's best watchdog.  HRSA has abandoned its duty to police the product-replenishment model, despite its plain potential for spawning incorrect and duplicate price concessions.  *See* Government Accountability Office (GAO), *GAO-20-212, 340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* 23–26 (Jan. 2020) (2020 GAO Report), https://www.gao.gov/assets/gao-20-212.pdf.  Instead of reining in the product-replenishment model's abuses, HRSA has refused to reveal the details of how contract-pharmacies use it and helped perpetuate misconceptions about what it entails.  Brief of Eli Lilly & Co. as *Amicus Curiae*, *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-CV-1603 (DLF) (D.D.C. Oct. 31, 2024), ECF No. 19-1 at 4–6.  And HRSA recently doubled down on refusing to audit in Medicaid managed care, despite conceding that utilization of Medicaid managed care can result in prohibited discount duplication.  *See* 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28,634, 28,649 (Apr. 19, 2024).  HRSA's actions—or lack thereof—have forced Plaintiffs to pursue rebate models to protect themselves from costly statutory violations.

Intervenors also fault the 340B statute for not providing "exacting" detail on how a rebate model would function, contrasting it with the Medicaid rebate law, which "lays out a multitude of specifics related to the Medicaid Drug Rebate Program."  Intervenors' Br. 28.  But the 340B statute says just as much about any rebate model as it does about any discount model—and more than it says about the product-replenishment model of which Intervenors are so fond.  Yet Intervenors contend that the product-replenishment model—or perhaps a true point-of-purchase discount model—is the *only* way to comply with the statute.

**4.**  Intervenors conclude by trying—and failing—to poke holes in the "widespread abuses in the 340B Program" that Plaintiffs have identified.  Intervenors' Br. 33.  But Intervenors cannot explain away the many status quo problems that Plaintiffs properly raised to the agency—the very same problems Plaintiffs' new models attempt to solve.

14

*First*, Intervenors quibble with what they call "cherry-picked statistics regarding HRSA's audit findings." *Id.* The statistics come from the Government itself, which, of course, does not dispute them. And Intervenors do not contest GAO's findings—which, again, ignore abuses in Medicaid managed care, Lilly Opening Br. 15; BMS Opening Br. 13; Novartis Opening Br. 13— that fully "72 percent of the covered entities audited in fiscal years 2012 through 2017 had one or more findings of noncompliance." GAO, *GAO-18-480, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 16 (June 2018) (2018 GAO Report), https://www.gao.gov/assets/d18480.pdf. Nor do Intervenors take issue with research cited by Plaintiffs that estimates three-to-five percent of *all* Medicaid rebates now duplicate 340B pricing. Ashwin Mundra, Drug Channels, *The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark* (Mar. 18, 2022), https://tinyurl.com/445uvh88; *see also* Brief of Eli Lilly & Co. as *Amicus Curiae*, *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-CV-1603 (DLF) (D.D.C. Oct. 31, 2024), ECF No. 19-1 at 7 (noting that "extensive internal investigation and analysis" revealed "that two covered entities had likely engaged in violations of the 340B statute, including duplicate discounting"). At bottom, Intervenors' attempt to explain away some subset of violations cannot detract from the Government's own findings that have long "identified several areas of weakness in HRSA's oversight processes that impede its ability to ensure that duplicate discounts are prevented or remedied." 2020 GAO Report, *supra* p.14, at 23. Indeed, a former CMS official "acknowledged there has been duplication between 340B discounts and Medicaid rebates, even though manufacturers should be protected from it." Cathy Kelly, *CMS May Engage in Medicare, 340B Discount Deduplication 'Eventually,' Ex-CMS Official Says*, Citeline Regulatory (Mar. 13, 2025), https://tinyurl.com/sbstjepm. The widespread abuses in the 340B Program that Plaintiffs seek to redress through their 340B models are not cherry-picked or hypothetical: They are real, persistent, confirmed by the Government itself, and must be stopped—*now*.

15

Intervenors' attempt to minimize HRSA's audit findings is misleading. They suggest that some findings of duplication could be illusory as the result of "[f]ailure to have the correct numbers" on HRSA's 340B Medicaid Exclusion File (MEF). Intervenors' Br. at 33–34. Not so; HRSA expressly distinguishes between MEF inaccuracies that caused "[d]uplicate [d]iscounts" and those for which "[i]t was determined that duplicate discounts did not occur as a result." *E.g.*, HRSA, Program Integrity: FY24 Audit Results (last updated Mar. 26, 2025) (compare the entry for "Aultman Orrville Hospital" with that for "Baptist Hospital"), https://www.hrsa.gov/opa/program-integrity/fy-24-audit-results. In any event, accurate participation in HRSA's MEF is a statutory responsibility. *See* 42 U.S.C. § 256b(d)(2)(B)(iv). Intervenors may not decide for themselves which compliance obligations are worthy of being enforced.

*Second*, Intervenors point the finger at state Medicaid plans and maintain that covered entities "have no role in preventing Medicaid MCOs from improperly claiming rebates on 340B MCO claims." Intervenors' Br. 35. But state Medicaid agencies try the same trick, seeking to pawn off *their* obligations onto covered entities. *See, e.g.*, Michigan Dep't of Health and Human Servs., *Enhanced 340B Reporting Requirements* 1 (Mar. 1, 2017), https://tinyurl.com/2ww887rr ("[P]roviders are responsible for accurate reporting of drugs purchased through the 340B program . . . ."). At bottom, blame shifting cannot change what the statute says: "A covered entity *shall not request payment* . . . with respect to a drug that is subject to an agreement under this section if the drug is subject to the payment of a rebate to the State under" Medicaid. 42 U.S.C. § 256b(a)(5)(A)(i) (emphasis added). Covered entities cannot shrug off a responsibility Congress gave them directly.

*Third*, Intervenors blame Plaintiffs for failing to "work with 340B Providers on limited data sharing arrangements for 340B drugs." Intervenors' Br. 36. Intervenors conspicuously do not volunteer their agreement to such requests. And covered entities *could* provide this data—which they

already "collect, report, and maintain in the normal course of business," AR 435—of their own free will, but they do not. Plaintiffs are entitled to attach "reasonable conditions" to their offer, *Novartis*, 102 F.4th at 461, and the "limited data" that Plaintiffs request through their 340B models is one such condition—requiring covered entities to provide the data needed to implement deduplication obligations and giving them an incentive to do so timely. Tellingly, Intervenors do not claim that the substance of the data Plaintiffs' models require is unreasonable or irrelevant. *See* Intervenors' Br. 31 (noting that the data Plaintiffs seek is similar to data that would be provided in an audit); *see also* Gov. Br. 24 (suggesting that Plaintiffs *should* "impose [these] data-reporting conditions on 340B covered entities" in another form). Rightly so: Plaintiffs seek essentially the same data that covered entities already send to their third-party administrators to grease the wheels of the product-replenishment model. No. 24-CV-3337, ECF No. 26 at 17–18.

*Finally*, Intervenors are left to loudly contend that this litigation is "a full-frontal attack on the 340B program." Intervenors' Br. 32. False. Plaintiffs are committed to the 340B Program's original mission. Plaintiffs' models are narrowly focused on detecting and stopping practices the 340B statute expressly prohibits—and will not even deny 340B rebates in response to evidence of duplicate discounting. At bottom, Plaintiffs' models will create information parity that will improve existing processes and benefit all stakeholders. AR 273, 307, 435; No. 24-CV-3220, ECF No. 26-1 at 21–24. Those outcomes would save the 340B Program, not destroy it.

Intervenors' position, in the end, seems to be that any model covered entities dislike is not allowed by the 340B statute. But "[i]t is 'quite mistaken to assume' . . . that any interpretation of a law that does more to advance a statute's putative goal 'must be the law.' " *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)). The 340B statute seeks to make reduced-price medicine available to covered enti-ties; it also seeks to ensure that manufacturers are not subject to duplicate discounts and that 340B-

priced drugs are not diverted to non-340B patients. "[L]egislation invariably includes trade-offs between different interests," *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 24 (D.C. Cir. 2022), and section 340B is no different. Its text simply does not allow the discount-only reading that Intervenors suppose.

## II.    INTERVENORS DO NOT PROVIDE A NON-ARBITRARY RATIONALE FOR HRSA'S REFUSAL TO APPROVE PLAINTIFFS' MODELS.

HRSA's refusal to approve Plaintiffs' rebate models is doubly unlawful because it is also arbitrary and capricious. *See* Lilly Opening Br. 30–44; BMS Opening Br. 27–42; Novartis Opening Br. 23–34; Sanofi Opening Br. 27–29. *First*, HRSA has already asked and answered the rebate-model question with ADAPs. HRSA blessed the rebate model for ADAPs, and the agency may not now block the model's implementation here without irrationally treating like cases differently. *Second*, the product-replenishment model and the rebate model are legally equivalent, meaning HRSA may not elevate one over the other. *Third*, HRSA's actions force Plaintiffs to provide 340B pricing where none is owed, a result that perpetuates unlawful diversion and duplicate discounting. *Fourth*, HRSA's position denies BMS and Novartis the only feasible means of preventing MFP-340B duplication. *Finally*, the agency's decision fails to consider an important aspect of the problem—namely, the compelling operational and program-integrity reasons for adopting the rebate model—and HRSA's position undermines the commonsense benefits the rebate model offers. Each of those defects is an independent reason to grant summary judgment for Plaintiffs.

A word about the record that HRSA produced: It supplies the full—and only—basis for this Court's arbitrary-and-capricious review of the agency's decision. *Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). Intervenors' brief is replete (at 6, 7, 8 13, 14) with extra-record citations, some of which are designed to support rationales the agency

itself did not adopt; Intervenors even suggest "HRSA may have provided additional justifications for its decision" beyond what is reflected in the administrative record. Intervenors' Br. 40 n.48. To be clear, the agency documented its thinking in response to meetings held with and correspondence received from manufacturers, *see, e.g.*, AR 53–54, and any unspoken reasons not in the record—if there were any—are off limits, anyway. "When a party challenges agency action as arbitrary and capricious the reasonableness of the agency's action is judged in accordance with its stated reasons. Agency deliberations not part of the record are deemed immaterial." *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 156 F.3d 1279, 1279 (D.C. Cir. 1998) (internal citation omitted). The Court should therefore disregard Intervenors' additional arguments in defense of HRSA's position. *Chenery*, 332 U.S. at 196.

### A.    HRSA Irrationally Distinguished Between Plaintiffs' Models And The ADAP Cash-Rebate Model.

There is no reasoned basis—especially not a reasoned basis in the record—on which HRSA could treat Plaintiffs' models differently from the model used for ADAPs. HRSA did not object to a rebate model in the ADAP context, on-point agency precedent that Intervenors call an "exception," Intervenors' Br. 4 n.5, and that makes its reaction against Plaintiffs' rebate models all the more unreasonable. AR 57–58, 332–333, 354, 436–437. Intervenors offer thin defenses for HRSA's uneven approach to rebate models, none of which withstand scrutiny.

The method of payment for Plaintiffs' models and the ADAP cash-rebate model are identical. With the ADAP cash-rebate model, HRSA said that an after-purchase rebate "as a method" of furnishing "the 340B discount provided by the statutory ceiling price" was legitimate. 63 Fed. Reg. at 35,242. Intervenors offer no adequate response to explain HRSA's differential treatment of Plaintiffs' models; covered entities' interests may be differently "situated," but the means by which they access 340B pricing cannot be subject to the agency's whim. Intervenors' Br 41. For this

reason, the agency's action is arbitrary.  *See County of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999).

As for concerns about covered entities' "cashflow," Intervenors' Br. 21, HRSA suggested that ADAPs and manufacturers may use "standard business practices" to assist in advance planning for any issues that may arise.  63 Fed. Reg. at 35,239–42.  That logic applies equally to other types of covered entities.  Here again, Intervenors provide no explanation why ADAPs, but not major disproportionate share hospitals (DSH)—some of the largest, most sophisticated, and most profitable hospitals in the country—can accommodate short windows between wholesale purchases and rebates.  Intervenors' Br. 4–5 n.5.  The record shows that Plaintiffs' models would preserve covered entities' cash flow as well as, if not better than, the product-replenishment model does.  AR 269, 287.  And Intervenors do not dispute that ADAPs' reliance on a network of retail pharmacies closely resembles the contract-pharmacy and third-party-administrator arrangements that hospitals and other covered entities use under the product-replenishment model.  *See* BMS Opening Br. 31; Novartis Opening Br. 28; Lilly Opening Br. 36.

HRSA's comparative reasoning with respect to ADAPs is also wrong.  To be sure, a rebate model for ADAPs was especially appropriate because ADAPs had difficulty accessing 340B-priced medicines through other means.  Intervenors' Br. 4–5 n.5 (citing 63 Fed. Reg. at 35,242).  But HRSA clings to the premise that discounts are the default mechanism, unless it finds good reasons to deviate.[4]  Nowhere does the statute prioritize one or the other or authorize HRSA to reserve a rebate model for some types of covered entities and not others, however.  And that ADAPs face "unique challenges" that may prevent them from using a discount model, Intervenors' Br. 30,

---

[4]  This premise also clashes with the omnipresence of the product-replenishment model, which is fundamentally a rebate model, not a discount model.  Lilly Opening Br. 32–33; BMS Opening Br. 33–34; Novartis Opening Br. 29–30.

hardly suggests that other 340B covered entities are uniquely well-suited to a discount model *only*. HRSA's guidance document also does not support that reading, which HRSA notably did not rely on to reach its decision. AR 342–344 (BMS Ltr.); AR 292–294 (Lilly Ltr.); AR 202–204 (Johnson & Johnson Ltr.); AR 380–382 (Sanofi Ltr.); AR 439–441 (Novartis Ltr.).

**B.    HRSA Irrationally Distinguished Between Plaintiffs' Models And The Product-Replenishment Model.**

HRSA's refusal to approve Plaintiffs' rebate models is also arbitrary and capricious because the existing product-replenishment model is itself a rebate model. Lilly Opening Br. 32–33; BMS Opening Br. 33–34; Novartis Opening Br. 29–30; Sanofi Opening Br. 26. Intervenors disagree. Intervenors' Br. 31. But Intervenors make a critical—indeed, dispositive—concession: The product-replenishment model begins with a wholesale-price purchase, followed by a later purchase at the 340B price. Intervenors' Br. 31 ("Under the in-house replenishment model, the 340B Provider pays market price for a drug one time."). Both models therefore rely on retrospective provisioning of the 340B price, after an initial purchase of medicine at the market price. AR 203 (HRSA acknowledging that "under a typical replenishment structure, a covered entity generally makes an initial purchase at a higher price").

That is a rebate model: If Intervenors were correct that a rebate should be ignored when determining the purchase price, then Plaintiffs' model of a rebate paid in cash could be described in the exact same way as the existing product-replenishment model. Suppose a manufacturer wholesales medicine for $100 a unit and the 340B ceiling price on the unit is $50. Under Plaintiffs' models, a covered entity purchases its first unit for $100, uses the unit to fill its eligible patients' prescriptions, and receives a $50 cash rebate. The covered entity can put that $50 rebate towards the purchase of a replacement unit of medicine, such that it pays only $50 out of pocket for the replacement unit. The covered entity then uses the replacement unit to fill its eligible patients'

prescriptions, receives another $50 rebate, can apply the $50 towards another $100 replacement purchase of medicine, and so on in perpetuity. There is an initial wholesale-price purchase that begins a flywheel of later reduced-price purchases under both models, and the covered entity must pay the full wholesale price for only the first purchase.

With Intervenors' misconceptions cleared up, the arbitrariness of HRSA's denial becomes plain: "A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Thus, "[i]f the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Id.* Applied here, if HRSA has tacitly blessed the product-replenishment model, then it should do the same for Plaintiffs' functionally identical rebate models. The only difference between the two is that instead of replacing product with product, as the product-replenishment model does, Plaintiffs' models replace product with cash that can be used to replace the product; that is precisely why Lilly's model is called a "cash-replenishment" model. *See* Lilly Opening Br. 18 n.12

*Independent Petroleum Association of America v. Babbitt*, 92 F.3d 1248 (D.C. Cir. 1996), is instructive. There, the Department of Interior sought to collect royalties on one type of payment made to gas producers, but not another. *Id.* at 1260. Although the payment types differed in that only one "follow[ed] negotiations between the parties over the cancellation of contractual obligations," the Court concluded that this distinction made no difference when assessing "the functional nature of the payments for royalty purposes." *Id.* Here too, the functional nature of the product-replenishment model and Plaintiffs' intended rebate models is the same: Both depend on an initial purchase at wholesale rates followed by subsequent purchases at reduced prices. Against that backdrop, HRSA has failed to articulate a sufficient, nonarbitrary rationale for treating the two models differently. *See id.* at 1260 ("The treatment of cases A and B, where the two cases are functionally

22

indistinguishable, must be consistent.  That is the very meaning of the arbitrary and capricious standard.").

### C.    HRSA's Policy Impedes Statutory Objectives.

Intervenors do not contest one of the chief flaws in HRSA's insistence on the product-re-plenishment model:  The 340B statute prohibits duplicate-discounting and diversion, yet the prod-uct-replenishment model inherently enables violations of those key statutory provisions.  AR 300.  The product-replenishment model commingles 340B and non-340B inventory, and uses a pass-the-baton methodology for moving the 340B price and attendant compliance obligations from unit-to-unit.  AR 324.  That means that Plaintiffs' medicines are all-too-frequently diverted to non-340B-eligible patients—a problem exacerbated by prolific contract-pharmacy arrangements.  And be-cause HRSA currently lacks the oversight tools or the will to monitor for unlawful duplication, manufacturers also pay multiple price concessions on the same unit.  Novartis Opening Br. 24–25; BMS Opening Br. 34–36; Lilly Opening Br. 7; Sanofi Opening Br. 8–10.  As the agency tasked with enforcing the 340B statute and its anti-duplication, anti-diversion aims, HRSA was at mini-mum required to acknowledge this inconsonance.  Its failure to clear even that minimum bar was arbitrary and capricious.  *See Independent U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987) (agency's failure to discuss how rule squares with statute's objective is arbitrary and capricious).  HRSA's action should be set aside now, notwithstanding Intervenors' interest in preserving the status quo until HRSA finds the time to meet its APA obligations.  *See* Intervenors' Br. 42.[5]

---

[5]   Under that status quo, the charity-care ratios of 340B hospitals that Intervenors emphasize (at 6–8) have fallen by 20% between 2011 and 2022, even as 340B program purchases have doubled over the same period.  No. 24-CV-3337, ECF No. 26 at 10.

Moreover, Intervenors' emphasis (at 5, 15) on manufacturers' ability to conduct audits over-looks audits' lackluster track record of enforcing program integrity.  Lilly's experience attempting to audit covered entities confirms as much.  Despite receiving HRSA's approval to implement two audit plans, covered entities have dragged their feet and refused to produce documents HRSA specifically authorized Lilly to seek, with "HRSA . . . refus[ing] to require compliance and enforce the very document requests that it previously approved."  Brief of Eli Lilly & Co. as *Amicus Curiae*, *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-CV-1603 (DLF) (D.D.C. Oct. 31, 2024), ECF No. 19-1 at 7–10, 13.  But the best proof of these processes' current inadequacy is ultimately the real-world results: rampant duplication and other improper pricing,[6] costs to the Government from improperly claimed Medicaid discounts, and a system in which "stakeholders can feel they are operating in the dark."  Kalderos, *2022 Annual Report: Conquering the "Great Unknown"* 24–25 (2022), https://tinyurl.com/45tv6bw6.

What's more, although Intervenors and their *amici* tout audits as allowing manufacturers to address fraud and abuse, these same entities have fought tooth and nail against manufacturers who have availed themselves of their audits rights.  Intervenors do not mention that manufacturers who obtained HRSA's approval—following a reasonable cause finding—to conduct audits are fighting off legal challenges from covered entities that seek to stop them in their tracks.[7]  Far from a fix for

---

[6]  *See, e.g.*, AR 432 n.19 (citing GAO, *GAO-21-107, Drug Pricing Program: HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements* 14 (Dec. 2020), https://www.gao.gov/assets/gao-21-107.pdf; House Energy & Commerce Comm., *Review of the 340B Drug Pricing Program* 36–37 (Jan. 10, 2018), https://tinyurl.com/58rpjk; Mundra, *supra* p.15); Lindsay Bealor Greenleaf, *Analysis of FY 2021 HRSA 340B Covered Entity Audits* (Feb. 23, 2023), https://tinyurl.com/yc2aktnh.

[7]  *E.g.*, *Oregon Health & Sci. Univ. v. Engels*, 24-CV-2184 (RC) (D.D.C. filed July 24, 2024); *MaineGeneral Med. Ctr. v. Engels*, 24-CV-2187 (RC) (D.D.C. filed July 24, 2024); *University of Rochester v. Engels*, 24-CV-2268 (RC) (D.D.C. filed Aug. 1, 2024); *Children's Nat'l Med. Ctr. v. Engels*, 24-CV-2563 (RC) (D.D.C. filed Sept. 6, 2024); *University of Wash. Med. Ctr. v. Kennedy*,

Plaintiffs' well-founded complaints, the ADR and audit process—as HRSA administers it—ensures that manufacturers are unable to pursue 340B statutory compliance through one of the few means theoretically available.

### D. The Agency's Policy Precludes Manufacturers From Implementing MFP-340B Nonduplication.

BMS and Novartis have set out how their obligations under the Drug Price Negotiation Program's maximum fair price provisions and the 340B statute are incompatible with the current product-replenishment model, as well as how the rebate model is the only readily available means manufacturers have to solve the problem. BMS Opening Br. 38–40, Novartis Opening Br. 34–36. Because the Drug Price Negotiation Program lacks any plausible mechanism for avoiding duplication, and because CMS has disclaimed responsibility, manufacturers are left to devise a compliance plan themselves.[8]

Intervenors complain that it would be "premature" to examine the agency's review of Plaintiffs' rebate models in relation to the IRA because "CMS is still considering collecting more data to address any non-duplication concerns." Intervenors' Br. 37. There is nothing "premature" about Plaintiffs' challenge. HRSA made its statutory-interpretation position clear in letters to Plaintiffs. AR 292 (September 18, 2024 letter to Lilly); AR 342 (November 4, 2024 letter to BMS); AR 439 (January 14, 2025 letter to Novartis); AR 424–425 (December 13, 2024 letter to Sanofi). The agency's response to Plaintiffs' proposed 340B models was consistent with its letters to other manufacturers, too. *See* AR 66 (August 14, 2024 letter to J&J). As for Intervenors' suggestion

---

No. 24-CV-2998 (RC) (D.D.C. filed Oct. 22, 2024); *University of Kan. Hosp. Auth.*, No. 25-CV-549 (RC) (D.D.C. filed Feb. 24, 2025).

[8] CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027* 54–56 (Oct. 2, 2024) (CMS 2027 IRA Guidance), https://tinyurl.com/2exf63s3.

(at 36–37) that Plaintiffs could somehow continue to use the product-replenishment model to comply with their IRA mandates, that requires data to be shared through HHS's platform, and HHS has pointedly declined to adopt that approach. *See* CMS 2027 IRA Guidance, *supra* n.8, at 230–232.

In its letters, HRSA explicitly threatened the manufacturers with termination from the 340B Program—rendering the manufacturers' products ineligible for reimbursement by Medicaid and Medicare Part B—and crushing civil monetary penalties if they did not yield to HRSA's claimed preapproval power. AR 214, 425; *see Center for Auto Safety v. National Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006). And if HRSA's letters to manufacturers were not clear enough, its website removes any doubt about its legal position: "[I]mplementing a rebate proposal without Secretarial approval would violate Section 340B(a)(1) of the Public Health Service Act." HRSA, *340B Drug Pricing Program* (last updated Jan. 2025), https://www.hrsa.gov/opa. HRSA has "publicly articulate[d]" its "unequivocal position," *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986), and it expects manufacturers to "change their behavior," *Pharmaceutical Rsch. & Mfrs. of Am. v. HHS*, 138 F. Supp. 3d 31, 44 (D.D.C. 2015)—or else. Together, these agency actions determine Plaintiffs' "rights or obligations"—by purporting to eliminate Plaintiffs' right to effectuate their 340B models—and "legal consequences"—in the form of civil monetary penalties and termination from the 340B Program—"will flow" from the agency's expressed position. *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997).

Moreover, the IRA's MFP deadline is imminent. This problem is not a theoretical one for BMS and Novartis. HHS selected BMS's drug ELIQUIS® and Novartis's drug ENTRESTO® for the Drug Price Negotiation Program and imposed an MFP on them beginning on January 1, 2026. CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026*, at 2 (Aug. 2024) (IPAY 2026 Results), https://www.cms.gov/files/document/fact-sheet-negotiated-prices-initial-price-applicabilityyear2026.pdf; *see* AR 330. BMS and Novartis must

therefore provide CMS with a written "plan for making the MFP available" for ELIQUIS and EN-TRESTO, called an MFP effectuation plan, by September 1, 2025.  CMS 2027 IRA Guidance, *supra* n.8, at 285; AR 330.

Because HRSA's position thwarts Plaintiffs' 340B models while CMS simultaneously refuses to fulfill the IRA's promise of "[n]onduplication with 340B ceiling price[s]," *contra* 42 U.S.C. §§ 1320f(a)(2), 1320f-2(d), Plaintiffs have no other recourse but these lawsuits.  *See Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) (finding claim ripe where challenger's "only alternative to obtaining judicial review . . . [was] to violate [the agency's] directives, . . . and then defend an enforcement proceeding on the [same] grounds"); *see also Pharmaceutical Rsch. & Mfrs. of Am.*, 138 F. Supp. at 42 n.7 (concluding challenge is ripe where "the Interpretive Rule presents a purely legal question of statutory interpretation" and "the rule also poses a 'hardship to the parties of withholding court consideration' ") (quoting *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 808 (2003)).

Far from being "premature," Intervenors Br. 37, Plaintiffs' lawsuits are both timely and necessary in order to effectuate the IRA's MFP-340B nonduplication entitlement.  *See CSI Aviation Servs., Inc. v. Department of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) (concluding challenge was not "premature" where the "DOT ha[d] issued a 'definitive' statement of the agency's legal position" in "[i]ts initial warning letter," which "took the position that air charter brokers under GSA contract require agency certification").

### E.    HRSA Has No Solution For The Program-Integrity Problems Of The Current System And No Answer For The Benefits Of Plaintiffs' Models.

HRSA refused to consider the operational and program-integrity rationales supporting Plaintiffs' intended rebate models, their commonsense benefits, and their comparative advantages over the product-replenishment model.

Intervenors acknowledge that "HRSA's explanations" for its decision "were brief."  Intervenors' Br. 41.  And the threadbare explanation that HRSA provided here does not clear the APA's minimum standard of reasonableness.  The agency never engaged with Plaintiffs' arguments explaining how the cash-rebate model will reanimate core protections Congress built into the 340B statute.  *E.g.*, AR 295, 298, 325–330.  Nowhere, for example, did HRSA grapple with the practical benefits of Plaintiffs' models that address the worst shortcomings of the product-replenishment model or identify any harms that could offset those benefits.  *E.g.*, AR 58–60, 274–275.  The agency's mandate to engage in reasoned decisionmaking means it must not ignore Plaintiffs' explanation of the unlawful operation of the product-replenishment model that Plaintiffs have identified, or disregard Plaintiffs' arguments that their intended rebate models would permit meaningful oversight of both duplicate discounting and diversion of 340B medicines.  An agency must "respond meaningfully to the arguments raised before it."  *New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 210 (D.C. Cir. 2018) (citation omitted).  HRSA did not.

## III.    HRSA'S REFUSAL TO APPROVE BMS'S AND NOVARTIS'S MODELS DENIES THEM DUE PROCESS OF LAW.

Congress charged HHS's Secretary to oversee both the 340B Program and the IRA's Drug Price Negotiation Program.  42 U.S.C. §§ 256b(a)(1), 1320f(a).  In the 340B Program, the Secretary is supposed to help "prevent . . . violations of the duplicate discount provision and other [compliance] requirements."  *Id.* § 256b(d)(2)(A).  In the IRA's Drug Price Negotiation Program, the Secretary should act "in accordance with section 1320f-2," *id.* § 1320f(a)(2), which contains the requirement of "nonduplication with [the] 340B ceiling price," *id.* § 1320f-2(d) (capitalization altered).  When the Secretary nevertheless facilitates improper 340B pricing, manufacturers lose revenue in ways forbidden by Congress.  That is the problem at the heart of BMS's and Novartis's

due-process claims: Unlawful duplication and other improper 340B claims are erroneous deprivations of BMS's and Novartis's property, and by adopting contradictory positions and frustrating manufacturers' efforts to correct the 340B Program's rampant abuses, HHS has guaranteed that these deprivations will not just continue, but accelerate.

Intervenors first try to brush off these claims as a mere "refashion[ing]" of Plaintiffs' APA claims. Intervenors' Br. 42. That framing is mistaken. True, the Court need not address BMS's and Novartis's due-process claims if it rules in their favor on the APA claims. *See, e.g.*, *Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1293 (D.C. Cir. 2023) (declining to address a constitutional claim after concluding that an agency rule must be vacated). But that does not make the claims identical. BMS's and Novartis's due-process claims go beyond any one narrow action or policy, focusing instead on the aggregate effect of the way HHS has discharged its oversight. In other words, these claims foreclose any attempt by HHS to deflect blame among its component agencies, creating a shapeshifting and effectively unchallengeable policy. *See* No. 24-CV-3337, ECF No. 1 ¶ 107 (challenging "HHS's siloed administration of the DPNP and the 340B Program"); No. 25-CV-117, ECF No. 1 ¶ 135 (challenging HHS's use of two subcomponents to impose "irreconcilable . . . demands that Novartis cannot simultaneously meet"). At bottom, HHS may not deprive BMS and Novartis of property without due process regardless of the means it uses to do so.

### A.    HHS's Position Is Irrational And Gravely Unfair.

HHS is speaking out of both sides of its mouth through different subcomponents. To avoid unlawful IRA-340B duplication, CMS "strongly encourages manufacturers to work with dispensing entities, covered entities and their 340B TPAs" by "utilizing data available from covered entities and their 340B TPAs." CMS 2027 IRA Guidance, *supra* n.8, at 232. That is what BMS's and Novartis's models are designed to do: utilize claims data already collected by virtual-inventory

systems and TPAs, *University of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (RC) (D.D.C. Dec. 20, 2024), ECF No. 22-1 (Testoni Decl.) ¶¶ 6–7, so that providers can receive the right price at the right time.  AR 274–275, 318–320, 433–435.  By preventing implementation of those models, HRSA has forbidden BMS and Novartis to effectuate CMS's instructions.  *See* AR 292, 342, 439.[9] The result is two mutually incompatible directives, both from HHS—which will force manufacturers to offer price concessions forbidden by Congress.  That is "legally irrational in that it is not sufficiently keyed to any legitimate state interests."  *Committee of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 943–944 (D.C. Cir. 1988) (quotation omitted and alteration adopted), *abrogation on other grounds recognized*, *Schieber v. United States*, 77 F.4th 806 (D.C. Cir. 2023).

Intervenors claim that BMS and Novartis "lack standing" and that their due-process claims are "not yet ripe."  Intervenors' Br. 43.  Apart from gesturing at general justiciability principles, Intervenors cite *National Mining Association v. Fowler*, 324 F.3d 752, 757–758 (D.C. Cir. 2003), where the court found that a challenge *was* ripe because it was already clear how the defendant had interpreted the regulation at issue.  Intervenors' Br. 43–44.  The same is true here:  HRSA has interpreted the 340B statute to contain an agency preapproval requirement and forbidden BMS and Novartis to implement their models.  AR 292, 342, 439.  In addition, the financial harms associated with Novartis's due-process claims arising from MDRP-340B duplication are already occurring.  Novartis Opening Br. 43–45.  And the financial harms associated with BMS's and Novartis's due-

---

[9] Intervenors suggest that manufacturers could instead use a discount model to effectuate IRA prices.  Intervenors' Br. 36–37.  But this would make manufacturers' plight *worse* because they would have *no* time, instead of 14 days, to come up with evidence that an MFP would duplicate a lower 340B ceiling price.  For support, Intervenors cite their own comment letter to CMS, in which they requested that CMS mandate a discount model and route all covered-entity claims data to the Medicare Transaction Facilitator (MTF), rather than to manufacturers.  Letter from 340B Health to Dr. Meena Seshamani, M.D., Ph.D., CMS at 5 (July 2, 2024), https://tinyurl.com/5buvbvbm.  CMS pointedly rejected these suggestions, adopting a rebate model and encouraging manufacturers to get claims data without involving the MTF.  CMS 2027 IRA Guidance, *supra* n.8, at 196, 232.

process claims arising from MFP-340B duplication will begin occurring on a certain date in the near future—January 1, 2026. IPAY 2026 Results, *supra* p.27, at 1. Even if there were any uncertainty about whether HHS will change its mind and allow Plaintiffs to solve these problems, all that is needed for standing is a " 'substantial risk' of future injury." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) (citation omitted). That standard is easily met here, given the inevitability of harm on a definite timeline.

HHS has had *years* to address rebate models, and nearly eight months to consider this precise problem. AR 59, 499. There is no more time. BMS and Novartis must submit plans for effectuating MFPs by September 1, and they need substantial experience working with those models to inform those plans. CMS 2027 IRA Guidance, *supra* n.8, at 285; No. 24-CV-3337, ECF No. 12 ¶ 19; No. 25-CV-117, ECF No. 12-2 ¶ 30. HHS's irrational policy therefore has immediate consequences for BMS and Novartis: It is already hampering their ability to combat unlawful duplication once IRA price caps become effective in January.

To the extent Intervenors deny that unlawful MFP-340B duplication will occur under the status quo, they are mistaken. CMS's current guidance does not claim that current processes are sufficient to avoid MFP-340B duplication; CMS simply declined to "assume responsibility" for ensuring this. CMS 2027 IRA Guidance, *supra* n.8, at 230. Just this month, a former CMS official acknowledged that the agency's current processes "could lead to a rebate on a 340B claim in Medicaid, and potentially an MFP, being paid on a 340B claim." Kelly, *supra* p.15. The sticking point—as always under the product-replenishment model—is a lack of access to even basic claims data that would allow 340B-eligible transactions to be timely identified so that duplication can be avoided or corrected. *See id.*

Intervenors also lean on the legal standard, pointing out that HHS's decisions need only refrain from being "irrational." Intervenors' Br. 42. But HHS's conduct here fails to clear even

that lowest of bars. HHS talks in circles, telling manufacturers it has already addressed their concerns by "encouraging" them to act in ways it has simultaneously forbidden. The bottom line is that HHS will neither help manufacturers avoid unlawful duplication nor allow manufacturers to help themselves. BMS and Novartis thus face an impossible choice: Comply with HRSA's demands, knowing the result will be huge financial losses due to unlawful MFP-340B duplication. Or pursue CMS's recommendation, getting necessary basic claims data by requiring covered entities to provide it before receiving 340B pricing for a unit—that is, a cash-rebate model—but only while risking civil monetary penalties and even termination from Medicaid and Medicare Part B. AR 203, 214, 424–425. That "grave[ly] unfair[ ]" bind amounts to "a deliberate flouting of the law that trammels significant . . . property rights." *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988).

> ## B. Novartis Has No Meaningful Opportunity To Be Heard Regarding Improper 340B Pricing.

Novartis's procedural-due-process claim is based on the lack of process afforded to Novartis to address individual instances of improper 340B pricing. Novartis Opening Br. 40–41. Novartis is erroneously deprived of those property interests when it is forced to offer price concessions forbidden by law, such as 340B pricing on ineligible transactions and MFP-340B and MDRP-340B duplication. The Due Process Clause obliges HHS to institute "appropriate procedural safeguards" to ensure Novartis has a meaningful way to prevent such pricing errors, or at least to correct them after the fact. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

What's needed is a mechanism for informing HRSA that covered entities have received 340B pricing they were not entitled to, and a robust way of holding such entities accountable. By invigorating existing procedures, Novartis's cash-rebate model would do just that. So contrary to Intervenors' suggestion, Intervenors' Br. 44, Novartis *is* asking for more process.

It is no answer to point to the "various statutory safeguards and processes that permit man-ufacturers to seek recourse." Intervenors' Br. 44. HHS must provide processes not just in the abstract, but ones that work in the real world and are effective enough to avoid errors. *See, e.g.*, *Propert v. District of Columbia*, 948 F.2d 1327, 1333–34 (D.C. Cir. 1991); *Thompson v. District of Columbia*, 832 F.3d 339, 345–346 (D.C. Cir. 2016); *Da'Vage v. D.C. Hous. Auth.*, 583 F. Supp. 3d 226, 238 (D.D.C. 2022). Novartis does not have that.

Take audits, for example. As Plaintiffs have repeatedly emphasized, access to audits de-pends on manufacturers' ability to first get "sufficient facts and evidence in support" of a claim that a covered entity has misused the 340B Program. 61 Fed. Reg. at 65,410. Intervenors insist this requirement can be surmounted, Intervenors' Br. 15 n.29, but they provide no support for that prop-osition. Nor do they account for covered entities' persistent efforts to avoid compliance with audits even in the rare instances where HRSA authorizes them. *Supra* p.25 & n.7.

The additional process Novartis is proposing is, at bottom, to grant manufacturers access to basic claims data they should have had all along. *See* AR 435. Access to that data would strengthen the processes Intervenors themselves identify, including audits and the 340B credit-debit ledger system. No. 25-CV-117, ECF No. 12-2 ¶ 28. But more importantly, Novartis would have less of a need to use those remedial processes in the first place because it would have enough information "to stop MDRP-340B duplication before it happens" and to "make available (or not, as appropriate) IRA MFPs correctly." *Id.* Providers would receive the right prices at the right times. In other words, Novartis is asking for pre-deprivation procedures that actually work.

Finally, Novartis's cash-rebate model is based on requiring standard claims data that cov-ered entities already "collect, report, and maintain in the normal course of business." AR 435. The model therefore will not impose onerous requirements on covered entities while enhancing program integrity, leaving HHS with no "interest in avoiding [the] additional procedural safeguards." *See*

*Simms v. District of Columbia*, 872 F. Supp. 2d 90, 103 (D.D.C. 2012).  Intervenors' supposed survey reporting fears of additional costs—in addition to being outside the record and unrelated to the stated rationale for HRSA's decisions—is apparently based only on hospitals' self-interested speculation.  340B Health, *Preliminary Results of 340B Health Survey: Impact of Rebates on 340B Hospitals* (Mar. 18, 2025), https://tinyurl.com/mpncmmbh (discussing self-reported "antici-pat[ions]," "expect[ations]," and "concern[s]").  For its part, HRSA has previously (and correctly) treated the provision of "detailed and accurate . . . initial claim data" as a "standard business prac-tice[ ]" that benefits all stakeholders, including covered entities.  63 Fed. Reg. at 35,241–42.  That is true here as well, and it shows that the additional guardrails Novartis is proposing are required given "the magnitude of the private interest at stake."  *Esparraguera v. Department of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024).

## IV.    VACATUR OF THE AGENCY'S UNLAWFUL ACTIONS IS THE NORMAL— AND PROPER—REMEDY.

When an agency's actions are unlawful, "vacatur is the normal remedy."  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  In deciding whether to depart from it, courts consider the "seriousness of the order's deficiencies" and the potentially "disruptive conse-quences" of vacatur, *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–151 (D.C. Cir. 1993) (citation omitted).

Intervenors (at 41) offer no compelling reason for the Court to depart from the normal course.  *First*, as Plaintiffs have explained, HHS's actions are wrong many times over.  The agency relied on its purported power to preapprove methods of effectuating 340B pricing.  AR 292, 342, 380, 439.  But HRSA does not have that power and has never before attempted to enforce its sup-posed preapproval requirement.  Plaintiffs' Br. in Opp. to Defs.' Cross-Mot. for Summary Judg-ment and Reply in Support of Summary Judgment 3–8.  And HHS cannot on remand justify an

action premised on a statutory power that it simply does not have.  Intervenors do not contend otherwise.

Even if HRSA had preapproval power, its actions here were still woefully deficient.  HRSA already blessed a cash-rebate model for ADAPs, so the agency may not now block the implementation of other cash-rebate and replenishment models without irrationally treating like cases differently.  And because the product-replenishment model and Plaintiffs' 340B models are legally equivalent, HRSA may not elevate one over the other.  Further, HRSA's actions force Plaintiffs to provide 340B pricing where none is owed, perpetuating unlawful diversion and duplicate discounting.  HRSA's position also denies BMS and Novartis the only feasible means of preventing MFP-340B duplication.  And finally, HRSA's decision fails to consider an important aspect of the problem—namely, the compelling operational and program-integrity reasons for adopting the rebate model.  *See supra* pp. 19–29.  In short, the "deficiencies" of the agency's actions here are numerous and "serious[ ]," *Allied-Signal*, 988 F.2d at 150, and there is not " 'a significant possibility that the [agency] may find an adequate explanation for its actions' on remand."  *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (citation omitted).

*Second*, Intervenors mischaracterize and catastrophize the consequences of vacatur.  They maintain that the status quo has been 30-plus uninterrupted years of "effectuating the 340B price through discounts."  Intervenors' Br. 42.  As Plaintiffs have explained, that's simply not true.  *See supra* pp. 7–9.  Plaintiffs' models are narrowly focused on detecting and stopping practices the 340B statute expressly prohibits—and will not even deny 340B rebates in response to evidence of duplicate discounting.  So, "[t]his is not a case in which the 'egg has been scrambled,' and it is too late to reverse course."  *Allina Health*, 746 F.3d at 1110–11 (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)).

## CONCLUSION

For the foregoing reasons, and those in Plaintiffs' opening briefs, Plaintiffs' motions for summary judgment should be granted, and Intervenors' cross-motion for summary judgment should be denied.

Dated: April 1, 2025

Respectfully submitted,

/s/ Catherine E. Stetson
John C. O'Quinn
Matthew S. Owen
Megan McGlynn
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 389-5000
john.oquinn@kirkland.com
matt.owen@kirkland.com
megan.mcglynn@kirkland.com

Catherine E. Stetson (D.C. Bar No. 453221)
Jacob T. Young (D.C. Bar No. 90014334)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com
jake.young@hoganlovells.com

Attorneys for Plaintiffs Eli Lilly and Company
and Lilly USA, LLC

/s/ Sean Marotta
Sean Marotta (D.C. Bar No. 1006494)
Marlan Golden (D.C. Bar No. 1673073)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-4881
Facsimile: (202) 637-5910
sean.marotta@hoganlovells.com

Attorneys for Plaintiff Bristol Myers
Squibb Company

36

*/s/ Rajeev Muttreja*
Rajeev Muttreja (admitted pro hac vice)
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
rmuttreja@jonesday.com

Noel Francisco (D.C. Bar No. 464752)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
njfrancisco@jonesday.com

*Attorneys for Plaintiff Sanofi-Aventis U.S. LLC*

*/s/ Sean Marotta*
Sean Marotta (D.C. Bar No. 1006494)
Jacob T. Young (D.C. Bar No. 90014334)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

*Attorneys for Plaintiff Novartis
Pharmaceuticals Corporation*