# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PREMIER, INC, | |
| Plaintiff, | |
| v. | Civil Action No. 24-3116 (LLA) |
| HEALTH RESOURCES AND SERVICES ADMINISTRATION, et al. | |
| Defendants. | |

**DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56, Defendants the Secretary of Health and Human Services and the Administrator of the Health Resources and Services Administration respectfully move the Court for an order granting summary judgment in their favor. As grounds for this motion, Defendants respectfully refer the Court to the attached memorandum of points and authorities. A proposed order is also attached herewith.

Dated: May 9, 2025

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By:        */s/ John J. Bardo*
    JOHN J. BARDO, D.C. Bar #1655534
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 870-6770

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PREMIER, INC, | |
| Plaintiff, | |
| v. | Civil Action No. 24-3116 (LLA) |
| HEALTH RESOURCES AND SERVICES ADMINISTRATION, et al. | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents .................................................................................................................. i

Table of Authorities ............................................................................................................. ii

Background ........................................................................................................................... 2

    I.     Statutory and Regulatory Background .................................................................. 2

    II.    Factual Background ............................................................................................... 4

Legal Standards .................................................................................................................... 6

Argument .............................................................................................................................. 7

    I.     The 2013 Policy Release Was Consistent with the Text of the 340B Statute. ........ 7

    II.    The 2013 Policy Release Was Not a Legislative Rule ......................................... 11

    III.   The Agency's Refusal to Revoke the 2013 Policy or Exempt Plaintiff Was not Arbitrary and Capricious. ................................................................................... 14

Conclusion .......................................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Laboratories v. Portland Retail Druggists Ass'n,*
  425 U.S. 1 (1976) ..................................................................................................10, 11
*Am. Farm Bureau Fed'n v. EPA,*
  559 F.3d 512 (D.C. Cir. 2009) .........................................................................................20
*Am. Min. Cong. v. Mine Safety & Health Admin.,*
  995 F.2d 1106 (D.C. Cir. 1993) ...........................................................................11, 12, 13
*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta,*
  785 F.3d 710 (D.C. Cir. 2015) .........................................................................................12
*Bowman Transp., Inc. v. Ak.-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) .........................................................................................................20
*Citizens Bank of Md. v. Strumpf,*
  516 U.S. 16 (1995) .............................................................................................................9
*Citizens to Preserve Overton Park v. Volpe,*
  401 U.S. 402 (1971) ...............................................................................................6, 7, 14
*City of, Clarksville v. Fed. Energy Regul. Comm'n,*
  888 F.3d 477 (D.C. Cir. 2018) ...........................................................................................7
*City of South Bend v. Surface Transp. Bd.,*
  566 F.3d 1166 (D.C. Cir. 2009) .........................................................................................7
*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ...........................................................................................................7
*CSL Plasma Inc. v. Customs & Border Prot.,*
  628 F. Supp. 3d 243 (D.D.C. 2022) .................................................................................20
*Escobedo v. Green,*
  602 F. Supp. 2d 244 (D.D.C 2009) ..................................................................................14
*FCC v. Nat'l Citizens Comm. for Broad.,*
  436 U.S. 775 (1978) ...........................................................................................................7
*Fed. Commc'n Comm'n v. Fox Television Stations,*
  556 U.S. 502 (2009) .........................................................................................................14
*Loper Bright Enters. v. Raimondo,*
  144 S. Ct. 2244 (2024) .......................................................................................................6
*Lounge, LLC v. SBA, Civ. A.,*
  No. 22-3320 (RBW) 2024 U.S. Dist. LEXIS 219999 (D.D.C. Dec. 5, 2024) ..................19
*Magwood v. Patterson,*
  561 U. S. 320, (2010) .......................................................................................................15
*Marsh v. Or. Natural Res. Council,*
  490 U.S. 360 (1989) .........................................................................................................14
*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .....................................................................................................14, 17
*Nat. Res. Def. Council v. Wheeler,*
  955 F.3d 68 (D.C. Cir. 2020) .....................................................................................11, 12

*Novartis Pharms. Corp. v. Johnson*,
   102 F.4th 452 (D.C. Cir 2021) ........................................................................13
*Oklahoma v. Castro-Huerta*,
   597 U.S. 629 (2022) ........................................................................................15
*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) ....................................................................................15, 16
*Pac. Ga, s & Elec. Co. v. Fed. Energy Regul. Comm'n*, 1
   13 F.4th 943 (D.C. Cir. 2024) ......................................................................6, 7
*Patel v. Garland*,
   596 U.S. 328 (2022) ........................................................................................17
*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) ..........................................................................................11
Release No. 2013 ...................................................................................................5
*Roelofs v. Sec'y of Air Force*,
   628 F.2d 594 (D.C. Cir. 1980) ..................................................................19, 20
*SEC v. Fed. Lab. Rels. Auth.*,
   568 F.3d 990 (D.C. Cir. 2009) ........................................................................7
*Texas & Pac. R. Co. v. Abilene Cotton Oil Co.*,
   204 U.S. 426 (1907) ........................................................................................9
*Tourus Records, Inc. v. Drug Enforcement Admin.*,
   259 F.3d 731 (D.C. Cir. 2001) ......................................................................14
*U.S. Sugar Corp. v. EPA*,
   113 F.4th 984 (D.C. Cir. 2024) ......................................................................6
*Van Buren v. United States*,
   593 U.S. 374 (2021) ......................................................................................7, 8
*Xcel Energy Servs. Inc. v. FERC*,
   41 F.4th 548 (D.C. Cir. 2022) ......................................................................20

**Statutes**

5 U.S.C. § 706(2) ..................................................................................................1
5 U.S.C. § 706(2)(A) ....................................................................................6, 7, 14
42 U.S.C. § 256b (1992) ......................................................................................2
42 U.S.C. § 256b(a)(1) ........................................................................................2
42 U.S.C. § 256b(a)(4) ........................................................................................3
42 U.S.C. § 256b(a)(4)(L) ..................................................................................3
Pub. L. No. 102-585 ............................................................................................2

Defendants the Secretary of Health and Human Services, and the Administrator of the Health Resources and Services Administration ("the Agency") respectfully submit this memorandum of points and authorities in support of their motion for summary judgment.

## INTRODUCTION

Certain covered entity hospitals cannot qualify to purchase drugs under the 340B Drug Discount Program if the hospitals purchase those drugs through a group purchasing organization. 42 U.S.C. § 256b(a)(4)(L)(iii). The Agency learned, through its program integrity initiatives, that some covered entities were attempting to bypass this prohibition by making initial purchases of drugs through a group purchasing organization and then replenishing those drugs at the 340B price after the drugs were dispensed to a 340B eligible patient. In 2013, the Agency published guidance, in the form of a Policy Release advising covered entities subject to the group purchasing prohibition that these arrangements violated the statute. Release 2013-1.

Plaintiff Premier, Inc. is a group purchasing organization (GPO). Plaintiff sought to begin offering its disproportionate share hospital clients the option to make their initial purchases of drugs that are ultimately dispensed to 340B disproportionate share hospitals through their GPO accounts. Accordingly, Plaintiff petitioned the Agency to revoke the 2013 guidance or grant Plaintiff an exemption from the guidance. The Agency declined to take either action, and Plaintiff filed suit under the Administrative Procedures Act ("APA") asking the Court to set aside the 2013 Policy Release. 5 U.S.C. § 706(2).

The Agency is entitled to summary judgment in its favor. First, the 2013 Policy Release restated the requirements of the statute and therefore was not contrary to law. Second, because the 2013 Policy Release tracked the statutory requirements, the release was an interpretive rule that did not require legislative rulemaking. Third, because the 2013 Policy Release was consistent with

the statute, neither the Agency's decision to publish it or its refusal to allow Plaintiff an exemption

from following it was arbitrary and capricious.

## BACKGROUND

### I.    Statutory and Regulatory Background

In 1992, Congress created the 340B Program, administered by the Secretary of Health and

Human Services, through which certain safety-net healthcare providers, including hospitals,

community health centers, and other federally funded entities (collectively known as "covered

entities") serving low-income patients could receive drug price reductions.  See Veterans Health

Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967–71 (1992), codified at § 340B,

Public Health Service Act, 42 U.S.C. § 256b (1992).  The 340B Program has dual benefits: Drug

discounts "enable these entities to stretch scarce federal resources as far as possible, reaching more

eligible patients and providing more comprehensive services," and may directly benefit uninsured

and underinsured patients when covered entities opt to pass along the discounts by helping patients

afford costly medications.  H.R. Rep. No. 102-384, pt. 2, at 12 (1992).

To achieve these benefits, Congress directed the Secretary to enter into an agreement,

known as a Pharmaceutical Pricing Agreement "with each manufacturer of covered outpatient

drugs under which the amount required to be paid … to the manufacturer for [such] drugs . . .

purchased by a covered entity . . . does not exceed [the ceiling price]."  42 U.S.C. § 256b(a)(1).

The ceiling price is derived from components of each drug's "average" and "best" price as

calculated under the Medicaid Drug Rebate Program.  *Id*.  Each pricing agreement "shall require

that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below

the applicable ceiling price if such drug is made available to any other purchaser at any price."  *Id*.;

see also, 58 Fed. Reg. 27,289, 27,291 (May 7, 1993).  In essence, the statute requires participating

drug manufacturers to offer their pharmaceutical products to covered entities at reduced cost. 58

Fed. Reg. at 27,289.  Examples of qualifying covered entities include federally qualified health centers that serve populations such as the homeless, uninsured, and rural populations, family planning clinics, entities providing outpatient early intervention services for HIV diseases, state-operated AIDS drug assistance programs, black lung clinics, hemophilia diagnostic treatment centers, and Native Hawaiian health centers.  See generally, 42 U.S.C. § 256b(a)(4).

A hospital that serves a disproportionate share of low-income patients, known as a disproportionate share hospital 42 U.S.C. § 1396a(a)(13)(A)(iv), is one such type of covered entity. 42 U.S.C. § 256b(a)(4)(L).  For a disproportionate hospital to qualify as a covered entity under the 340B Program, the hospital must be, a private nonprofit hospital under contract with state or local government to provide health care services to low-income individuals who are not eligible for Medicare or Medicaid, owned or operated by a unit of state or local government, or a public or private nonprofit corporation that is formally granted governmental powers by a unit of state or local government.  42 U.S.C. § 256b(a)(4)(L)(i).  To continue to qualify as a covered entity, a disproportionate share hospital is prohibited from purchasing "covered outpatient drugs through a group purchasing organization or other group purchasing arrangement."  *Id.* § 256b(a)(4)(L)(iii). In other words, a disproportionate share hospital cannot obtain a 340B discount on an otherwise covered outpatient drug if the hospital purchases covered outpatient drugs through a group purchasing organization.  59 Fed. Reg. 25,110, 25,113 (May 13, 1994) (AR 084).

On February 7, 2013, the Agency released a policy clarifying the "340B Program policy regarding the statutory prohibition against obtaining covered outpatient drugs through a group purchasing organization for certain covered entities."   Health Resources and Services Administration, 340B Drug Pricing Program Notice, Release No. 2013-1 (AR 086).  The purpose of the policy release was to "further explain and clarify [the Agency's] position on questions that

- 3 -

have arisen as the marketplace has changed." *Id.* The Agency reiterated that a covered entity subject to the group purchasing prohibition cannot use a group purchasing organization "for covered outpatient drugs at any point in time." *Id.* The Agency learned through its 340B Program integrity initiatives that some hospitals had been purchasing covered outpatient drugs through a group purchasing organization and then subsequently "either (1) 'replenishing' through accounting by 'replacing' the GPO purchased drug with a drug purchased under 340B; or (2) otherwise reclassifying the method of purchase after dispensing." *Id.* A covered entity violates the prohibition any time that it uses a group purchasing organization to purchase a covered outpatient drug and the violation "cannot be fixed or cured by subsequently changing the characterization through accounting or other methods." *Id.* (AR 087-88).

The Agency warned covered entities that the Agency had not authorized a group purchasing replenishment model and that a covered entity subject to the prohibition should make initial purchases using a non-group purchasing account and only replenish with 340B drugs once 340B patient eligibility is confirmed and can be documented through auditable records. *Id.* (AR 087-88). The Agency reminded hospitals that because the group purchasing prohibition was an eligibility requirement "covered entities found in violation will be considered ineligible and immediately removed from the 340B Program." *Id.* (AR 088).

The policy does not prevent disproportionate share hospitals from using a group purchasing organization to "purchase drugs dispensed to inpatients or to purchase drugs which do not meet the definition of covered outpatient drug." 80 Fed. Reg. 52,300, 52,304 (Aug. 28, 2015) (AR 093).

## II.    <u>Factual Background</u>

Plaintiff Premier, Inc. is a self-described "healthcare improvement company" uniting an alliance of hospitals and other healthcare providers. AR 125. One aspect of the alliance is its pharmacy group purchasing contract program which, in 2015 included more than 190 suppliers of

more than 13,900 different products, making it one of the largest group purchasing organizations for pharmaceuticals." AR 126. As early as October 27, 2015, Plaintiff contacted the Agency expressing its opposition to Release No. 2013-1 and urging the Agency to reconsider certain aspects of the policy. AR 125-34. Plaintiff sent additional comments on September 8, 2017, AR 135-40, July 18, 2018, AR 141-229, November 26, 2018, AR 230-32, and January 25, 2018. AR 233-56.

Over time, covered entities began to purchase covered outpatient drug through a purchasing model, often referred to as the product replenishment model. See Release No. 2013-1 (AR 87-88). Under the product replenishment model, the covered entities purchase an initial supply of a 340B eligible drug at the wholesale acquisition cost. AR 258. This purchase includes drugs that are dispensed to 340B and non-340B patients alike. *Id.* After the covered entity dispenses the equivalent of a "package-size" of a certain drug to 340B eligible patients, the covered entity purchases a replenishment stock of the drug at the 340B discounted price. AR 259. Plaintiff sought to provide disproportionate share hospitals with the option to make their initial purchases through the hospitals' group purchasing accounts which would allow the covered entities to purchase the drugs at lower prices than the wholesale acquisition cost. AR 257.

On July 27, 2023, Plaintiff contacted the Agency informing the Agency that Plaintiff intended to begin allowing 340B covered entities subject to the group purchasing prohibition to make their initial purchases of 340B drugs through the covered entities' group purchasing organization accounts. AR 257. Plaintiff acknowledged that in order for Plaintiff to extend this offer to disproportionate share hospitals, the Agency would need to exempt Plaintiff and its clients from Policy Release 2013-1 or reverse the policy. AR 257. In its letter, Plaintiff requested that the Agency confirm, by September 11, 2023, that it agreed that Plaintiff's proposal is consistent

with the 340B Statute.  AR 263.  Plaintiff stated that if the Agency "declines to respond by September 11, 2023, Premier will reasonably anticipate that [the Agency] has accepted the arguments contained in this letter and, further, that [the Agency] agrees that this is a lawful arrangement." *Id*.  On August 16, 2023, the Agency responded that it was evaluating Plaintiff's proposal and that Plaintiff "should not view this communication or the absence of a further response from [the Agency] by Premier'1s imposed deadline as [the Agency's] endorsement of Premier's proposed arrangement or agreement that the arrangement is lawful." AR 268.  Plaintiff followed up on November 7, 2023, requesting that the Agency "commit to address, with finality, the issues we raised by December 15, 2023." AR 267.  On December 20, 2023, the Agency advised Plaintiff that it "does not plan to exempt Premier's proposed arrangement or reverse its 2013 Policy Release." AR 272.

## LEGAL STANDARDS

The Administrative Procedure Act ("APA") provides that final agency action can be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–15 (1971); *see also* 5 U.S.C. § 706(2)(A), (E).  Courts review de novo issues of statutory interpretation and "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024); *see also U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024).  "Courts must 'interpret statutes, no matter the context, based on the traditional tools of statutory construction.'" *Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 113 F.4th 943, 947 (D.C. Cir. 2024) (*quoting Loper Bright,* 144 S. Ct. at 2268).  "Therefore, when 'addressing a question of

statutory interpretation, we begin with the text.'" *Id.* at 948 (*quoting City of Clarksville v. Fed. Energy Regul. Comm'n*, 888 F.3d 477, 482 (D.C. Cir. 2018)).

Agency action is arbitrary and capricious if based on an unlawful interpretation of statute or regulations, or if it is "not rational and based on consideration of the relevant factors." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 803 (1978). The Secretary's factual findings can be set aside only if they are "unsupported by substantial evidence" in the administrative record. 5 U.S.C. § 706(2)(A); *see also Overton Park*, 401 U.S. at 413–15. The substantial evidence standard is satisfied if the final agency decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (internal quotation marks and citation omitted); *see also City of South Bend v. Surface Transp. Bd.*, 566 F.3d 1166, 1170 (D.C. Cir. 2009). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620 (citations omitted); *SEC v. Fed. Lab. Rels. Auth.*, 568 F.3d 990, 995 (D.C. Cir. 2009).

## ARGUMENT

### I.    The 2013 Policy Release Was Consistent with the Text of the 340B Statute.

When interpreting a statute, the court starts with the text of the statute. *Van Buren v. United States*, 593 U.S. 374, 381 (2021) ("We start where we always do: with the text of the statute.") The statute specifies the criteria that certain covered entity hospitals need to meet in order to remain eligible for the 340B Program, and one of those conditions is that the hospital "does not obtain covered outpatient drugs through a group purchasing organization or other group purchasing arrangement." 42 U.S.C. § 256b(a)(4)(L)(iii). Consistent with the statute, the 2013 Policy Release, or Release 2013-1, advised hospital covered entities subject to the group purchasing

prohibition that purchasing covered outpatient drugs through a group purchasing organization violated the group purchasing prohibition even if the purchase is made as part of a replenishment process.  Release 2013-1 (AR 087-88).  Nothing in the statute could be construed to provide an exception for initial purchases made as part of a product replenishment regime.

Hospitals that elect to use a product replenishment model must make their initial purchase of drugs that it intends to dispense to 340B-eligible patients at the wholesale acquisition cost. Release 2013-1 (AR 088).  Under Plaintiff's proposal, a hospital would make an initial purchase of a drug through a group purchasing organization rather than at the wholesale acquisition cost. AR 257-58. This purchase would include drugs that the hospital intends to dispense to 340B patients and non-340B patients alike which creates, in Plaintiff's words, a "neutral inventory."  AR 258.  After the hospital dispenses a unit of one of these drugs to a 340B eligible patient, that drug is "replenished" at the 340B price.  AR 259.  Plaintiff seeks to use this arrangement as a workaround to the group purchasing prohibition.  Specifically, Plaintiff argues that the prohibition only applies to "covered outpatient drugs" and, because a drug does not become a covered outpatient drug until it is dispensed to an eligible patient, a hospital would not know, at the time of purchase whether drugs purchased for a neutral inventory will be dispensed to an eligible patient.  Pl. Mot at 27.  But Plaintiff does not deny that its proposal would allow hospitals to purchase some of the drugs that are dispensed to 340B patients through a group purchasing agreement.  *Id.*  The statute does not make an exception for the initial drug purchase of the product replenishment process.   42 U.S.C. § 256b(a)(4)(L)(iii).   A drug purchased through a group purchasing organization and then dispensed to a 340B eligible patient is a "covered outpatient drug" obtained "through a group purchasing organization or other group purchasing arrangement." *Id.*

Moreover, accepting Plaintiff's argument would make the group purchasing prohibition meaningless. As Plaintiff explains, the drugs that accumulate through subsequent purchases become "'neutral inventory' that may be dispensed to any subsequent patient, with appropriate tracing to 'accumulate' the next round of replenishments through either the 340B account or the non-340B account.'" Pl. Mot. at 13 (quoting, Schneider Decl. ¶ 11 (ECF No. 11-2)). In other words, not only does a hospital not know which units of a drug from an initial purchase are destined to be dispensed to a 340B patient, but the hospital also does not have that knowledge for drugs that it acquires through replenishment. Schneider Decl. ¶ 11 (ECF No. 11-2); see also Pedley Decl. ¶ 11 (ECF No. 11-9) (explaining that the replenishment stock "becomes 'neutral inventory,' and may be dispensed to any subsequent patient."). Thus, under Plaintiff's logic, a drug obtained through replenishment also would not yet be a covered outpatient drug which would render the group purchasing prohibition meaningless. The only difference between a drug obtained through an initial purchase and stored in a neutral inventory before it is dispensed to a 340B patient and a drug obtained through the 340B replenishment processes, stored in a neutral inventory and then dispensed 340B patient, is the step in the replenishment process when the drug is purchased. Both drugs ultimately become "covered outpatient drugs," 42 U.S.C. § 256(a)(4)(L)(iii), and "it is an elementary rule of construction that 'the act cannot be held to destroy itself.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 20 (1995) (*quoting Texas & Pac. R. Co. v. Abilene Cotton Oil Co*., 204 U.S. 426, 446 (1907)).

Nothing in the declaration from Office of Pharmacy Affairs Director Krista Pedley that Plaintiff cites (Pl. Mot at 28-29) contradicts this interpretation. See Pedley Decl. (ECF No. 11-9). The declaration simply describes Pedley's understanding of "of how, in general, contract-pharmacy arrangements work under the replenishment model." *Id*. ¶ 3. Nowhere in the declaration

does Pedley state, or even imply that only replenishment purchases are subject to the group purchasing prohibition. See generally, *Id*. In fact, nothing in the declaration addresses the group purchasing prohibition. Although the statute does not require covered entities to "maintain separate physical inventories for 340B drugs," Pl. Mot a 29, the statute does prevent certain covered entities from purchasing 340B drugs through group purchasing organizations. 42 U.S.C. § 256b(a)(4)(L)(iii). Separate inventories are simply one method that covered entities can use to separate 340B covered outpatient drugs from drugs dispensed to other patients. Covered entities that choose not to use separate inventories for 340B drugs and non-340B drugs "must have systems in place to be able to demonstrate that the covered entity is properly accounting for 340B purchases in a replenishment system." Pedley Decl. ¶ 12 (ECF No. 11-9).

Notably, the predicament that Plaintiff describes, where covered entities need to make an initial purchase at the wholesale acquisition cost is the result of the product replenishment model that the covered entities have voluntarily opted into. See generally, Pedley Decl. (ECF No. 11-9). The Agency never mandated that covered entities accept 340B price reductions through the product replenishment model, rather the Agency had become aware "through its program integrity initiatives" that covered entities had begun using the product replenishment model to purchase some 340B drugs through a group purchasing organization. Release No. 2013-1 (AR 087).

Plaintiff attempts to analogize the arrangement that it seeks to enter with the covered entities to the facts in *Abbott Laboratories v. Portland Retail Druggists Ass'n*, 425 U.S. 1 (1976). Pl. Mot. at 29-30. Although both this case and *Abbott Laboratories* concerned drug purchases, the similarities end there. *Abbott Laboratories*, 425 U.S. at 4, concerned whether the Nonprofit Institutions Act exempted various types of drug purchases by a non-profit hospital that would otherwise be subject to the Robinson-Patman Act. As Plaintiff notes, the Supreme Court held that

whether the exemption applied depended on the purpose for which the drug was dispensed, and the Court suggested various accounting methods that the hospital could use to track exempt and non-exempt inventory.  Pl. Mot. at 30 (citing *Abbott Laboratories*, 425 U.S. at 20-21).  But for *Abbott Laboratories* to be analogous to the system that Plaintiff seeks to adopt, the Court would need to have permitted a system where some drugs purchased at exempt prices were dispensed for purposes not subject to any of the exempt purposes, which would be the equivalent of dispensing drugs to 340B patients that were purchased through a group purchasing organization.  Because such a scenario was not discussed in *Abbott Laboratories*, the case does not support the position that Plaintiff seeks to advance in this litigation.

Accordingly, because the statute does not provide for exceptions to the group purchasing prohibition for purchases of 340B drugs made at the start of a product replenishment process, the 2013 Policy Release was not contrary to law.

## II.    The 2013 Policy Release Was Not a Legislative Rule.

The 2013 Policy Release clarifying the scope of the group purchasing prohibition was the Agency's interpretation of the statute, thus making it an interpretive rule.  *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) ("the critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers").  A legislative rule is one that has legal effect or, alternatively, one that an agency promulgates with the intent to exercise its delegated legislative power by speaking with the force of law." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020).  "[A] rule has such force only if Congress has delegated legislative power to the agency and if the agency intended to exercise that power in promulgating the rule." *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993).  A legislative rule also "creates new rights or

imposes new obligations on regulated parties or narrowly limits administrative discretion . . ." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015).

Indeed, "the line between interpretive and legislative rules is fuzzy and enshrouded in considerable smog." *Nat. Res. Def. Council*, 955 F.3d at 83. But the D.C. Circuit explained, "the question of whether a rule is legislative or interpretive turns on whether the purported interpretive rule has 'legal effect.'" *Am. Mining Cong*, 995 F.2d at 1112. Whether an interpretive rule has legal effect is determined by asking "(1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule." *Id.* A rule is legislative if any one of these questions is answered in the affirmative. *Id.* But here, the answer to all four questions is no.

The statute, by its plain text, prevents certain covered entity hospitals from obtaining 340B drugs through a group purchasing organization. 42 U.S.C. § 256b(a)(4)(L)(iii). The statute contains no exceptions for drugs purchased during the initial stage of a product replenishment process. *Id.* Release 2013-1 echoes the statutory restriction stating that the group purchasing prohibition is "violated upon use of a [group purchasing organization] to obtain covered outpatient drugs and cannot be fixed or cured by subsequently changing the characterization through accounting or other methods." Release 2013-1 (AR 087-88). The Agency's warning that covered entities who violate the group purchasing prohibition by replenishing group purchased drugs with 340B discounted drugs would be removed from the program is also consistent with the text of the statute. Release 2013-1 (AR 088). The prohibition on group purchasing is a condition precedent for hospitals to maintain their status as covered entities, and if a covered hospital took some action

that disqualified it from maintaining its status as a covered entity, then it would lose its statutory entitlement to benefit from the 340B Program.  See, 42 U.S.C. § 256b(a)(4)(L)(iii),

The 2013 policy did not modify any aspect of the 340B Program, rather, it reiterated the "longstanding position that a covered entity enrolled in the 340B Program subject to the [group purchasing] prohibition and listed on the [Office of Pharmacy Affairs] 340B database may not use [group purchasing] for covered outpatient drugs at any point in time."  Release 2013-1 (AR 086-87).  The Agency issued the 2013 guidance because questions about the group purchasing prohibition had arisen "as the marketplace has changed."  *Id*. (AR 086).  Specifically, the Agency had learned through its "program integrity initiatives" that covered entities had been using the product replenish model to skirt the prohibition.  *Id.* (AR 087-88).  The statute did not contain an exception for initial purchases made as part of a product replenishment process.  *Id.*  Covered entities that used a replenishment model needed to continue to comply with the group purchasing prohibition for all purchases and demonstrate their compliance with the prohibition through auditable records.  *Id*. (AR 088).  In short, because the statute itself provides the "legislative basis for enforcement action," a legislative rule is not necessary.  *Am. Mining Cong*., 995 F.2d at 1112.

The remaining questions in *Am. Mining Cong*., 995 F.2d at 1112 are even more easily answered in the negative.  The Agency has not published a rule in the Code of Federal Regulations. The Agency also has not "explicitly invoked its general legislative authority."  *Id.*  On the contrary, the Agency "lacks rulemaking authority over the section 340B program," and thus could not issue a legislative rule pertaining to the group purchasing prohibition.  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 459 (D.C. Cir 2021).  Finally, the Agency's decision does not "amend[] a prior legislative rule" because there is no prior legislative rule to amend.  *Am. Mining Cong*., 995

F.2d at 1112.  Accordingly, because Release 2013-1 was an interpretive rule, the Agency was not

required to promulgate it through notice and comment rulemaking.

III.    **The Agency's Refusal to Revoke the 2013 Policy or Exempt Plaintiff Was not Arbitrary and Capricious.**

The Agency's decision not to maintain the 2013 Policy Release and decline to  Plaintiff an

exemption to the Policy Release is not arbitrary and capricious.  5 U.S.C. § 706(2)(A); *Tourus*

*Records, Inc. v. Drug Enforcement Admin*., 259 F.3d 731, 736 (D.C. Cir. 2001).  Under the APA,

an agency action may be arbitrary and capricious if the agency offered an explanation for its

decision that runs counter to the evidence before the agency or is so implausible that it could not

be ascribed to a difference in view or agency expertise.  *Escobedo v. Green*, 602 F. Supp. 2d 244,

248 (D.D.C 2009) (*citing Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983)).  "As the Supreme Court has explained, 'the scope of review under the arbitrary and

capricious standard is narrow and a court is not to substitute its judgment for that of the agency.'"

*Id.*  Although the court's review under the "arbitrary and capricious" standard is "searching and

careful," it is also "narrow."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377-78 (1989); *see*

*also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  The ultimate question

under this narrow standard of review is whether the agency's action was reasonable.   *Fed.*

*Commc'n Comm'n v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009).  Here, the group

purchasing prohibition is an eligibility condition for certain hospitals to qualify as a covered entity.

42 U.S.C. § 256b(a)(4)(L)(iii).  Because the statute requires the Agency to enforce the prohibition,

the Agency's decision refusing to revoke the 2013 Policy Release or exempt Plaintiff's proposed

arrangement from the prohibition is reasonable and thus cannot be arbitrary and capricious.  AR

272.

Plaintiff argues that the Agency's application of the group purchasing prohibition to initial purchases of covered outpatient drugs frustrates the statute's purpose to help covered entities stretch their resources.  Pl. Mot. at 23 (citing H.R. Rep. No. 102-384, pt. 2, 12).  But the Court cannot overlook the text of the statute to determine whether a particular provision is consistent with the purpose of the statute.  As the Supreme Court explained, "the text of a law controls over purported legislative intentions unmoored from any statutory text.  The Court may not 'replace the actual text with speculation as to Congress' intent.'"  *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (*quoting, Magwood v. Patterson*, 561 U. S. 320, 334, (2010)); *see also, Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 79 (1998) ("the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").  A disproportionate share hospital that chooses to participate in the 340B program as a covered entity cannot purchase covered outpatient drugs through a group purchasing organization.   Release 2013-1 (AR 086-87) 42 U.S.C. § 256b(a)(4)(L)(iii).

Moreover, the legislative history demonstrates that Congress was aware that participating in group purchasing arrangements would be beneficial to covered entities but specifically sought to prevent covered entities from purchasing any 340B drugs through group purchasing organizations.  H.R. Rep. No. 102-384, pt. 2, at 14-15.  The House Energy and Commerce Committee recognized that disproportionate share hospitals could use group purchasing for non-340B purchases but explained that the eligibility criteria meant that the Secretary could not certify a disproportionate share hospital as a covered entity if "the hospital purchases any covered outpatient drug through a group purchasing organization or other group purchasing arrangement during the period for which certification is sought." *Id.*

To the extent this prohibition requires covered entities to pay higher upfront costs for initial purchases as part of a replenishment model, these higher costs are not due to the group purchasing prohibition but rather because the covered entity has chosen to opt into a product replenishment model.  Importantly, covered entities began using the product replenishment model of their own volition, not because the Agency required them to use this model.  Release 2013-1 (AR 087).  A covered entity need not accept an arrangement, like the product replenishment model, where it needs to make some purchases without the 340B discount.  *Id.*  A covered entity that meets the 340B eligibility criteria is supposed to be able to purchase covered outpatient drugs at the 340B price.  *Id.*  The Agency has advised covered entities that if they are unable to "purchase a covered outpatient drug at the 340B price, written notification should be sent to [the Office of Pharmacy Affairs] immediately detailing the covered outpatient drug(s) involved, the manufacturer, and the process by which the entity was notified that the purchase could not be made."  Release 2013-1 (AR 087).  The Agency "reviews all allegations brought to [its] attention to ensure compliance with program requirements."  *Id.*  A manufacturer's refusal to provide a 340B discount to a covered entity can result in enforcement actions including termination of the manufacturer's Pharmaceutical Pricing Agreement.  42 U.S.C. § 1396r-8(b)(4)(B)(v).

In short, to the extent that the Agency's enforcement of the group purchasing prohibition frustrates a covered entity's ability to obtain discounted drugs, a covered entity can remedy that problem itself by opting for a purchasing model other than the product replenishment model.  As just one potential solution, a covered entity could purchase all drugs that it intends to dispense to 340B patients by obtaining the 340B discount upfront.  Indeed, the Agency has long envisioned upfront discounts as the preferred 340B price reduction mechanism, noting that "[c]overed entities

generally preferred a discount system, because they could negotiate lower prices and needed less initial outlay of drug purchasing money."  62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997).

Plaintiff argues that the group purchasing prohibition is inconsistent with the "prudent buyer" principle that the government has adopted in other healthcare contexts.  Opp'n at 34.  But the statute does not mention the prudent buyer principle let alone suggest that it can be used to override the group purchasing prohibition for certain purchases by covered entities that are otherwise subject to the prohibition.  42 U.S.C. § 256b(a)(4)(L)(iii).  By invoking the prudent buyer principal, Plaintiff is asking the Court to consider a policy argument, but "policy concerns cannot trump the best interpretation of the statutory text."  *Patel v. Garland*, 596 U.S. 328, 346 (2022).  Moreover, it would be arbitrary and capricious for the Agency to "rel[y] on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Because the prudent buyer principle is not in the text of the statute Congress did not intend for the Agency to consider it and thus the Agency appropriately did not consider it.  Not only does Plaintiff not dispute that the prudent buyer principle lacks support in the text of the statute, but Plaintiff also relies on the Medicare Provider Reimbursement Manual to argue that the principle should apply here.  Pl. Mot at 34.   The manual concerns the Medicare program, not the 340B Program. See generally, CMS Provider Reimbursement Manual, I ("This manual provides guidelines and policies to implement Medicare regulations."),  https://www.cms.gov/regulations-and-guidance/guidance/manuals/paper-based-manuals-items/cms021929 (last visited May 6, 2025). Plaintiff cites no statutes, cases, or administrative materials that would suggest that the prudent buyer principle applies in the 340B context.

Plaintiff argues that the Agency allowed group purchasing for initial purchases prior to the 2013 guidance.  Pl. Mot. at 36.  Not so.  As early as 1994, the Agency advised hospitals subject to

the group purchasing prohibition that that if they participated in a group purchasing organization, "or other group purchasing arrangement for covered outpatient drugs, the [hospital] will no longer be an eligible covered entity and cannot purchase covered outpatient drugs at the section 340B discount prices." 59 Fed. Reg. 25,110, 25,111 (May 13, 1994) (AR 084). The guidance did not make exceptions for initial purchases of drugs as part of a product replenishment model. *Id.* The 1994 guidance also echoed the 2013 guidance in advising covered entities that the Agency would investigate and take enforcement action against any participating manufacturers that refuse to sell covered outpatient drugs at the 340B discount price. *Compare id.* at 25,111, *with* Release 2013-1 (AR 087). "This is the proper course for dealing with any manufacturer noncompliance rather than attempting to compensate for continued noncompliance by disregarding the statutory [group purchasing] provisions." 59 Fed. Reg. at 25,111 (AR 084).

In adopting the 1994 guidance, the Agency acknowledged that it had previously interpreted the statute to allow hospitals "to participate both in the section 340B discount program and also in a [group purchasing organization]". 58 Fed. Reg. 68,922, 68,924 (Dec. 29, 1993) (AR 079). But the Agency changed course and interpreted the statute to mean that a hospital that "participates in a group purchasing organization or arrangement for covered outpatient drugs, . . . will no longer be an eligible covered entity and cannot purchase covered outpatient drugs at the section 340B discount prices." *Id.* This is the interpretation that the Agency has maintained since 1994 because the group purchasing prohibition is a criterion for a disproportionate share hospital to qualify as a covered entity thus making literal application of the prohibition "more fully consistent with the legislative intent." *Id.* Congress sought to give hospitals a choice between benefitting from a 340B discount or a group purchasing discount, but the hospitals could not use both to purchase drugs dispensed to 340B eligible patients. H.R. Rep. No. 102-384, pt. 2, at 14-15. The Agency

added the section of the 2013 guidance pertaining to replenishment models because it had become

aware "through 340B Program integrity initiatives" that covered entities were using replenishment

models to obtain some 340B drugs through group purchasing.  Release 2013-1 (AR 087).  Because

the 2013 guidance merely clarifies the 1994 guidance, accepting Plaintiff's argument that the 2013

guidance should be set aside as arbitrary and capricious would require the Court to also set aside

the 1994 guidance and force the Agency to accept an interpretation that the Agency determined,

more than thirty years ago, was inconsistent with the text and legislative intent of the statute.  58

Fed. Reg. at 68,924 (AR 079).

Plaintiff claims that from "1994 to 2013, most hospitals used [group purchasing]-based

virtual inventory systems under which initial neutral inventory was purchased on a [group

purchasing] account without any indication from HRSA that such a system ran afoul of the

statute[.]"  Pl. Mot at 36.  In support of this assertion, Plaintiff cited to Frequently Asked Questions

that the Agency published in 2004.  See Disproportionate Share Hospitals, FAQs (Dec. 7, 2004)

(ECF No. 11-11).  But these FAQs do not support Plaintiff's assertion.  The FAQs do not mention

"initial neutral inventory" or product replenishment models.  *Id.*  The closest the guidance comes

is stating that the Agency "does not require separate inventories" while also suggesting that

covered entities maintain "separate purchasing and dispensing records."  *Id.*, Q-13.

Finally, Plaintiff argues that the Agency failed to provide an explanation for why it would

not grant Plaintiff an exception to the group purchasing prohibition.  Pl. Mot. at 38.  But the

Agency's reasons for denying Plaintiff an exception are self-explanatory, and "an agency does not

need to give even a 'minimal' explanation if the reason for a denial is self-explanatory."  *1306

Lounge, LLC v. SBA*, Civ. A. No. 22-3320 (RBW) 2024 U.S. Dist. LEXIS 219999, at *21 (D.D.C.

Dec. 5, 2024); *Roelofs v. Sec'y of Air Force*, 628 F.2d 594, 600 (D.C. Cir. 1980) ("There is an

exception to [5 U.S.C. § 555(e)] when the denial is 'self-explanatory.'").  Here, the Agency's decision is self-explanatory because the group purchasing prohibition is a criterion for a disproportionate share hospital to qualify as a covered entity and the statute does not vest the Agency with the authority to exempt some group purchasing organizations or covered entities from the criterion.  42 U.S.C. § 256b(a)(4)(L)(iii); see also, 58 Fed. Reg. at 68,924 (AR 079).  Because Plaintiff sought an exemption from a statutory criterion, the Agency's denial is in "such a form that its mere denial fully informs the party of all he would otherwise be entitled to have stated." *Roelofs*, 628 F.2d, at 600 n.33.

Under APA review, the question for this Court is whether the agency adequately explained its decision or if the decision "may be reasonably discerned."  *Bowman Transp., Inc. v. Ak.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 557 (D.C. Cir. 2022) ("We will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."); *see also CSL Plasma Inc. v. Customs & Border Prot.*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022) ("[A] brief explanation is not arbitrary and capricious just because of its brevity.").  Here, the Agency considered Plaintiff's reasons for why the Agency should revoke the 2013 Policy Release or grant Plaintiff an exemption from the requirements of the release, but found that taking either action would be inconsistent with the group purchasing prohibition.  AR 268, 271-72.  In other words, the Agency "considered all aspects of the problem" and "cataloged its concerns," and thus the Agency's decision was neither arbitrary nor capricious. *Am. Farm Bureau Fed'n v. EPA,* 559 F.3d 512, 527 (D.C. Cir. 2009).

*    *    *

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for summary judgment and grant summary judgment in Defendants' favor.

Dated: May 9, 2025

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney


By: _____/s/ John J. Bardo_____
JOHN J. BARDO, D.C. Bar #1655534
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 870-6770

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PREMIER, INC, <br><br>        Plaintiff, <br><br>   v. <br><br> HEALTH RESOURCES AND SERVICES ADMINISTRATION, et al. <br><br>        Defendants. | Civil Action No. 24-3116 (LLA) |

## **[PROPOSED] ORDER**

UPON CONSIDERATION of Plaintiff's Motion for Summary Judgment, Defendant's Opposition and Cross-Motion for Summary Judgment, and the entire record herein, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment is DENIED, it is

ORDERED that Defendant's Cross Motion for Summary Judgment is GRANTED, and it is further

ORDERED that summary judgment is granted in Defendant's favor.


SO ORDERED:


_____
Date

_____
LOREN L. ALIKHANN
United States District Judge